<table>
<tr><td>

DISTRICT COURT, COUNTY OF ADAMS,
STATE OF COLORADO
1100 Judicial Center Drive
Brighton, Colorado 80601

</td><td>

EFILED Document – District Court
CO Adams County District Court 17th JD
2011cv299
Filing Date: Mar  1 2011  4:41PM MST
Transaction ID: 36187172

</td></tr>
</table>

TYCO INTERNATIONAL LTD.,

        Plaintiff,

v.

CHARTIS INC. and NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA.,

        Defendants.

▲  COURT USE ONLY  ▲

Richard G. (Chip) Sander, #12504
SANDER INGEBRETSEN & WAKE, P.C.
1660 17th Street, Suite 450
Denver, Colorado 80202
Tel.: (303) 285-5300
Fax: (303) 285-5301
rsander@siwlegal.com

John H. Kazanjian, *pro hac vice* to be filed
Edward M. Grauman, *pro hac vice* to be filed
BEVERIDGE & DIAMOND, P.C.
477 Madison Avenue, 15th Floor
New York, New York 10022
Tel.: (212) 702-5400
Fax: (212) 702-5450
jkazanjian@bdlaw.com
egrauman@bdlaw.com

Case Number:

Division      Courtroom

## COMPLAINT AND JURY DEMAND

    Plaintiff Tyco International Ltd. ("Tyco"), by and through its undersigned attorneys, for its Complaint for declaratory and monetary relief against Defendants Chartis Inc. ("Chartis") and National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union"), alleges as follows:



EXHIBIT
A

## PRELIMINARY STATEMENT

1.      This is an insurance coverage action for declaratory and monetary relief in which Tyco seeks to enforce obligations that Defendants have failed to honor under an umbrella insurance policy issued by National Union to Tyco. The insurance policy covers damages awarded in several lawsuits against a former Tyco subsidiary. Tyco presented these suits to Defendants for coverage, but Defendants have wrongfully refused to fulfill their duty under the policy to pay the damages on behalf of Tyco. Tyco therefore seeks a judgment declaring that Defendants are obligated to pay on behalf of Tyco the sums awarded in these lawsuits that are within the limits of the policy. Tyco also seeks damages related to Defendants' breach of contract. Defendants' breach of the insurance contract was in bad faith and brought about by Defendants' willful and wanton conduct.

## THE PARTIES

2.      Tyco is a Switzerland corporation with its principal place of business in Scaffhausen, Switzerland. During the effective period of the insurance policy at issue Tyco was a Bermuda corporation with its principal place of business in Hamilton, Bermuda. During the policy period, Sonitrol Corporation and Sonitrol Management Corporation (collectively, "Sonitrol") were subsidiaries of Tyco.

3.      Upon information and belief, Chartis is a Delaware corporation with its principal place of business in New York. Upon information and belief, Chartis Claims, Inc., a division of Chartis, is the claims administrator for National Union. Upon information and belief, Chartis conducts continuous and systematic business activities in this State.

4.      Upon information and belief, National Union is a subsidiary of Chartis that is, and at all relevant times has been, a Pennsylvania corporation with its principal place of business in

- 2 -

New York. Upon information and belief, National Union conducts continuous and systematic business activities in this State.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over the subject matter of this Complaint pursuant to Article VI, sections 1 and 9(1), of the Colorado Constitution.

6.     This action involves a currently justiciable issue or an existing legal controversy.

7.     This Court has personal jurisdiction over Defendants.

8.     Venue is proper in this Court pursuant to C.R.C.P. 98(c).

## THE INSURANCE POLICY

9.     Tyco, in consideration of substantial premiums, purchased a commercial umbrella policy, no. BE 2195412, from National Union for the period October 1, 2002, to October 1, 2003 ("National Union Policy"). Sonitrol Corporation and Sonitrol Management Corporation were subsidiaries of Tyco as of the effective date of the National Union Policy and were covered by its terms. A copy of the National Union Policy, together with endorsements and declarations thereto, is attached hereto as Exhibit A.

10.     Pursuant to the terms of the National Union Policy, National Union has a duty to pay on behalf of Tyco sums that Tyco becomes legally obligated to pay because of bodily injury, property damage, personal injury, or advertising injury that takes place during the policy period and is caused by an occurrence happening anywhere in the world, as the relevant terms are defined in the National Union Policy, when the limits of underlying insurance coverage have been exhausted.

11.     Tyco's expectation was that the National Union Policy would cover payments for settlements or judgments arising out of lawsuits alleging liability for bodily injury, property

damage, personal injury, and advertising injury, in excess of the underlying insurance up to the limits of the National Union Policy.

## THE UNDERLYING LAWSUITS

12.     Sonitrol was named as a defendant in several lawsuits that were filed in the District Court of Adams County, Colorado, and later consolidated for trial. The suits are entitled <u>Core-Mark Midcontinent, Inc., et al. v. Sonitrol Corporation</u>, Civil Action No. 03-CV-3836, consolidated for trial with 04-CV-1978 and 04-CV-3625. These suits (collectively, the "Underlying Suits") form the basis of Tyco's insurance coverage claims in the instant action.

13.     Annexed hereto as Exhibits B through D, and incorporated by reference as if fully set forth herein, are copies of the complaints in each of the Underlying Suits.

14.     The Underlying Suits alleged, inter alia, that Sonitrol breached an alarm-monitoring-services contract with Core-Mark Midcontinent, Inc./Core-Mark International, Inc. (collectively, "Core-Mark") on the basis that Sonitrol failed to adequately install and monitor a burglar alarm system it installed in a warehouse owned by Core-Mark. In December 2002, burglars broke into the warehouse and eventually set fire to it, destroying the building and everything inside. In the Underlying Suits, Core-Mark and its insurers sought various forms of relief, including compensatory and punitive damages, attorney fees, and prejudgment interest.

15.     At trial, the jury found against Sonitrol and awarded plaintiffs over $18 million in damages.

16.     On August 24, 2010, the trial court entered judgment against Sonitrol in the amount of $18,314,508 together with prejudgment interest thereon.

17.     On September 21, 2010, the trial court entered a Final Entry of Judgment Including Prejudgment Interest and awarded prejudgment interest in the amount of $14,765,705, for a total judgment against Sonitrol in the amount of $33,080,213.

18.     On January 3, 2011, the trial court entered judgment against Sonitrol based on an award of attorney fees and costs in the amount of $1,030,943.36.

19.     Sonitrol has appealed the judgment in the Underlying Suits to the Colorado Court of Appeals. Those appeals are pending.

20.     As a result of the judgment, liability has been imposed against Tyco's former subsidiary Sonitrol because of property damage that took place during the policy period caused by an occurrence, as the relevant terms are defined in the National Union Policy.

21.     The sums awarded in the Underlying Suits are covered by the terms and conditions of the National Union Policy. Defendants are obligated to pay on behalf of Tyco those sums in excess of the underlying insurance limits.

## TYCO'S TENDER OF THE UNDERLYING SUITS AND DEFENDANTS' WRONGFUL REFUSAL OF COVERAGE

22.     Tyco fully and timely performed all conditions precedent to Defendants' obligations under the National Union Policy and tendered the Underlying Suits to Defendants, with proper notice.

23.     Despite Tyco's demand that they do so, Defendants have wrongfully and unreasonably refused to fulfill their obligations to Tyco in connection with the Underlying Suits tendered to them, which refusal has and will cause Tyco to incur substantial damages.

24.     In a letter dated February 17, 2011, a copy of which is annexed as Exhibit E hereto, Defendants denied coverage for the Underlying Suits tendered to Defendants under the National Union Policy.

- 5 -

25.     In a letter dated February 18, 2011, a copy of which is annexed as Exhibit F hereto, Tyco explained that Defendants' decision to deny coverage was clearly erroneous. Tyco requested that Defendants reevaluate their decision to deny coverage and acknowledge that Tyco was entitled to coverage for the Underlying Suits under the National Union Policy.

26.     Defendants continue to maintain their denial of coverage for the Underlying Suits.

27.     The insurer providing coverage underlying the National Union Policy ("Primary Insurer") has acknowledged its obligation to pay for the judgment in the Underlying Suits up to its policy limits.

28.     Upon information and belief, both National Union and the Primary Insurer are wholly-owned subsidiaries of the same parent company.

29.     As a result of Defendants' denial of coverage, Tyco will incur damages in excess of the insurance underlying the National Union Policy.

## COUNT ONE
### (Declaratory Judgment)

30.     Tyco hereby incorporates by reference paragraphs 1 through 29 above as if fully set forth herein.

31.     An actual and justiciable controversy presently exists between Defendants and Tyco concerning Defendants' aforesaid refusal to fulfill their obligations under the National Union Policy. Tyco is entitled to a declaration, pursuant to the Colorado Uniform Declaratory Judgments Law, §§ 13-51-101 to -115, C.R.S. ("Uniform Declaratory Judgments Law") and C.R.C.P. 57, adjudicating and decreeing Tyco's rights under the National Union Policy. The Uniform Declaratory Judgments Law provides that "its purpose is to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations; and it is to be liberally construed and administered." § 13-51-102, C.R.S. Because Defendants and Tyco

- 6 -

disagree as to the proper interpretation of the National Union Policy, a declaratory judgment will afford relief from the parties' uncertainty with respect to their rights, status, and other legal relations under the National Union Policy.

32.     Tyco is entitled to a declaration that Defendants are obligated by, and in accordance with, the National Union Policy to pay on behalf of Tyco sums awarded in the Underlying Suits.

## COUNT TWO
### (Breach of Contract)

33.     Tyco hereby incorporates by reference paragraphs 1 through 32 above as if fully set forth herein.

34.     Despite notice and demand upon Defendants to fulfill their obligations to Tyco in connection with the Underlying Suits tendered to them, Defendants have wrongfully denied coverage in material breach of their obligations to Tyco under the National Union Policy.

35.     Defendants' aforesaid denial of coverage constitutes a breach of contract for which Tyco is entitled to recover all damages it has suffered and will suffer as a result of such breach.

## COUNT THREE
### (Unreasonable Denial of Claim, §§ 10-3-1115, -1116, C.R.S.)

36.     Tyco hereby incorporates by reference paragraphs 1 through 35 above as if fully set forth herein.

37.     With respect to its claim for coverage for the Underlying Suits under the National Union Policy, Tyco is a "first-party claimant" as that term is defined in section 10-3-1115, C.R.S.

38.     Defendants' aforesaid denial of coverage was unreasonable.

39.     Pursuant to section 10-3-1116, C.R.S., Tyco is entitled to recover from Defendants two times the covered benefit under the National Union Policy as well as reasonable attorney fees and court costs.

## COUNT FOUR
### (Bad Faith Breach of Insurance Contract)

40.     Tyco hereby incorporates by reference paragraphs 1 through 39 above as if fully set forth herein.

41.     Defendants' aforesaid denial of coverage to Tyco was unreasonable under the circumstances.

42.     Defendants knowingly or recklessly disregarded the validity of Tyco's claim for coverage under the National Union Policy.

43.     Defendants' aforesaid denial of coverage constituted willful and wanton conduct purposefully committed by Defendants. Defendants must have realized that the aforesaid denial was done heedlessly and recklessly and without regard to consequences to, or the rights of, Tyco.

44.     Defendants' aforesaid refusal to fulfill its obligations to Tyco constitutes bad faith breach of insurance contract for which Tyco is entitled to recover all damages it has suffered and will suffer as a result of such breach.

**WHEREFORE,** Plaintiff Tyco respectfully requests judgment against Defendants:

A.     For a declaration that Defendants are obligated by and in accordance with the terms of the National Union Policy to pay on behalf of Tyco sums awarded in the Underlying Suits tendered to Defendants;

B.     For all damages Tyco has suffered and will suffer as a result of Defendants' breach of contract;

- 8 -

C.     For two times the covered benefit under the National Union Policy, pursuant to section 10-3-1116, C.R.S.;

D.     For all damages Tyco has suffered as a result of Defendants' bad faith breach of insurance contract;

E.     For Tyco's reasonable attorney fees, pursuant to sections 10-3-1116 and 13-17-102, C.R.S., and Tyco's taxable legal costs; and

F.     For such other and further relief as may be deemed just and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY OF ALL ISSUES SO TRIABLE.**

Dated: March 1, 2011

Respectfully submitted,

SANDER INGEBRETSEN & WAKE, P.C.

By: s/ Richard G. Sander
Richard G. (Chip) Sander, #12504

1660 17th Street, Suite 450
Denver, Colorado 80202
Tel.:  (303) 285-5300
Fax:  (303) 285-5301
rsander@siwlegal.com

Of Counsel:                        BEVERIDGE & DIAMOND, P.C.
John H. Kazanjian, *pro hac vice* to be filed
Edward M. Grauman, *pro hac vice* to be filed

477 Madison Avenue, 15th Floor
New York, New York 10022
Tel.:  (212) 702-5400
Fax:  (212) 702-5450
jkazanjian@bdlaw.com
egrauman@bdlaw.com

Attorneys for Plaintiff Tyco International Ltd.

# EXHIBIT A

EFILED Document – District Court
CO Adams County District Court 17th JD
2011cv299
Filing Date: Mar 1 2011 4:41PM MST
Transaction ID: 36187172

**AIG**   ## COMMERCIAL UMBRELLA DECLARATIONS

# NATIONAL UNION FIRE INSURANCE COMPANY
# OF PITTSBURGH, PA.

### A CAPITAL STOCK COMPANY

ADMINISTRATIVE OFFICES
70 PINE STREET, NEW YORK, N.Y. 10270-0150

**POLICY NUMBER:**   BE   2195412                    **RENEWAL OF:** 8713678

**PRODUCER NAME:**   MARSH GLOBAL BROKING, INC.

**ADDRESS:**   1166 AVE OF AMERICAS, 40TH FLR.
NEW YORK, NY 10036

**ITEM 1.**   **NAMED INSURED:**   TYCO INTERNATIONAL LTD

   **ADDRESS:**   9 WEST 57TH STREET
NEW YORK, NY 10019

**ITEM 2.**   **POLICY PERIOD:  FROM:** October 1, 2002      **TO:** October 1, 2003
AT 12:01 A.M. STANDARD TIME AT THE ADDRESS OF THE NAMED INSURED SHOWN ABOVE.

**ITEM 3.**   **LIMITS OF INSURANCE:**

The Limits of Insurance, subject to all the terms of this policy, are:

| | | |
|---|---|---|
| A. | $50,000,000 | Each Occurrence |
| B. | $50,000,000 | General Aggregate (in accordance with Section III. Limits of Insurance) |
| C. | $50,000,000 | Products-Completed Operations Aggregate (in accordance with Section III. Limits of Insurance) |
| D. | $25,000 | Self Insured Retention |

RECEIVED

MARSH USA INC.

**ITEM 4.**   **PREMIUM COMPUTATION**

| ESTIMATED EXPOSURE | RATE / PER | ADVANCE PREMIUM | MINIMUM PREMIUM |
|---|---|---|---|
| N/A | FLAT | $7,500,000.00 | $7,500,000.00 |

ITEM 5. ENDORSEMENTS ATTACHED: SEE ATTACHED SCHEDULE

NOTICE
APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE LAW, HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

COUNTERSIGNED _____
DATE

BY _____
**AUTHORIZED REPRESENTATIVE**

57696 (6/93)      2 - 13000

## FORMS SCHEDULE

**Named Insured:**     TYCO INTERNATIONAL LTD

**Policy Number:**     BE   2195412
**Effective 12:01 AM:**  October 1, 2002

| End't. No. | Form Name | Form Number/ Edition Date | |
|---|---|---|---|
| | COMM UMB DEC NAT UNION OF PA | 57696 | (06/93) |
| | COMM UMB POL FORM | 57697 | (06/93) |
| 1 | SCHEDULE OF UNDERLYING INSURANCE | MNSCPT | (10/02) |
| 2 | EMPLOYEE BENEFITS LIABILITY FOLLOW FORM | MNSCPT | (10/02) |
| 3 | CLAIMS MADE POLICY | MNSCPT | (10/02) |
| 4 | NAMED PERIL & TIME ELEMENT POLLUTION | MNSCPT | (10/02) |
| 5 | JOINT VENTURE CLAUSE | MNSCPT | (10/02) |
| 6 | RETAINED LIMIT AMENDEDMENT | MNSCPT | (10/02) |
| 7 | WAIVER OF SUBROGATION | 60417 | (05/94) |
| 8 | KNOWLEDGE OF OCCURRENCE | 62224 | (03/95) |
| 9 | NOTICE OF OCCURRENCE | 62223 | (03/95) |
| 10 | UNINTENTIONAL ERRORS AND OMISSIONS | 62222 | (03/95) |
| 11 | SPECIFIED PRODUCTS EXCL | 60442 | (05/94) |
| 12 | AIRCRAFT PRODUCTS AND GROUNDING EXCL | 57728 | (06/93) |
| 13 | NY AMENDATORY | 60593 | (06/94) |
| 14 | CRISIS RESPONSE AND EXCESS CASUALTY CRISIS FUND | 74641 | (12/99) |
| 15 | STATE OF FLORIDA UNINSURED MOTORISTS COVERAGE | MNSCPT | (10/02) |
| 16 | INDIANA UNINSURED MOTORISTS COVERAGE | 76670 | (09/00) |
| 17 | LA UNINSURED/UNDERINSURED MOTORIST BODILY INJURY C | 62596 | (06/98) |
| 18 | NH UNINSURED MOTORISTS COV | 62413 | (04/95) |
| 19 | VT UNINSURED MOTORISTS COVERAGE | 59264 | (05/94) |

**NOTICE:**   THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

CIFMSC
CI0226                  2 - 13000

**ENDORSEMENT NO. 1**

This endorsement, effective 12:01 AM: October 1, 2002

Forms a part of policy no.: BE   2195412

Issued to: TYCO INTERNATIONAL LTD

By: NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA.

### SCHEDULE OF UNDERLYING INSURANCE

| TYPE OF COVERAGE | INSURER POLICY DATE | LIMITS OF LIABILITY |
|---|---|---|
| Commercial General Liability (All other States) | American Home 10/1/02 - 10/1/03 | $5,000,000 Each Occurrence |
| Commercial General Liability (Canada) | American Home 10/1/02 - 10/1/03 | $5,000,000 Each Occurrence |
| Automobile Liability (All other States) | American Home 10/1/02 - 10/1/03 | $5,000,000 Combined Single Limit $5,000,000 Hired & Non-Owned Liability |
| Automobile Liability (Canada) | American Home 10/1/02 - 10/1/03 | $5,000,000 Combined Single Limit |
| Employers Liability (All Other States) | American Home 10/1/02 - 10/1/03 | $1,000,000 Each Accident $1,000,000 BI by Disease - Each Employee $1,000,000 BI by Disease - Policy Aggregate |
| Employers Liability (AR, FL, MA, TN, VA) | American Home 10/1/02 - 10/1/03 | $1,000,000 Each Accident $1,000,000 BI by Disease - Each Employee $1,000,000 BI by Disease - Policy Aggregate |
| Employers Liability (IL, LA) | American Home 10/1/02 - 10/1/03 | $1,000,000 Each Accident $1,000,000 BI by Disease - Each Employee $1,000,000 BI by Disease - Policy Aggregate |
| Employers Liability (NY, WI) | American Home 10/1/02 - 10/1/03 | $1,000,000 Each Accident $1,000,000 BI by Disease - Each Employee $1,000,000 BI by Disease - Policy Aggregate |
| Employers Liability (CA) | American Home 10/1/02 - 10/1/03 | $1,000,000 Each Accident $1,000,000 BI by Disease - Each Employee $1,000,000 BI by Disease - Policy Aggregate |

**NOTICE:** THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.
2 - 13000

ENDORSEMENT NO. 1    (Continued)

| | | |
|---|---|---|
| Employers Liability (NV, OR) | American Home 10/1/02 - 10/1/03 | $1,000,000 Each Accident<br>$1,000,000 BI by Disease - Each Employee<br>$1,000,000 BI by Disease - Policy Aggregate |
| Employers Liability (GA) | American Home 10/1/02 - 10/1/03 | $1,000,000 Each Accident<br>$1,000,000 BI by Disease - Each Employee<br>$1,000,000 BI by Disease - Policy Aggregate |
| Commercial General Liability (Puerto Rico) | American Home 10/1/02 - 10/1/03 | $5,000,000 Each Occurrence |
| Automobile Liability (Puerto Rico) | American Home 10/1/02 - 10/1/03 | $5,000,000 Combined Single Limit |
| Automobile Liability (Canada) Tyco Electronics only (38 vehicles) | PSA Insurance 1/31/01 - 1/31/02 | $2,000,000 Combined Single Limit |
| Healthcare Division - Product Liability Claims Made | MedMarc 10/1/02 - 10/1/03 | $5,000,000 Indemnity Only Each Occurrence |
| Self Insured Products Liability (Raychem Heat Tape Only) | Self-Insured 10/1/02- 10/1/03 | $5,000,000 Each Occurrence Indemnity Only |
| Foreign Liability | Winterthur 11/1/01 - 10/1/03 | $5,000,000 Each Occurrence |
| Owners & Contractors Protective Liability (OCIP) | American Home 10/1/02- 10/1/03 | $5,000,000 Each Occurrence |
| Railroad Protective Liability | American Home 10/1/02- 10/1/03 | $5,000,000 Each Occurrence |
| Owned & Non-Owned Aircraft Liability | National Union 11/1/01 - 11/1/02 | $100,000,000 Each Claim |
| P&I - Tyco/Volvo Around The World Yacht Race | TBD TBD | $100,000,000 Aggregate |

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.
2 - 13000

_____
**Authorized Representative or countersignature (where required by law)**

**ENDORSEMENT NO.2**  ✓

**This endorsement, effective 12:01 AM:**  October 1, 2002

**Forms a part of policy no.:**  BE    2195412

**Issued to:**  TYCO INTERNATIONAL LTD

**By:**  NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH,PA.

## EMPLOYEE BENEFITS LIABILITY FOLLOW-FORM ENDORSEMENT

This insurance does not apply  for those sums the  Insured shall become legally  obligated to pay as damages because of any claim made against the Insured due to any Wrongful Act of the Insured, or any other person for whose acts  the Insured is legally liable,  in the Administration of  the Insured's Employee Benefits Programs.

However, if insurance for such damages is provided by a policy listed in  the Schedule of Underlying Insurance:

1. This exclusion shall not apply, and

2. Except with  respect to  limits of  liability, retentions, deductibles,   cancellation/non-renewal,  duty to defend and premium,  this  insurance shall  follow  the  terms, conditions, and  exclusions  of  the  policy(ies) listed  in  the Schedule of  Underlying Insurance, and

3. The  insurance  provided  by our  policy   will not  be  broader  than  the  insurance coverage provided by the policy listed in the Schedule of Underlying Insurance.

' All other terms and conditions of this policy remain unchanged.

**NOTICE:**   THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT.  HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.
2 - 13000

**Authorized Representative**
**or countersignature (where required by law)**

**ENDORSEMENT NO. 3**

This endorsement, effective 12:01 AM:   October 1, 2002

Forms a part of policy no.:   BE    2195412

Issued to:   TYCO INTERNATIONAL LTD

By:   NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH,PA.


### FOLLOW-FORM ENDORSEMENT
### (CLAIMS MADE VERSION)

### PROVIDES CLAIMS MADE COVERAGE - PLEASE READ CAREFULLY

This insurance does not apply to Bodily Injury, Property Damage, Personal Injury or Advertising Injury arising out of:

Tyco Healthcare

However, if insurance for such Bodily Injury, Property Damage, Personal Injury or Advertising Injury is provided by a policy listed in the Schedule of Underlying Insurance:

1.   This exclusion shall not apply,

2.   The insurance provided by our policy will not be broader than the insurance *(Medmarc Policy)* coverage provided by the policy listed in the Schedule of Underlying Insurance.

3.   The insurance limit, provided by the policy listed in the Schedule of Underlying Insurance shall not be less than $5,000,000 for any occurrence and no aggregate.

4.   Solely as respects this endorsement, we will only provide coverage for a claim made against the Insured during our policy period.

If the insurance provided by the policy listed in the Schedule of Underlying Insurance provides coverage for Occurrences occurring on or after a specified Retroactive Date or for claims     made during an Extended Reporting Period, the insurance provided by our policy will also provide such coverage.


All other terms and conditions of this policy remain unchanged.

**NOTICE:**   THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.
2 - 13000

_____

**Authorized Representative
or countersignature (where required by law)**

ENDORSEMENT NO. 4

**This endorsement, effective 12:01 AM:** October 1, 2002

**Forms a part of policy no.:** BE 2195412

**Issued to:** TYCO INTERNATIONAL LTD

**By:** NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA.

## NAMED PERIL AND TIME ELEMENT POLLUTION ENDORSEMENT

Exclusion M. of this policy is hereby deleted in its entirety and replaced by the following:

This insurance does not apply to:

1. Bodily Injury, Property Damage or Personal Injury arising out of the actual or threatened discharge, dispersal, seepage, migration, release or escape of pollutants anywhere in the world,

2. Any loss, cost or expense arising out of any governmental direction or request that we, the Insured or any other person or organization test for, monitor, clean-up, remove, contain, treat, detoxify, neutralize or assess the effects of pollutants, or

3. Any loss, cost, or expense, including but not limited to costs of investigation or attorneys' fees, incurred by a governmental unit or any other person or organization to test for, monitor, clean-up, remove, contain, treat, detoxify or neutralize pollutants.

As used in this exclusion, pollutants mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste material. Waste material includes materials which are intended to be or have been recycled, reconditioned or reclaimed.

However, this exclusion does not apply to Bodily Injury, Property Damage or Personal Injury arising out of:

1. Any discharge, dispersal, seepage, migration, release or escape directly or indirectly caused by fire, explosion, lightning, windstorm, vandalism or malicious mischief, riot and civil commotion, flood, earthquake, collision, or upset of a motor vehicle, mobile equipment or aircraft, automatic sprinkler leakage,

2. The Products - Completed Operations Hazard, or

3. Any discharge, dispersal, seepage, migration, release or escape of pollutants that meets all of the following conditions:

**NOTICE:** THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.
2 - 13000

**ENDORSEMENT NO. 4**   (Continued) ✓

a.  It was accidental and neither expected nor intended by the Named Insured. This condition would not serve to deny coverage for a specific incident where such discharge, dispersal, seepage, migration, release or escape of pollutants was a result of an attempt by the Insured to mitigate or avoid a situation where substantial third party Bodily Injury, Property Damage or Personal Injury could occur, and

b.  It was demonstrable as having commenced on a specific date during the term of this policy, and

c.  Its commencement became known to the Named Insured within twenty (20) calendar days and was further reported to the Risk Management Department within a reasonable time frame, and

d.  Its commencement was reported in writing to us within eighty (80) calendar days of becoming known to the Risk Management Department, and

e.  Reasonable effort was expended by the Named Insured to terminate the situation as soon as conditions permitted.

However, nothing contained in this provision 3. shall operate to provide any coverage with respect to:

a.  Any site or location principally used by the Insured, or by others on the Insured's behalf, for the handling, storage, disposal, dumping, processing or treatment of waste material.

b.  Any fines or penalties.

c.  Any clean-up costs ordered by the Superfund Program, or any federal, state or local governmental authority. However, this specific exclusion c. shall not serve to deny coverage for third party clean-up costs otherwise covered by this endorsement simply because of the involvement of a governmental authority.

d.  Acid rain.

°e.  Clean-up, removal, containment, treatment, detoxification or neutralization of pollutants situated on premises the Insured owns, rents or occupies at the time of the actual discharge, dispersal, seepage, migration, release or escape of said pollutants, or

It is further agreed that solely as respects any coverage granted by this endorsement, the following shall apply to any occurrence which is covered by this policy but not covered by the underlying policies listed in the Schedule of Underlying Insurance or any other underlying insurance providing coverage to the Insured due to an exclusion(s) contained therein:

1.  The Self-Insured Retention in Item 3. D. of the Declarations is amended to $5,000,000

2.  In Section II, Defense, provision A. 2. is hereby deleted in its entirety, and

**NOTICE:**   THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.
2 - 13000

**ENDORSEMENT NO. 4**   (Continued)

3. We will not be obligated to assume charge of the investigation, settlement or defense of any claim made, suit brought or proceeding instituted against the Insured. We will, however, have the right and shall be given the opportunity to participate in the defense and trial of any claims, suits or proceedings relative to any Occurrence which, in our opinion, may create liability on our part under the terms of this policy. If we exercise such right, we will do so at our own expense.

It is further agreed that in the event of a disagreement as to the interpretation of this endorsement, the disagreement shall be submitted to binding arbitration before a panel of three (3) arbitrators. Within thirty (30) days of a written request for arbitration by either you or us, each party will choose an arbitrator. If the two (2) arbitrators are unable to agree within one (1) month upon the third arbitrator, such arbitrator shall at the request of either party be selected by the American Arbitration Association in accordance with its rules and procedures.

The parties shall submit their cases to the panel by written and oral evidence at a hearing time and place selected by the third arbitrator. The panel shall be relieved of all judicial formality, shall not be obligated to adhere to the strict rules of law or of evidence, shall seek to enforce the intent of the parties hereto and may refer to, but are not limited to, relevant legal principles. The decision of at least two (2) of the three (3) panel members shall be binding and final and not subject to appeal except for grounds of fraud and gross misconduct by the arbitrators. The award will be issued within thirty (30) days of the close of the hearings. Each party shall bear the expenses of its designated arbitrator and shall jointly and equally share with the other the expense of the third arbitrator and of the arbitration.

The arbitration proceedings shall take place in the state mentioned in Item I of the Declarations Page. The procedural rules applicable to this arbitration shall, except as provided otherwise herein, be in accordance with the Commercial Arbitration Rules of the American Arbitration Association.


All other terms and conditions of this policy remain unchanged.


**NOTICE:**   THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.
2 - 13000

**Authorized Representative
or countersignature (where required by law)**

**ENDORSEMENT NO.5**

**This endorsement, effective 12:01 AM:** October 1, 2002

**Forms a part of policy no.:** BE    2195412

**Issued to:** TYCO INTERNATIONAL LTD

**By:** NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH,PA.

## JOINT VENTURE CLAUSE

It is hereby agreed that such coverage as is afforded  by this policy shall also apply to the assured's liability arising  out of joint  venture, co-venture,  partnership (hereafter called  (" joint venture") but only to the extent of 100% of the assured's legal liability in such joint venture.

It is further agreed that such coverage as is afforded by this endorsement shall only apply excess of other valid and collectible  insurance, for the  full limits therein,  and then only for  such liabilities as are covered by such insurance.

All other terms and conditions of this policy remain unchanged.

**NOTICE:** THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT.  HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.
2 - 13000

**Authorized Representative**
**or countersignature (where required by law)**

**ENDORSEMENT NO.6**

This endorsement, effective 12:01 AM: October 1, 2002

Forms a part of policy no.: BE    2195412

Issued to: TYCO INTERNATIONAL LTD

By: NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH,PA.


## RETAINED LIMIT AMENDMENT ENDORSEMENT

1. In Section III.. Limits of Insurance  Paragraph E.. Retained Limit. is deleted in its entirety and replaced by the following:

    E.    Retained Limit

    We will be liable only for that portion of damages in excess of the Limits stated in the Schedule of Retained Limits attached to this policy and then up to the amount not exceeding the Each Occurrence Limits as stated in the Declarations. The Retained Limits shown in the attached Schedule shall apply whether or not the Insured maintains applicable underlying insurance.

    Coverage is limited to apply only in excess of the Retained Limits shown in the attached Schedule and only for those coverages for which a Retained Limit is shown. these Retained limits shall not include "Defense Expenses."

2. Section II.. Defense. is hereby deleted in its entirety and replaced by the following:

    II.    Defense

    A.    We shall have the right and duty to defend any claim or suit seeking damages covered by the terms and conditions of this policy when the applicable Limits shown in the Schedule of Related Limits have been exhausted by payment of claims to which this policy applies.

    B.    When we assume the defense of any claim or suit:

        1. ·    We will defend any suit against the Insured seeking damages on account of Bodily Injury. Property Damage. Personal Injury or Advertising Injury even if such suit is groundless. false or fraudulent. but we have the right to investigate. defend and settle the claim as we deem expedient.

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.
2 - 13000

2.   We will pay for the following:

    a.   premiums on bonds to release attachments for amounts not exceeding our Limits of insurance, but we are not obligated to apply or furnish any such bond,

    b.   premiums on appeal bonds required by law to appeal any claim or suit we defend, but we are not obligated to apply for or furnish any such bond,

    c.   all costs taxed against the Insured in any claim or suit we defend,

    d.   pre-judgement interest award against the Insured on the part of the judgement we pay. If we make an offer to pay the applicable Limit of Insurance, we will not pay any pre-judgement interest unless based on that period of time after the offer,

    e.   all interest that accrues after entry of judgement and before we have paid, offered to pay or deposited in court the part of the judgement that is within our applicable Limit of Insurance,

    f.   the Insured's expenses incurred at our request.

We will not defend any suit or claim after our applicable Limits of Insurance have been exhausted by payment of judgements or settlements.

All expenses we incur in the defense of any suit or claim are in addition to our Limits of Insurance.

C.   In all other instances except A. above, we will not be obligated to assume charge of the investigation, settlement or defense of any claim made, suit brought or proceeding instituted against the Insured. We will however, have the right and shall be given the opportunity to participate in the defense and trial of any claims, suits or proceedings relative to any Occurrence which, in our opinion, may create liability on our part under the terms of this policy. If we exercise such right, we will do so at our own expense.

3. Additional Definition

"Defense Expenses" means a payment allocated to a specific loss, claim or suit for its investigation, settlement or defense, including but not limited to:

    a.   attorneys' fees and all other investigation, loss adjustment and litigation expenses,

    to release attachments,

NOTICE:   THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.
2 - 13000

c.   premiums on appeal bonds required by law to appeal any claim or suit,

d.   costs taxed against the Insured in any claim or suit,

e.   pre-judgement interest awarded against the Insured,

f.   interest that accrues after entry of judgement.

4. Section III., Limits of Insurance B. and D. are hereby deleted in their entirety and replaced by the following:

B.   The General Aggregate Limit is the most we will pay for all damages covered under Insuring Agreement 1 except:

1. Damages included in the Products-Completed Operations Hazard, and

2. Coverages included in the policies listed in the Schedule of Retained Amounts applicable t claims or suits resulting from the Ownership, use or maintenance of an auto.

D.   Subject to B. and C. above. whichever applies, the Each Occurrence Limit is the most we will pay for the sum of damages covered under Insuring Agreement I because of all Bodily Injury, Property Damage, Personal Injury and Advertising Injury arising out of any one Occurrence.

If the applicable limits of Insurance of the policies listed in the Schedule of Retained Amounts or of other Insurance providing coverage to the Insured are reduced or exhausted by payment of one or more claims that would be insured by our policy, we will:



1.   In the event of reduction, pay in excess of the reduced Underlying Limits of Insurance, or

2.   In the event of exhaustion of the Underlying Limits of Insurance, continue in force as Underlying Insurance.

The Limits of Insurance of this policy apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations. unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the preceding period for purposes of determining the Limits of Insurance.

5. Section IV Definitions, Paragraph E, Item 1.) b.) 2.) and Item 4.), are hereby deleted in their entirety.

6. Section IV Definitions, Paragraph E. Item 9. is hereby added to the policy:

NOTICE:   THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

2 - 13000

9.     Any person or organization to whom you become obligated to include as an additional insured under this policy, as a result of any contract or agreement you enter into which requires you to furnish insurance to that person or organization of the type provided by this policy, but only with respect to liability arising out of you operations or premises owned by or rented to you. However, the insurance provided will not exceed the lesser of:

1.     The coverage and/or limits of this policy, or

2.     The coverage and/or limits required by said contract or agreement.

7. Section V. Exclusion J., is hereby deleted in its entirety.

8. Section VI. Conditions Items I. is hereby deleted in its entirety. *Maintance of U/L policies*

9. Section VI. Conditions Item P. is hereby deleted in its entirety and replaced by the following:

P. When Loss is Payable

Coverage under this policy will not apply unless and until the Insured is obligated to pay the Retained Limit.

When the amount of loss has finally been determined, we will promptly pay on behalf of the Insured the amount of loss falling within the terms of this policy.

You shall promptly reimburse us for any amount within the Self Insured Retention paid by us on behalf of an Insured.

All other terms and conditions of this policy remain unchanged.

**NOTICE:**   THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.
2 - 13000

_____
**Authorized Representative
or countersignature (where required by law)**

## ENDORSEMENT No. 7

**This endorsement, effective 12:01 AM:**  October 1, 2002

**Forms a part of policy no.:** BE     2195412

**Issued to:**  TYCO INTERNATIONAL LTD

**By:**  NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH,PA.

### WAIVER OF SUBROGATION

In the event of any payment under this policy for a loss for which you have waived the right of recovery in a written contract entered into prior to the loss, we hereby agree to also waive our right of recovery. This waiver shall only apply with respect to a loss occurring due to operations undertaken as per the specific contract in which you waived the right of recovery.

NOTICE: All other terms and conditions of this policy remain unchanged.

APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.
60417 (5/94)          2 - 13000

AUTHORIZED REPRESENTATIVE

ENDORSEMENT No. 8

**This endorsement, effective 12:01 AM:** October 1, 2002

**Forms a part of policy no.:** BE    2195412

**Issued to:** TYCO INTERNATIONAL LTD

**By:** NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH,PA.

### KNOWLEDGE OF OCCURRENCE ENDORSEMENT

As respects any loss reporting requirements under this policy, it is understood and agreed that knowledge of an accident or incident by an agent, servant or employee of yours or any other person shall not in itself constitute knowledge by you, unless a corporate officer of yours shall have received notice from said agent, servant, employee or any other person.

All other terms, conditions and exclusions remain the same.

**NOTICE:**   THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT.  HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.
62224 (3/95)         2 - 13000
LI0276

AUTHORIZED REPRESENTATIVE

**ENDORSEMENT No. 9**

**This endorsement, effective 12:01 AM:** October 1, 2002

**Forms a part of policy no.:** BE    2195412

**Issued to:** TYCO INTERNATIONAL LTD

**By:** NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH,PA.

## NOTICE OF OCCURRENCE ENDORSEMENT

Your failure to give first report of a claim to us shall not invalidate coverage under this policy if the loss was inadvertently reported to another Insurer. However, you shall report any such **Occurrence** to us within a reasonable time once you become aware of such error.

All other terms, conditions and exclusions remain the same.

**NOTICE:**  THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.
2223 (3/95)          2 - 13000
H027

**AUTHORIZED REPRESENTATIVE**

ENDORSEMENT No. 10

**This endorsement, effective 12:01 AM:**  October 1, 2002

**Forms a part of policy no.:** BE    2195412

**Issued to:**  TYCO INTERNATIONAL LTD

**By:**  NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH,PA.


## UNINTENTIONAL ERRORS OR OMISSIONS ENDORSEMENT


Your failure to disclose all hazards existing as of the inception date of the policy shall not prejudice you with respect to the coverage afforded by this policy provided such failure or any omission is not intentional.


All other terms and conditions of this policy remain unchanged.


**AUTHORIZED REPRESENTATIVE**

**NOTICE:** ·THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

2222 (03/95)          2 - 13000
LH0273

## ENDORSEMENT No. 11

**This endorsement, effective 12:01 AM:**  October 1, 2002

**Forms a part of policy no.:**  BE    2195412

**Issued to:**  TYCO INTERNATIONAL LTD

**By:**  NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH,PA.

### SPECIFIED PRODUCTS EXCLUSION

This insurance does not apply to **Bodily Injury** or **Property Damage** included in the **Products-Completed Operations Hazard** and arising out of **your products** listed below:

THIMEROSAL (TMS), OR ANY MERCURY-BASED PRESERVATIVE USED IN VACCINES

All other terms, conditions and exclusions remain the same.

**NOTICE:**  THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.
80442 (5/94)          2 - 13000
LH0060

**AUTHORIZED REPRESENTATIVE**

## ENDORSEMENT No. 12

**This endorsement, effective 12:01 AM:** October 1, 2002

**Forms a part of policy no.:** BE    2195412

**Issued to:** TYCO INTERNATIONAL LTD

**By:** NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA.

### AIRCRAFT PRODUCTS AND GROUNDING EXCLUSION

This insurance does not apply to **Bodily Injury** or **Property Damage** arising out of the **Products-Completed Operations Hazard** relating to:

1.  Aircraft (including missiles or spacecraft) and any ground support or control equipment used therewith;

2.  Any other goods or products manufactured, sold, handled or distributed by the **Insured** or any services provided or recommended by the **Insured** or by others trading under the **Insured's** name for use in the manufacture, repair, operation or use of any aircraft; or

3.  Any articles furnished by the **Insured** or by others trading under the **Insured's** name and installed in aircraft or used in connection with aircraft or for spare parts for aircraft including but not limited to ground handling tools and equipment, training aids, instructions, manuals, blueprints, engineering or other advice or service relating to aircraft and any labor relating to such aircraft or articles.

It is further agreed that this insurance does not apply to **Bodily Injury** or **Property Damage** arising out of the grounding of any aircraft.

For the purposes of this endorsement, "grounding" means the withdrawal of one or more aircraft from flight operations or the imposition of speed, passenger or load restrictions on such aircraft by reason of the existence of or alleged or suspected existence of any defect, fault or condition in such aircraft, or any part thereof sold, handled or distributed by the **Insured** or manufactured, assembled or processed by any other person or organization according to specifications, plans, suggestions, orders or drawings of the **Insured** or with tools, machinery or other equipment furnished to such persons or organizations by the **Insured**, whether such aircraft so withdrawn are owned or operated by the same or different persons, organizations or corporations. A grounding shall be deemed to commence on the date of an **Occurrence** which discloses such condition or on the date an aircraft is first withdrawn from service on account of such condition, whichever occurs first.

All other terms and conditions of this policy remain unchanged.

**NOTICE:** THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.
57728 (6/93)        2 - 13000

AUTHORIZED REPRESENTATIVE

This endorsement, effective 12:01 AM:  October 1, 2002

Forms a part of policy no.:  BE    2195412

Issued to:  TYCO INTERNATIONAL LTD

By:  NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH,PA.

### COMMERCIAL UMBRELLA

### NEW YORK AMENDATORY ENDORSEMENT

In Section VI, Conditions, Condition D, Cancellation, is hereby deleted in its entirety and replaced by the
following:

**D.**     Cancellation, Nonrenewal And Conditional Renewal By Us.

   **1.**     You may cancel the policy. You must mail or deliver advance written notice to us stating
when the cancellation is to take effect. The policy period will end on the day and hour
stated in such notice or on the day and hour of surrender.

   **2.**     New policies in effect for sixty (60) days or less.

   We may cancel this policy. If we cancel because of non-payment of premium, we must
mail or deliver to you and your authorized insurance agent or broker not less than fifteen
(15) days advance written notice stating when the cancellation is to take effect. If we
cancel for any other reason, we must mail or deliver to you and your authorized insurance
agent or broker not less than ninety (90) days advance written notice stating when the
cancellation is to take effect. Mailing that notice to you at your mailing address shown in
Item 1 of the Declarations will be sufficient to prove notice. Notice shall specify the
grounds for cancellation.

   **3.**     New policies in effect for more than sixty (60) days and any renewal policy.

   This policy may be cancelled by us by mailing or delivering to you and to your authorized
insurance agent or broker, written notice stating when not less than fifteen (15) days
thereafter the cancellation shall be effective; however, such cancellation must be based on
one or more of the following:

      **a.**     nonpayment of premium;

      **b.**     conviction of a crime arising out of acts increasing the hazard insured against;

      **c.**     discovery of fraud or material misrepresentation in the obtaining of the policy or in
the presentation of a claim thereunder;

      **d.**     after issuance of the policy or after the last renewal date, discovery of an act or
omission, or a violation of any policy condition, that substantially and materially
increases the hazard insured against, and which occurred subsequent to inception of
the current policy period;

      **e.**     material change in the nature or extent of the risk, occurring after issuance or last
annual renewal anniversary date of the policy, which causes the risk of loss to be
substantially and materially increased beyond that contemplated at the time the
policy was issued or last renewed;

      f.     a determination by the New York Superintendent of Insurance ... premium volume would jeopardize our solvency or ... our insureds, our creditors or the public;

**NOTICE:**  THESE POLICY FORMS AND THE
APPLICABLE RATES ARE EXEMPT FROM THE
REQUIREMENTS OF THE NEW YORK INSURANCE
DEPARTMENT.  HOWEVER, THE POLICY FORMS
MUST MEET THE MINIMUM STANDARDS OF THE NEW
YORK INSURANCE LAW AND REGULATIONS.

60593 (06/94)     2 - 13000               Page  of 3

g. a determination by the New York Superintendent of Insurance that the continuation of the policy would violate, or would place us in violation of, any provision of the New York Insurance Law;

h. revocation or suspension of an **Insured's** license to practice his profession; or

i. where we have reason to believe that there is a probable risk or danger that you will destroy or permit the destruction of the insured property for the purpose of collecting the insurance proceeds, provided, however, that:

1) a notice of cancellation on this ground shall inform you in plain language that you must act within ten days if review by the department of the ground for cancellation is desired pursuant to item (3) of this subparagraph i.;

2) notice of cancellation on this ground shall be provided simultaneously by us to the department; and

3) upon your written request made to the department within ten days from your receipt of notice of cancellation on this ground, the department shall undertake a review of the ground for cancellation to determine whether or not we have satisfied the criteria for cancellation specified in this subparagraph; if after such review the department finds no sufficient cause for cancellation on this ground, the notice of cancellation on this ground shall be deemed null and void.

Our notice of cancellation shall specify the grounds for cancellation.

4. The policy period will end on the day and hour stated in the cancellation notice.

5. If we cancel, final premium will be calculated pro rata based on the time this policy was in force. Final premium will not be less than the pro rata share of the Minimum Premium as shown in Item 4 of the Declarations.

6. If you cancel, final premium will be more than pro rata; it will be based on the time this policy was in force and increased by our short rate cancellation table and procedure. Final premium will not be less than the short rate share of the Minimum Premium as shown in Item 4 of the Declarations.

7. Premium adjustment may be made at the time of cancellation or as soon as practicable thereafter but the cancellation will be effective even if we have not made or offered any refund due you. Our check or our representative's check, mailed or delivered, shall be sufficient tender of any refund due you.

8. The first **Named Insured** in Item 1 of the Declarations shall act on behalf of all other **Insureds** with respect to the giving and receiving of notice of cancellation and the receipt of any refund that may become payable under this policy.

9. Any of these provisions that conflict with a law that controls the cancellation of the insurance in this policy is changed by this statement to comply with that law.

10. We shall mail to you and to your authorized insurance agent or broker, written notice indicating our intention:

a. not to renew this policy;

**NOTICE:** THE PREMIUMS IN FORMS APPLICABLE RATES ARE EXEMPT FROM REQUIREMENTS OF THE RATING OR ULTIMATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

...change of limits, change in type of coverage, reduction of coverage, increased deductible or addition of exclusions or upon increased ...percent; (exclusive of any premium increase generated ...re units or as a result of experience rating, loss

60593 (06/94) 2 - 13000 Page 2 of 3

c. that the policy will not be renewed or will not be renewed upon the same terms, conditions or rates; such alternative renewal notice must be mailed or delivered on a timely basis and advise you that a second notice shall be mailed at a later date indicating our intention as specified in subparagraph a. or b. of this paragraph 10. and that coverage shall continue on the same terms, conditions and rates as expiring, until the later of the expiration date or sixty (60) days after the second notice is mailed or delivered; such alternative renewal notice also shall advise you of the availability of loss information and, upon written request, we shall furnish such loss information within twenty days to you.

11. A nonrenewal notice as specified in subparagraph a., a conditional renewal notice as specified in subparagraph b., and the second notice described in subparagraph c. of paragraph 10. shall contain the specific reason or reasons for nonrenewal or conditional renewal, and set forth the amount of any premium increase and nature of any other proposed changes.

12. The notice required by paragraph 10. shall be mailed at least sixty (60) but not more than one hundred twenty (120) days in advance of the end of the policy period.

13. If we employ an alternative renewal notice as authorized by subparagraph c. of paragraph 10. we shall provide coverage on the same terms, conditions, and rates as the expiring policy, until the later of the expiration date of sixty (60) days after the mailing of the second notice described in such subparagraph.

14. Prior to the expiration date of this policy, in the event that an incomplete or late conditional renewal notice or a late nonrenewal notice is provided by us, the policy period shall be extended, at the same terms and conditions as the expiring policy and at the lower of the current rates or the prior period's rates, until sixty (60) days after such notice is mailed, unless you elect to cancel sooner.

15. In the event that a late conditional renewal notice or a late nonrenewal notice is provided by us on or after the expiration date of the policy, coverage shall remain in effect on the same terms and conditions of the expiring policy for another required policy period, and at the lower of the current rates or the prior period's rates unless you during the additional required policy period have replaced the coverage or elect to cancel, in which event such cancellation shall be on a pro rata premium basis.

16. Nothing herein shall be construed to limit the grounds for which we may lawfully rescind this policy or decline to pay a claim under this policy.

17. Notice required herein to be mailed to you shall be mailed to you at the address shown in Item 1 of the Declarations.

18. Notice required herein to be mailed by us shall be sent by registered, certified or other first class mail. Delivery of written notice shall be equivalent to mailing.

19. Proof of mailing of such notice as aforesaid shall be sufficient proof of notice. The policy period shall terminate at the effective date and hour of cancellation or nonrenewal specified in such notice.

All other terms and conditions of this policy remain unchanged.

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

AUTHORIZED REPRESENTATIVE

60593 (06/94)     2 - 13000          Page 3 of 3

**ENDORSEMENT No. 14**

**This endorsement, effective 12:01 AM:** October 1, 2002

**Forms a part of policy no.:** BE    2195412

**Issued to:**  TYCO INTERNATIONAL LTD

**By:**  NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH,PA.

Commercial Umbrella Policy

**CrisisResponse** <sup>SM</sup> **and Excess Casualty CrisisFund** <sup>SM</sup>

**(Advancement of CrisisResponse Costs during a Crisis Management Event and
Crisis Communications Management Insurance)**

---

**Additional Declarations**

**Item 1. CrisisResponse Sublimit of Insurance:** $250,000          **Each Crisis Management
Event And Aggregate**

**Item 2. Crisis Management Limit of Insurance:** $50,000          **Each Crisis Management
Event And Aggregate**

**Item 3. Premium:**                              -0-

---

This policy is amended to provide for Advancement of **CrisisResponse Costs** during a **Crisis
Management Event** and Crisis Communications Management Insurance pursuant to the terms,
definitions, conditions and exclusions set forth below:

| **I.** | **INSURING AGREEMENTS-CrisisResponse and Excess Casualty CrisisFund** |

The following insuring agreements section is added to this policy for the purpose of the coverage
provided by this endorsement:

**A.    Advancement of CrisisResponse Costs during a Crisis Management Event**

We will advance on behalf of the **Named Insured CrisisResponse Costs** that may be
associated with damages covered by this policy arising from a **Crisis Management Event**
first commencing during the Policy Period, up to the amount of the **CrisisResponse
Sublimit of Insurance.**

We will advance **CrisisResponse Costs** that may be associated with damages covered by
this policy directly to third parties.

**B.    Crisis Communications Management Insurance**

We will pay on behalf of the **Named Insured Crisis Management Loss** arising from a
~~Crisis Management Event first comm~~encing during the Policy Period, up to the amount
of the **Crisis Management Limit of Insurance.**

**NOTICE:**  THESE POLICY FORMS AND THE
APPLICABLE RATES ARE EXEMPT FROM THE FILING
REQUIREMENTS OF THE NEW YORK STATE INSURANCE
DEPARTMENT. HOWEVER, SUCH FORMS AND RATES
MUST MEET THE MINIMUM STANDARDS OF THE NEW
YORK INSURANCE LAW AND REGULATIONS.

74641 (12/99)      2 - 13000        1999 American International Group, Inc.                    Page **1** of 5

C.   A **Crisis Management Event** shall first commence at the time during the Policy Period when a **Key Executive** first becomes aware of an **Occurrence** that gives rise to a **Crisis Management Event** and shall end at the earliest of the time when we determine that a crisis no longer exists or when the **CrisisResponse Sublimit of Insurance** and/or the **Crisis Management Limit of Insurance**, whichever applies, has been exhausted.

D.   There shall be no Retained Limit applicable to **CrisisResponse Costs** or **Crisis Management Loss**. We shall pay such **CrisisResponse Costs** or **Crisis Management Loss** from first dollar, subject to the other terms and conditions of this endorsement.

## II.   LIMITS OF INSURANCE

The following provisions are added to Section III. Limits of Insurance for the purpose of the coverage provided by this endorsement:

A.   The **CrisisResponse Sublimit of Insurance** is the most we will pay for all **CrisisResponse Costs** under this policy, regardless of the number of **Crisis Management Events** first commencing during the Policy Period. This **CrisisResponse Sublimit of Insurance** shall be part of, not in addition to, the Limits of Insurance shown in Item 3 of the Declarations of this policy.

B.   The **Crisis Management Limit of Insurance** is the most we will pay for all **Crisis Management Loss** under this policy, regardless of the number of **Crisis Management Events** first commencing during the Policy Period. This **Crisis Management Limit of Insurance** shall be in addition to the Limits of Insurance shown in Item 3 of the Declarations of this policy.

C.   We will have no obligation to advance **CrisisResponse Costs** or to pay **Crisis Management Loss** from the earliest of the time when we determine that a **Crisis Management Event** has ended or when the **CrisisResponse Sublimit of Insurance** and/or the **Crisis Management Limit of Insurance**, whichever applies, has been exhausted.

## III.   DEFINITIONS

The following definitions are added to Section IV. Definitions for the purpose of the coverage provided by this endorsement:

A.   **Crisis Management Event** means an **Occurrence** that in the good faith opinion of a **Key Executive** of the **Named Insured**, in the absence of **Crisis Management Services**, has reasonably been associated with or may be associated with:

   1.   damages covered by this policy that are in excess of the Retained Limit applicable to such damages; and

   2.   significant adverse regional or national media coverage.

**Crisis Management Event** shall include, without limitation, man-made disasters such as explosions, major crashes, multiple deaths, burns, dismemberment, traumatic brain injury, permanent paralysis, or contamination of food, drink or pharmaceuticals.

B.   **Crisis Management Firm** means any public relations firm or crisis management firm approved by us that is hired by the **Named Insured** to perform **Crisis Management Services** in connection with a **Crisis Management Event**. Attached to and forming a part of this endorsement is a Schedule of firms that have been pre-approved by us and may be hired by the **Named Insured** without further approval by us.

**NOTICE:** APPLICABLE RATES THESE POLICY FORMS AND THE REQUIREMENTS OF ARE EXEMPT FROM THE FILING OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

C.   **Crisis Management Limit of Insurance** means the Crisis Management Limit of Insurance shown in Item 2 of the Additional Declarations of this endorsement.

D.   **Crisis Management Loss** means the following amounts incurred during a **Crisis Management Event**:

   1.   Amounts for the reasonable and necessary fees and expenses incurred by a **Crisis Management Firm** in the performance of **Crisis Management Services** for the **Named Insured** solely arising from a covered **Crisis Management Event**; and

   2.   Amounts for reasonable and necessary printing, advertising, mailing of materials, or travel by directors, officers, employees or agents of the **Named Insured** or a **Crisis Management Firm** incurred at the direction of a **Crisis Management Firm**, solely arising from a covered **Crisis Management Event**.

E.   **Crisis Management Service** means those services performed by a **Crisis Management Firm** in advising the **Named Insured** on minimizing potential harm to the **Named Insured** from a covered **Crisis Management Event** by maintaining and restoring public confidence in the **Named Insured**.

F.   **CrisisResponse Costs** means the following reasonable and necessary expenses incurred during a **Crisis Management Event** directly caused by a **Crisis Management Event**, provided that such expenses have been pre-approved by us and may be associated with damages that would be covered by this policy:

   1.   Medical expenses;

   2.   Funeral expenses;

   3.   Psychological counseling;

   4.   Travel expenses;

   5.   Temporary living expenses:

   6.   Expenses to secure the scene of a **Crisis Management Event**; and

   7.   Any other expenses pre-approved by the Company.

   **CrisisResponse Costs** will not include defense costs or **Crisis Management Loss**.

G.   **CrisisResponse Sublimit of Insurance** means the CrisisResponse Sublimit of Insurance shown in Item 1 of the Additional Declarations of this endorsement.

H.   **Key Executive** means the Chief Executive Officer, Chief Operating Officer, Chief Financial Officer, President, General Counsel or general partner (if the **Named Insured** is a partnership) of the **Named Insured** or sole proprietor (if the **Named Insured** is a sole proprietorship). A **Key Executive** also means any other person designated as such and scheduled by written endorsement.

---

| **IV.   EXCLUSIONS** |
|---|

The following exclusions are added to Section V. Exclusions for the purpose of the coverage provided by this endorsement:

This insurance shall not apply to any CrisisResponse Costs or Crisis Management Loss in connection with a **Crisis Management Even**t:

**NOTICE:**   THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

A.   arising out of, based upon or attributable to the acts alleged, or to the same or related acts alleged or contained, in any crisis or claim that has been reported, or in any circumstances where notice has been given, under any policy of which (i) this policy is a renewal or replacement or which it may succeed in time, or (ii) any underlying policy, which is listed in the Schedule of Underlying Insurance, is a renewal or replacement or which it may succeed in time;

B.   arising out of, based upon or attributable to any pending or prior crisis, claim, or **Suit** as of the inception date of this policy;

C.   arising directly or indirectly out of:

   1.   any actual or alleged failure, malfunction or inadequacy of:

      a.   any of the following, whether belonging to any **Named Insured** or to others:

         (1)   computer hardware, including microprocessors;

         (2)   computer application software;

         (3)   computer operating systems and related software;

         (4)   computer networks;

         (5)   microprocessors (computer chips) not part of any computer system; or

         (6)   any other computerized or electronic equipment or components; or

      b.   any other products, and any services, data or functions that directly or indirectly use or rely upon, in any manner, any of the items listed in Paragraph C1a of this exclusion

      due to the inability to correctly recognize, process, distinguish, interpret or accept the year 2000 and beyond.

   2.   any advice, consultation, design, evaluation, inspection, installation, maintenance, repair, replacement or supervision provided or done by or on behalf of the **Insured** to determine, rectify or test for any potential or actual problems described in Paragraph C1 of this exclusion.

---

| V. | CONDITIONS |
|---|---|

The following conditions are added to Section VI. Conditions for the purpose of the coverage provided by this endorsement:

A.   You must report any **Crisis Management Event** to us within twenty-four (24) hours of the time that a **Key Executive** first becomes aware of an **Occurrence** that gives rise to a **Crisis Management Event** to be eligible for the advancement of **CrisisResponse Costs** and the payment of **Crisis Management Loss.**

Notice of a **Crisis Management Event** may be given by calling 1-877-AIG-3100. If notice is given by telephone, written notice shall be given as soon as practicable thereafter. Written notice should include:

    ... **Crisis Management Event** is taking or took place;

    2.   the names and addresses of any injured persons and any witnesses; and

    ... of any injury or damage arising out of the **Crisis Management Event.**

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

Written notice should be mailed or delivered to:

AIG Excess Casualty Claim Department
70 Pine Street
New York, NY 10270

EFILED Document – District Court
CO Adams County District Court 17th JD
2011cv299

B.   There shall be no requirement that you obtain prior written approval from us before incurring any **Crisis Management Loss**, provided that the **Crisis Management Firm** selected by you to perform the **Crisis Management Services** has been approved by us. If you choose to retain a firm that does not appear in the Schedule attached to and forming a part of this endorsement, you must obtain our consent, which shall remain in our sole discretion, prior to retaining the services of such firm.

C.   Any payments for **Crisis Management Loss** or advancement of **CrisisResponse Costs** that we make under this endorsement:

1.   shall not be deemed to be a determination of the **Insured's** liability with respect to any claim or **Suit** that results from a **Crisis Management Event**; and

2.   shall not create any duty to defend any **Suit** or to investigate any claim arising from a **Crisis Management Event**, nor any coverage obligations under this policy.

D.   If the Crisis Communications Management Insurance provided by this endorsement and any other insurance issued to the **Named Insured** by us or any of our affiliated companies shall apply to the same crisis or claim, the maximum limit of insurance under all insurance available shall not exceed the highest applicable limit of insurance available under any one policy or endorsement. This condition does not apply to any other insurance issued by us or any of our affiliated companies specifically to apply as excess insurance over this endorsement.

E.   In the event of a dispute between the **Named Insured** and us as to whether a **Crisis Management Event** has occurred, the **Named Insured** may, at its own cost, retain the services of an approved **Crisis Management Firm** and/or advance **CrisisResponse Costs**. Provided, however, if the **Named Insured** elects to retain an approved **Crisis Management Firm** or to advance **CrisisReponse Costs**, we shall have no obligation to reimburse under this endorsement the **Named Insured** for such costs or expenses. The right to reimbursement shall be arbitrated pursuant to the rules of the American Arbitration Association in New York, New York or in the state indicated in Item 1 of the Declarations of this policy as the **Named Insured's** principal place of business.

All other terms, definitions, conditions and exclusions of this policy remain unchanged.

Authorized Representative
or countersignature (in states where applicable)

**NOTICE:** THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

74641 (12/99)        2 - 13000        1999 American International Group, Inc.        Page 5 of 5

**AIG** **AIG Excess Casualty**

**Excess Casualty CrisisFund**
(Crisis Communications Management Insurance)

### Approved Crisis Management Firms
### as of May 1, 2002

| FIRM/ADDRESS | CONTACT/TELEPHONE | EMERGENCY TELEPHONE |
|---|---|---|
| **Abernathy MacGregor Group** | | |
| New York Office<br>501 Madison Avenue<br>New York, NY 10022 | James T. MacGregor<br>Tel. (212) 371-5999<br>Cell (212) 593-1845 | *Emergency Only*<br>Tel. (212) 343-0818<br>Cell (917) 449-9964 |
| | Rhonda Barnat, Managing Director<br>Tel. (212) 371-5999<br>Cell (212) 593-1845 | *Emergency Only*<br>Cell (917) 912-6378 |
| Los Angeles Office<br>611 West Sixth Street<br>Suite 1880<br>Los Angeles, CA 90017 | Ian D. Campbell<br>Tel. (213) 630-6550<br>Cell (213) 489-3443 | *Emergency Only*<br>Tel. (818) 957-5650<br>Cell (917) 940-3476 |
| **Citigate Sard Verbinnen** | | |
| New York Office<br>630 Third Avenue<br>New York, NY 1 0017 | George Sard<br>Tel. (212) 687-8080<br>Fax (212) 687-8344 | *Emergency Only*<br>Contact switchboard @<br>(212) 687-8080 |
| | Citigate Sard Verbinnen web address:<br>www.sardverb.com | |
| | Paul Verbinnen<br>Tel. (212) 687-8080<br>Fax (212) 687-8344 | |
| | Citigate Sard Verbinnen web ad dress:<br>www.sardverb.com | |
| **Hill & Knowlton** | | |
| New York Office<br>466 Lexington Avenue<br>3rd Floor<br>New York, NY 10017 | Richard C. Hyde<br>Tel. (212) 885-0372<br>Cell (917) 816-2208<br>Fax: (212) 885-0570 | *Emergency Only*<br>H&K Crisis Pager<br>(888) 264-5193<br>24 Hours/7 Days |
| | Arthur Forster<br>Tel. (212) 885-0442<br>Cell: (908) 337-6853<br>Fax: (212) 885-0570<br>aforster@hillandknowlton.com | |

**NOTICE:** THESE POLICY FORMS AND APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

AH0559                  2 - 13000                          Page 1 of 3

| FIRM/ADDRESS | CONTACT/TELEPHONE | EMERGENCY TELEPHONE |
|---|---|---|

### Hill & Knowlton Continued

**Additional United States/Canada Offices:**
Atlanta; Austin; Calgary; Chicago; Detroit; Ft. Lauderdale; Houston; Irvin e; Los Angeles; Montreal; Ottawa; Portland; Quebec City; Sacramento; San Francisco; San Juan; Seattle; Tampa; Toronto; Vancouver; Washington, D.C.

**International Offices:**
**Latin America:** Bogota; Buenos Aires; Caracas; Mexico City; Sao Paulo; Santiago; Guatemala
**Europe, Middle East, Africa:** Amsterdam; Aschaffenburg; Athens; Barcelona; Berlin; Brussels; Budapest; Dubai; Frankfurt; Helsinki; Jeddah; London; Madrid; Manama; Milan; Moscow; Paris; Prague; Riga; Rome; Stockholm; Tallinn; Warsaw
**Asia Pacific:** Auckland; Bangkok; Beijing; Canberra; Hong Kong; Kuala Lumpur; Melbourne; Seoul; Shanghai; Singapore; Sydney; Tokyo; Wellington

### Lexicon Communications Corp.

| Los Angeles Office 9200 Sunset Blvd. Suite 1203 Los Angeles, CA 90069 | Steven B. Fink Tel. (213) 346-1212 Cell (626) 253-1519 sfink Lexicon Comm web address: www.crisismanagement.com | Emergency Only Contact switchboard @ (213) 346-1200, ext. 225 |
|---|---|---|

### PR21 (A Division of Edelman Worldwide)

| New York Office 79 Fifth Avenue, 17th Fl. New York, NY 10003 | Jon Goldberg Tel. (212) 299-8952 Fax (212) 462-1026/7 | Emergency Only Cell (973) 699-7148 Pager (877) 386-8115 |
|---|---|---|

**Additional United States/Canada Offices:**
Atlanta; Austin; Chicago; Dallas; Los Angeles; Miami; Milwaukee; Montreal; Sacramento; San Francisco; Seattle; Silicon Valley; Toronto; Washington, D.C.

**International Offices:**
**Latin America:** Buenos Aires; Mexico City; Sao Paulo
**Europe:** Barcelona; Brussels; Dublin; Frankfurt; Hamburg; London; Madrid; Milan; Paris
**Asia Pacific:** Beijing; Guangzhou; Hong Kong; Kuala Lumpur; Seoul; Shanghai; Singapore; Sydney; Taipei

### Robinson Lerer & Montgomery

| New York Office 75 Rockefeller Plaza 6th Floor New York, NY 10019 | Michael J. Gross Tel. (212) 484-7721 Cell (917) 853-0620 Fax (212) 484-7411 mgross52@aol.com | Emergency Only Contact switchboard @ (212) 484-6100 |
|---|---|---|

**NOTICE:** THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

AH0559         2 - 13000         Page 2 of 3

| FIRM/ADDRESS | CONTACT/TELEPHONE | EMERGENCY TELEPHONE |
|---|---|---|
| **Sitrick and Company Inc.** | | |
| Los Angeles Office<br>2029 Century Park East<br>Suite 1750<br>Los Angeles, CA 90067 | Michael S. Sitrick<br>Tel. (310) 788-2850<br>Cell (310) 788-2855 | *Emergency Only*<br>(310) 358-1011<br>24 hours/7 days |

Additional United States Offices:  New York and Washington, D.C.

**NOTICE:** THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

AH0559                    2 - 13000                    Page 2 of 3

ENDORSEMENT NO. 15

**This endorsement, effective 12:01 AM:**  October 1, 2002

**Forms a part of policy no.:**  BE    2195412

**Issued to:**  TYCO INTERNATIONAL LTD

**By:**  NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA.

### STATE OF FLORIDA

### UNINSURED MOTORIST COVERAGE NOTICE

 Florida law requires excess and umbrella carriers to offer Uninsured Motorist Coverage as part of the application process. Uninsured Motorist coverage provides for payment of certain benefits for damage caused by owners or operators of uninsured motor vehicles because of bodily injury or death resulting therefrom. Such benefits may include payments for certain medical expenses, lost wages and pain and suffering, subject to all the terms, provisions, definitions, exclusion, limitations and conditions contained in the policy. For purpose of this coverage, an uninsured motor vehicle may include a motor vehicle as to which the bodily injury limits are less than your damages. If you choose excess or umbrella Uninsured Motorist coverage, the cost will be $_____ for a policy with $1 Million Uninsured Motorist limits of liability. Consistent with Florida law, if you wish to purchase this coverage, you need to submit a written request to us that is signed and dated. Your selection of this coverage will be effective on either the policy's effective date or the date you sign the written request, whichever is later.

For your convenience, we have prepared and attached a letter that evidences your request for excess or umbrella Uninsured Motorist coverage. If you wish to purchase such Uninsured Motorist coverage, simply sign, date and return this request to the "Request To" address shown. If we do not receive your written, signed and dated request, then excess or umbrella Uninsured Motorist coverage will not be provided.

76729 (08/01)

**NOTICE:**   THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT.  HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.
2 - 13000

**ENDORSEMENT NO. 15**   (Continued)

## STATE OF FLORIDA

### INSURED'S ACCEPTANCE LETTER FOR UNINSURED MOTORIST COVERAGE

**RETURN TO:**

. Company:   American Home
175 Water Street, 21 st Floor
New York, NY 10038

Attention:  John Tateossian

I, on behalf of the named insured, wish to purchase either excess or umbrella Uninsured Motorist coverage with limits of liability of $ 1 Million and I agree to pay the premium for those limits, which have been explained to me. I understand that the coverage selected will apply to this policy and all future renewals, reinstatements or replacements of this policy unless a written request for a change is received and approved by the company. I further understand that if this or a similar letter requesting such coverage is not signed, dates and received by the company, the coverage will not be effective. I am authorized to make this selection on behalf of the named insured and all insureds entitled to coverage under the policy being purchased.

_____
Named Insured (As Appears on Declarations Page)

_____
Signature of Authorized Representative of
Named Insured

_____
Printed Named & Title of Authorized Representative

_____
Date Signed

78728 (08/01)

**NOTICE:**   THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.
2 - 13000

_____
**Authorized Representative
or countersignature (where required by law)**

**ENDORSEMENT No.** 16

**This endorsement, effective 12:01 AM:** October 1, 2002

**Forms a part of policy no.:** BE    2195412

**Issued to:** TYCO INTERNATIONAL LTD

**By:** NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA.

### Commercial Umbrella Liability Policy

### INDIANA UNINSURED MOTORISTS* COVERAGE
### OPTION FORM

This policy is amended as follows:

Uninsured Motorists Coverage provides insurance for the protection of persons insured under the policy who are legally entitled to recover damages from owners or operators of uninsured motor vehicles because of bodily injury, sickness or disease, including death resulting therefrom. Underinsured Motorists Coverage provides insurance for protection against loss for bodily injury, sickness or disease, including death, where the limit of coverage available for payment to the **Insured** under all bodily injury liability bonds and insurance policies covering persons liable to the **Insured** is less than the limit for the Uninsured Motorists Coverage under your policy at the time of the accident.

I.     The undersigned **Named Insured** on behalf of all **Named Insureds** in this policy acknowledges that it has been offered the opportunity to:

  1.   Elect a limit of Uninsured Motorists coverage which is equal to the Limits of Insurance on this policy.

  2.   Elect a limit of Uninsured Motorists coverage which is lower than the Limits of Insurance on this policy.

  3.   Completely reject Uninsured Motorists Coverage on this policy.

II.    On behalf of the **Named Insured** shown in Item 1 of the Declarations and all other **Named Insureds** in this policy, I hereby indicate my choice below. (1, 2 or 3)

In order to consider Uninsured Motorists coverage for this policy, the **Bodily Injury** Uninsured Motorists and Liability limits of your primary policy must be equal. The same applies to **Property Damage** but only if Uninsured Motorists **Property Damage** is included under state law and only if increased limits for Uninsured Motorists **Property Damage** are available.

  1.   [  ]   Coverage desired at a limit equal to the Limits of Insurance.

  2.   [  ]   Coverage desired at a limit lower than the Limits of Insurance as indicated below:

          LIMIT OPTIONS:  $

  3.   [  ]   Uninsured Motorists coverage rejected in its entirety for **Bodily Injury** and Property Damage. This rejection shall be binding upon every **Insured** and shall apply to this policy and to all renewal or policy replacements.

The term "Uninsured Motorists" includes "Underinsured Motorists when and to the extent provided by the primary policy.

**NOTICE-** THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT, HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

76670 (9/00)          2 - 13000                    PAGE  OF 2

For any change in coverage or limit, please notify us or your agent in writing.

_____

Signature of Applicant or **Named Insured**/Date

If the **Named Insured** has chosen to elect Uninsured Motorists coverage, it is agreed that this insurance does not apply to Uninsured Motorists coverage unless such coverage is included under the policies listed in the Schedule of Underlying Insurance and then for no broader coverage than is provided under such underlying policies. It is further agreed that in Section V. Exclusions, Exclusion C. is hereby deleted in its entirety and replaced by the following:

C.    Any obligations of the **Insured** under a "No-Fault" law.

All other terms and conditions of this policy remain unchanged.

_____

**AUTHORIZED REPRESENTATIVE**
or countersignature (in states where applicable)

**NOTICE:**  THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

76670 (9/00)        2 - 13000              PAGE 2 OF 2

ENDORSEMENT No. 17

**This endorsement, effective 12:01 AM:**  October 1, 2002

**Forms a part of policy no.:**  BE   2195412

**Issued to:**  TYCO INTERNATIONAL LTD

**By:**  NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH,PA.

# State of Louisiana

This form was promulgated pursuant to LRS 22§1406.D.(1)(a)(ii).  This form may not be altered or modified.

## Uninsured/Underinsured Motorist Bodily Injury Coverage Form

**Uninsured/Underinsured Motorists Bodily Injury Coverage,** referred to as **"UMBI"** in this form, is insurance which pays persons insured by your policy who are injured in an accident caused by an owner or operator of an uninsured or underinsured motor vehicle.

By law, your policy will include UMBI Coverage at the same limits as your Bodily Injury Liability Coverage unless you request otherwise. If you wish to reject UMBI Coverage, select lower limits of UMBI Coverage, or select Economic-Only UMBI Coverage, you must complete this form and return it to your insurance agent or insurance company.  (Economic-Only UMBI Coverage may not be available from your insurance company.  In this case, your company will have marked options 3 and 4 below as "Not Available.")

### UNINSURED/UNDERINSURED MOTORIST BODILY INJURY COVERAGE

You may select one of the following UMBI Coverage options (initial only one option):

1. _____
   Initials
   **I select UMBI Coverage** which will compensate me for my economic and non-economic losses with the same limits as my Bodily Injury Liability Coverage.

   **Economic losses** are those which can be measured in specific monetary terms including, but not limited to, medical costs, funeral expenses, lost wages, and out of pocket expenses.

   **Non-economic losses** are losses other than economic losses and include, but are not limited to, pain, suffering, inconvenience, and mental anguish.

2. _____
   Initials
   **I select UMBI Coverage** which will compensate me for my economic and non-economic losses with limits lower than my Bodily Injury Liability Coverage limits:
   $_____ each person        $ _____ each accident

3. _____
   Initials
   **I select Economic-Only UMBI Coverage** which will compensate me only for my economic losses with the same limits as my Bodily Injury Liability Coverage.

4. _____
   Initials
   **I select Economic-Only UMBI Coverage** which will compensate me only for my economic losses with limits lower than my Bodily Injury Liability Coverage limits:
   $_____ each person        $ _____ each accident

5. _____
   Initials
   **I do not want UMBI Coverage. I understand that I will not be compensated through UMBI** coverage for losses arising from an accident caused by an uninsured/underinsured motorist.

**NOTICE:**  THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT.  HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

62596 (6/98)          2 - 13000                    Page 1 of 2                              April 17,1998

## SIGNATURE

The choice I made by my initials on this form will apply to all persons insured under my policy. My choice shall apply to the motor vehicles described in the policy and to any replacement vehicles, to all renewals of my policy, and to all reinstatement or substitute policies until I make a written request for a change in my Bodily Injury Liability Coverage or UMBI Coverage.

_____

Named Insured or Legal Representative (Please Print)

_____

Signature of a Named Insured or Legal Representative

_____

Company Name

_____

Policy Number

_____

Date

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

_____

Authorized Representative
or Countersignature (in States Where Applicable)

62596 (6/98)        2 - 13000              Page 2 of 2

April 17,1998

**ENDORSEMENT No. 18**

**This endorsement, effective 12:01 AM:** October 1, 2002

**Forms a part of policy no.:** BE   2195412

**Issued to:**  TYCO INTERNATIONAL LTD

**By:**  NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH,PA.

## NEW HAMPSHIRE UNINSURED MOTORISTS COVERAGE*

### OPTION FORM

I.      In keeping with the provisions of the laws of my state, I have been offered the opportunity to:

      1.      Elect a limit of coverage which is equal to the Limits of Insurance on this policy.

      2.      Completely reject Uninsured Motorists coverage on this policy.

II.     I hereby indicate my choice below.

      In order to consider Uninsured Motorists coverage for this policy, the **Bodily Injury** Uninsured Motorists and Liability limits of your primary policy must be equal. The same applies to **Property Damage** but only if Uninsured Motorists **Property Damage** is included under state law and only if increased limits for Uninsured Motorists **Property Damage** are available.

      1. ☐  Coverage desired at a limit equal to the Limits of Insurance.

      2. ☐  Uninsured Motorists coverage rejected in its entirety for **Bodily Injury** and **Property Damage**. This rejection shall be binding upon every **Insured** and shall apply to this policy and to all renewal or policy replacements.

\*      The term Uninsured Motorists includes Underinsured Motorists when and to the extent provided by the primary policy.

For any change in coverage or limit, please notify us or your agent in writing.

_____

Signature of Applicant or **Named Insured**

_____

Date

**NOTICE:** THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.
62413 (4/95)          2 - 13000                    Page  of 2

It is agreed that if the **Insured** has chosen to elect Uninsured Motorists coverage, in Section V, Exclusions, Exclusion C is hereby deleted in its entirety and replaced by the following:

C.     Any obligations of the **Insured** under a "No-Fault" law.

It is further agreed that this insurance does not apply to Uninsured Motorists coverage unless such coverage is included under the policies listed in the Schedule of Underlying Insurance and then for no broader coverage than is provided under such underlying policies.

NOTICE All other terms and conditions of this policy remain unchanged.
APPLICABLE RATES ARE EXEMPT FROM THE FILING
REQUIREMENTS OF THE NEW YORK STATE INSURANCE
DEPARTMENT. HOWEVER, SUCH FORMS AND RATES
MUST MEET THE MINIMUM STANDARDS OF THE NEW
YORK INSURANCE LAW AND REGULATIONS.
62413 (4/95)          2 - 13000                      Page 2 of 2

**AUTHORIZED REPRESENTATIVE**

**This endorsement, effective 12:01 AM:** October 1, 2002

**Forms a part of policy no.:** BE   2195412

**Issued to:** TYCO INTERNATIONAL LTD

**By:** NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH,PA.

### COMMERCIAL UMBRELLA

### VERMONT UNINSURED MOTORISTS COVERAGE*

Exclusion C of this policy is hereby deleted in its entirety and replaced by the following:

**C.**     Any obligation of the **Insured** under a "No Fault" law.

It is further agreed that this insurance does not apply to Uninsured Motorists Coverage unless such coverage is included under the policies listed in the Schedule of Underlying Insurance and then for no broader coverage than is provided under such underlying policies.

### OPTION FORM

**I.**     In keeping with the provisions of the laws of Vermont, I have been offered the opportunity to:

   **1.**     Elect a limit of **Bodily Injury** Uninsured Motorists coverage which is equal to the Limits of Insurance on this policy.

   **2.**     Elect a limit of **Bodily Injury** Uninsured Motorists coverage which is lower than the Limits of Insurance on this policy.

   In both of the above options, the **Property Damage** Uninsured Motorists Limit under this policy shall be $10,000.

**II.**    I hereby indicate my choice below (1 or 2).

   In order to consider Uninsured Motorists coverage for this policy, the **Bodily Injury** Uninsured Motorists and Liability limits of your primary policy must be equal and the **Property Damage** Uninsured Motorists limit on your primary policy must be $10,000. If you fail to comply with these requirements, we will only be liable to the same extent that we would had you fully complied with these requirements.

   **1.**  ( ) Coverage desired at a **Bodily Injury** limit equal to the Limits of Insurance.

   **2.**  ( ) Coverage desired at a **Bodily Injury** limit lower than the Limits of Insurance.

      LIMIT  OPTIONS

      ( )

**NOTICE:** THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.
59264 (05/94)     2 - 13000          Page of 2

III.   Solely as respects the coverage provided by this endorsement, Exclusion D. 1 is deleted.

\* The term Uninsured Motorists includes Underinsured Motorists when and to the extent provided by the primary policy.

For any change in coverage or limit, please notify us or your agent in writing.

_____

Signature of Applicant or **Named Insured**

**NOTICE** All other terms and conditions of this policy remain unchanged.
APPLICABLE RATES ARE EXEMPT FROM THE FILING
REQUIREMENTS OF THE NEW YORK STATE INSURANCE
DEPARTMENT. HOWEVER, SUCH FORMS AND RATES
MUST MEET THE MINIMUM STANDARDS OF THE NEW
YORK INSURANCE LAW AND REGULATIONS.

59264 (05/94)          2 - 13000                          Page 2 of 2

_____

**AUTHORIZED REPRESENTATIVE**

# Commercial Umbrella Policy Form

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights. duties and what is and is not covered.

Throughout this policy. the words "you" and "your" refer to the **Named Insured** as defined in Insuring Agreement IV. Definitions. The words "we". "us" and "our" refer to the Company providing this insurance. The word **"Insured"** means any person or organization qualifying as such in Insuring Agreement IV. Definitions.

In consideration of the payment of the premium and in reliance upon the statements in the Declarations we agree with you to provide coverage as follows:

### Insuring Agreements

### I.    Coverage

We will pay on behalf of the **Insured** those sums in excess of the Retained Limit that the **Insured** becomes legally obligated to pay by reason of liability imposed by law or assumed by the **Insured** under an **Insured Contract** because of **Bodily Injury, Property Damage, Personal Injury** or **Advertising Injury** that takes place during the Policy Period and is caused by an **Occurrence** happening anywhere in the world. The amount we will pay for damages is limited as described in Insuring Agreement III, Limits of Insurance.

If we are prevented by law or statute from paying on behalf of the **Insured**. then we will. where permitted by law or statute. indemnify the **Insured** for those sums in excess of the Retained Limit.

### II.   Defense

**A.**   We shall have the right and duty to defend any claim or **suit** seeking damages covered by the terms and conditions of this policy when:

    **1.**   The applicable Limits of Insurance of the underlying policies listed in the Schedule of Underlying Insurance and the Limits of Insurance of any other underlying insurance providing coverage to the **Insured** have been exhausted by payment of claims to which this policy applies; or

    **2.**   Damages are sought for **Bodily Injury, Property Damage. Personal Injury** or **Advertising Injury** covered by this policy but not covered by any underlying insurance listed in the Schedule of Underlying Insurance or any other underlying insurance providing coverage to the **Insured.**

**B.**   When we assume the defense of any claim or suit:

    **1.**   We will defend any suit against the **Insured** seeking damages on account of **Bodily Injury, Property Damage, Personal Injury** or **Advertising Injury** even if such suit is groundless. false or fraudulent. but we have the right to investigate. defend and settle the claim as we deem expedient.

    **2.**   We will pay the following, to the extent that they are not included in the underlying policies listed in the Schedule of Underlying Insurance or in any other insurance providing coverage to the **Insured:**

        premiums on bonds to release attachments for amounts not exceeding our Limits of Insurance. but we are not obligated to apply for or furnish any such bond:

        premiums on appeal bonds required by law to appeal any claim or **suit** we defend. but we are not obligated to apply for or furnish any such bond:

        all costs taxed against the **Insured** in any claim or **suit** we defend:

**NOTICE:** THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

57697 (6/93)        2 - 13000                (1

      **d.**    pre-judgment interest awarded against the **Insured** on that part of the judgment we pay. If we make an offer to pay the applicable Limit of Insurance, we will not pay any pre-judgment interest based on that period of time after the offer;

      **e.**    all interest that accrues after entry of judgment and before we have paid, offered to pay or deposited in court the part of the judgment that is within our applicable Limit of Insurance;

      **f.**    the **Insured's** expenses incurred at our request.

We will not defend any **suit** or claim after our applicable Limits of Insurance have been exhausted by payment of judgments or settlements.

All expenses we incur in the defense of any **suit** or claim are in addition to our Limits of Insurance.

**C.**    In all other instances except A. above, we will not be obligated to assume charge of the investigation, settlement or defense of any claim made, **suit** brought or proceeding instituted against the **Insured**. We will, however, have the right and shall be given the opportunity to participate in the defense and trial of any claims, **suits** or proceedings relative to any **Occurrence** which, in our opinion, may create liability on our part under the terms of this policy. If we exercise such right, we will do so at our own expense.

**III.**    **Limits of Insurance**

    **A.**    The Limits of Insurance shown in Item 3 of the Declarations and the rules below state the most we will pay regardless of the number of:

      **1.**    **Insureds;**

      **2.**    Claims made or **suits** brought; or

      **3.**    Persons or organizations making claims or bringing **suits**.

    **B.**    The General Aggregate Limit is the most we will pay for all damages covered under Insuring Agreement I except:

      **1.**    Damages included in the **Products-Completed Operations Hazard;** and

      **2.**    Coverages included in the policies listed in the Schedule of Underlying Insurance to which no underlying aggregate limit applies.

    **C.**    The Products-Completed Operations Aggregate Limit is the most we will pay for all damages included in the **Products-Completed Operations Hazard.**

    **D.**    Subject to B. and C. above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of damages covered under Insuring Agreement I because of all **Bodily Injury, Property Damage, Personal Injury** and **Advertising Injury** arising out of any one **Occurrence.**

If the applicable limits of insurance of the policies listed in the Schedule of Underlying Insurance or other insurance providing coverage to the **Insured** are reduced or exhausted by payment of one or more claims that would be insured by our policy we will:

      **1.**    In the event of reduction, pay in excess of the reduced underlying limits of insurance; or

      **2.**    In the event of exhaustion of the underlying limits of insurance, continue in force as underlying insurance.

The Limits of Insurance of this policy apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

**NOTICE:** THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

57697 (6/93)    2 - 13000

E. Retained Limit

We will be liable only for that portion of damages in excess of the **Insured's** Retained Limit which is defined as the greater of either:

1. The total of the applicable limits of the underlying policies listed in the Schedule of Underlying Insurance and the applicable limits of any other underlying insurance providing coverage to the **Insured;** or

2. The amount stated in the Declarations as Self Insured Retention as a result of any one **Occurrence** not covered by the underlying policies listed in the Schedule of Underlying Insurance nor by any other underlying insurance providing coverage to the **Insured;**

and then up to an amount not exceeding the Each Occurrence Limit as stated in the Declarations.

## IV. Definitions

A. **Advertising Injury** means injury arising solely out of your advertising activities as a result of one or more of the following offenses:

1. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

2. Oral or written publication of material that violates a person's right of privacy;

3. Misappropriation of advertising ideas or style of doing business; or

4. Infringement of copyright, title or slogan.

B. **Auto** means a land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment. But **auto** does not include **mobile equipment.**

C. **Bodily Injury** means bodily injury, sickness, disability or disease. **Bodily Injury** shall also mean mental injury, mental anguish, humiliation, shock or death if directly resulting from bodily injury, sickness, disability or disease.

D. **Impaired Property** means tangible property, other than **Your Product** or **Your Work**, that cannot be used or is less useful because:

1. It incorporates **Your Product** or **Your Work** that is known or thought to be defective, deficient, inadequate or dangerous; or

2. You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by:

1. The repair, replacement, adjustment or removal of **Your Product** or **Your Work**; or

2. Your fulfilling the terms of the contract or agreement.

E. **Insured** means each of the following, to the extent set forth:

1. The **Named Insured**, meaning:

a. any person or organization listed in Item 1 of the Declarations, and any company that is your subsidiary as of the effective date of this policy and any company you own or control as of the effective date of this policy; and

any organization newly acquired or controlled or formed by you during the policy period but

**NOTICE:** THE PREMIUMS FOR AND THE APPLICABLE RATES ARE SUBJECT TO THE REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

    **1)**    as respects **Occurrences** taking place after you acquire, take control or form such organization;

    **2)**    if such organization is included under the coverage provided by the policies listed in the Schedule of Underlying Insurance; and

    **3)**    if you give us prompt notice after you acquire, take control or form such organization.

    We may make an additional premium charge for any additional organizations you acquire, form or take control of during the period of this policy.

**2.**    If you are an individual, you and your spouse, but only with respect to the conduct of a business of which you are the sole owner.

**3.**    If you are a partnership or joint venture, the partners or members and their spouses but only as respects the conduct of your business.

    No person or organization is an **Insured** with respect to the conduct of any current or past partnership or joint venture that is not shown as a **Named Insured** in the Declarations.

**4.**    Any person or organization, other than the **Named Insured**, included as an additional insured in the policies listed in the Schedule of Underlying Insurance but not for broader coverage than is available to such person or organization under such underlying policies.

**5.**    Any of your partners, executive officers, directors, stockholders or employees but only while acting within their duties.

    However, the coverage granted by this provision 5. does not apply to the ownership, maintenance, use, loading or unloading of any **autos**, aircraft or watercraft unless such coverage is included under the policies listed in the Schedule of Underlying Insurance and then for no broader coverage than is provided under such underlying policies.

**6.**    Any person, other than one of your employees, or organization while acting as your real estate manager.

**7.**    Any person, organization, trustee or estate to whom you are obligated by a written **Insured Contract** to provide insurance such as is afforded by this policy but only with respect to:

    **a.**    liability arising out of operations conducted by you or on your behalf; or

    **b.**    facilities owned or used by you.

**8.**    Any person (other than your partners, executive officers, directors, stockholders or employees) or organization with respect to any **auto** owned by you, loaned to you or hired by you or on your be half and used with your permission.

    However, the coverage granted by this provision 8. does not apply to any person using an **auto** while working in a business that sells, services, repairs or parks **autos** unless you are in that business.

**F.**    **Insured Contract** means any oral or written contract or agreement entered into by you and pertaining to your business under which you assume the tort liability of another party to pay for **Bodily Injury**, **Property Damage**, **Personal Injury** or **Advertising Injury** to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

**G.**    **Mobile Equipment** means any of the following types of land vehicles, including any attached machinery or equipment:

Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

Vehicles maintained for use solely on or next to premises you own or rent;

**NOTICE:** THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

3. Vehicles that travel on crawler treads;

4. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

   a. power cranes, shovels, loaders, diggers or drills; or

   b. road construction or resurfacing equipment such as graders, scrapers or rollers;

5. Vehicles not described in 1., 2., 3., or 4. above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

   a. air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

   b. cherry pickers and similar devices used to raise or lower workers;

6. Vehicles not described in 1., 2., 3., or 4. above maintained primarily for purposes other than the transportation of persons or cargo.

   However, self-propelled vehicles with the following types of permanently attached equipment are not **mobile equipment** but will be considered **autos:**

   a. equipment designed primarily for:

      1) snow removal;

      2) road maintenance, but not construction or resurfacing; or

      3) street cleaning;

   b. cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

   c. air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

H. **Occurrence** means:

   1. As respects **Bodily Injury** or **Property Damage**, an accident, including continuous or repeated exposure to conditions, which results in **Bodily Injury** or **Property Damage** neither expected nor intended from the standpoint of the **Insured**. All such exposure to substantially the same general conditions shall be considered as arising out of one **Occurrence;**

   2. As respects **Personal Injury**, an offense arising out of your business that results in **Personal Injury.** All damages that arise from the same or related injurious material or act shall be considered as arising out of one **Occurrence**, regardless of the frequency or repetition thereof, the number and kind of media used and the number of claimants; and

   3. As respects **Advertising Injury**, an offense committed in the course of advertising your goods, products and services that results in **Advertising Injury.** All damages that arise from the same or related injurious material or act shall be considered as arising out of one **Occurrence,** regardless of the frequency or repetition thereof, the number and kind of media used and the number of claimants.

I. **Personal Injury** means injury other than **Bodily Injury** or **Advertising Injury** arising out of one or more of the following offenses:

**NOTICE:** False arrest, detention or imprisonment THESE POLICY FORMS AND THE APPLICABLE RATES ARE SUBJECT TO THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

... wrongful entry into, or invasion of the right of private occupancy of a ... dwelling or premises that a person occupies by or on behalf of its owner, landlord or ...

57697 (6/93)          2 - 13000

4. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; or

5. Oral or written publication of material that violates a person's right of privacy.

**J.** 1. **Products-Completed Operations Hazard** includes all **Bodily Injury** and **Property Damage** occurring away from premises you own or rent and arising out of **Your Product** or **Your Work** except:

    a. products that are still in your physical possession; or

    b. work that has not yet been completed or abandoned.

2. **Your Work** will be deemed completed at the earliest of the following times:

    a. When all of the work called for in your contract has been completed.

    b. When all of the work to be done at the site has been completed if your contract calls for work at more than one site.

    c. When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

3. This hazard does not include **Bodily Injury** or **Property Damage** arising out of:

    a. the transportation of property, unless the injury or damage arises out of a condition in or on a vehicle created by the loading or unloading of it;

    b. the existence of tools, uninstalled equipment or abandoned or unused materials.

**K.** **Property Damage** means:

1. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

2. Loss of use of tangible property that is not physically injured. All such loss shall be deemed to occur at the time of the **Occurrence** that caused it.

**L.** **Suit** means a civil proceeding in which **Bodily Injury, Property Damage, Personal Injury** or **Advertising Injury** to which this insurance applies is alleged. **Suit** includes:

1. An arbitration proceeding in which such damages are claimed and to which you must submit or do submit with our consent; or

2. Any other alternative dispute resolution proceeding in which such damages are claimed and to which you submit with our consent.

**M.** **Your Product** means:

1. Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

    a. you;

    b. others trading under your name; or

    c. a person or organization whose business or assets you have acquired; and

2. Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

**NOTICE:** THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

57697 (6/93)       2 - 13000

**Your Product** includes:

1.   Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of **Your Product**; and

2.   The providing of or failure to provide warnings or instructions.

**Your Product** does not include vending machines or other property rented to or located for the use of others but not sold.

**N.**   **Your Work** means:

1.   Work or operations performed by you or on your behalf; and

2.   Materials, parts or equipment furnished in connection with such work or operations.

**O.**   **Your Work** includes:

1.   Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of **Your Work**; and

2.   The providing of or failure to provide warnings or instructions.

**V.**   **Exclusions**

This insurance does not apply to:

**A.**   Any obligation of the **Insured** under a Workers Compensation, Unemployment Compensation or Disability Benefits Law, or under any similar law.

**B.**   Any obligation of the **Insured** under the Employees' Retirement Income Security Act of 1974 or any amendments to that act.

**C.**   Any obligation of the **Insured** under a "No Fault", "Uninsured Motorist" or "Underinsured Motorist" law.

**D.**   **Property Damage** to:

1.   Property you own, rent, occupy or use;

2.   Personal property in the care, custody or control of the **Insured**.

**E.**   **Property Damage** to **Impaired Property** or property that has not been physically injured, arising out of:

1.   A defect, deficiency, inadequacy or dangerous condition in **Your Product** or **Your Work**; or

2.   A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to **Your Product** or **Your Work** after it has been put to its intended use.

**F.**   **Property Damage** to **Your Product** arising out of it or any part of it.

**G.**   **Property Damage** to **Your Work** arising out of it or any part of it and included in the **Products-Completed Operations Hazard**.

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

NOTICE

APPLICABLE FORMS AND RATES MUST MEET THE REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

57697 (6/93)          2 - 13000

H.   Damages claimed for any loss. cost or expense incurred by you or others for the loss of use, withdrawal, recall. inspection. repair. replacement. adjustment. removal or disposal of:

   **1.**   **Your Product:**

   **2.**   **Your Work:** or

   **3.**   **Impaired Property**

if such product. work or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect. deficiency. inadequacy or dangerous condition in it.

I.   Liability of any employee with respect to **Bodily Injury** or **Personal Injury** to another employee of the same employer injured in the course of such employment.

However. if insurance for such liability is provided by a policy listed in the Schedule of Underlying Insurance:

   **1.**   This exclusion shall not apply: and

   **2.**   The insurance provided by our policy will not be broader than the insurance coverage provided to the employee by the policy listed in the Schedule of Underlying Insurance.

 J.   **Bodily Injury** or **Property Damage** arising out of the ownership, maintenance. operation. use. loading or unloading of any watercraft or any aircraft owned by the **Insured** or rented to the **Insured** without a crew.

However. if insurance for such **Bodily Injury** or **Property Damage** is provided by a policy listed in the Schedule of Underlying Insurance:

   **1.**   This exclusion shall not apply: and

   **2.**   The insurance provided by our policy will not be broader than the insurance coverage provided by the policy listed in the Schedule of Underlying Insurance.

K.   **Personal Injury** or **Advertising Injury:**

   **1.**   Arising out of oral or written publication of material. if done by or at the direction of the **Insured** with knowledge of its falsity:

   **2.**   Arising out of oral or written publication of material whose first publication took place before the beginning of the policy period:

   **3.**   Arising out of the willful violation of a penal statute or ordinance committed by or with the consent of the **Insured:** or

   **4.**   For which the **Insured** has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the **Insured** would have in the absence of the contract or agreement.

L.   **Advertising Injury** arising out of:

   **1.**   Breach of contract. other than misappropriation of advertising ideas under an implied contract:

   **2.**   The failure of goods. products or services to conform with advertised quality or performance:

   **3.**   The wrong description of the price of goods. products or services: or

   **4.**   An offense committed by an **Insured** whose business is advertising. broadcasting. publishing or telecasting.

**NOTICE:** THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

**M.**  **1.**   Bodily Injury, Property Damage or Personal Injury arising out of the actual or threatened discharge, dispersal, seepage, migration, release or escape of pollutants anywhere in the world;

**2.**   Any loss, cost or expense arising out of any governmental direction or request that we, the Insured or any other person or organization test for, monitor, clean-up, remove, contain, treat, detoxify, neutralize or assess the effects of pollutants; or

**3.**   Any loss, cost, or expense, including but not limited to costs of investigation or attorneys' fees, incurred by a governmental unit or any other person or organization to test for, monitor, clean-up, remove, contain, treat, detoxify or neutralize pollutants.

This exclusion M. shall not apply to Bodily Injury, Property Damage or Personal Injury arising out of:

**a.**   Heat, smoke or fumes from a hostile fire;

**b.**   The upset, overturn or collision of a motor vehicle; or

**c.**   The Products-Completed Operations Hazard;

if insurance for such Bodily Injury, Property Damage or Personal Injury is provided by a policy listed in the Schedule of Underlying Insurance. However, the insurance provided by our policy for such Bodily Injury, Property Damage or Personal Injury will not be broader than the insurance coverage provided by the policy listed in the Schedule of Underlying Insurance.

As used in this exclusion:

**a.**   "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste material. "Waste material" includes materials which are intended to be or have been recycled, reconditioned or reclaimed;

**b.**   A "hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

**N.**   Bodily Injury or Property Damage due to war, whether or not declared, or any act or condit ion incident to war. War includes civil war, insurrection, rebellion or revolution. This exclusion applies only to liability assumed under a contract or agreement.

**O.**   Bodily Injury or Property Damage expected or intended from the standpoint of the Insured.

However, this exclusion does not apply to Bodily Injury resulting from the use of reasonable force to protect persons or property.

**P.**  **1.**   Bodily Injury, Property Damage or Personal Injury arising out of the manufacture of, mining of, use of, sale of, installation of, removal of, distribution of or exposure to asbestos, asbestos products, asbestos fibers or asbestos dust;

**2.**   Any obligation of the Insured to indemnify any party because of damages arising out of such Bodily Injury, Property Damage or Personal Injury as a result of the manufacture of, mining of, use of, sale of, installation of, removal of, distribution of or exposure to asbestos, asbestos products, asbestos fibers or asbestos dust; or

**3.**   Any obligation to defend any suit or claim against the Insured alleging Bodily Injury, Property Damage or Personal Injury resulting damages, if such suit or claim arises from Bodily Injury, Property Damage or Personal Injury as a result of the manufacture of, mining of, use of, sale of, installation of, removal of, distribution of or exposure to asbestos, asbestos products,

NOTICE: These forms and rates are not subject to the applicable rate and form filing requirements of the New York State Insurance Department. However, such forms and rates must meet the minimum standards of the New York Insurance Law and Regulations.

57697 (6/93)          2 - 13000

**Q.**   **Bodily Injury** or **Personal Injury** to:

  **1.**   A person arising out of any:

   **a.**   Refusal to employ that person;

   **b.**   Termination of that person's employment; or

   **c.**   Employment-related practices, policies, acts or omissions such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or

  **2.**   The spouse, child, parent, brother or sister of that person as a consequence of **Bodily Injury** or **Personal Injury** to that person at whom any of the employment-related practices described in paragraph a., b. or c. above is directed.

This exclusion applies:

  **1.**   Whether the **Insured** may be liable as an employer or in any other capacity; and

  **2.**   To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**R.**   **Bodily Injury, Property Damage, Personal Injury** or **Advertising Injury** arising out of or by reason of:

  **1.**   The purchase, sale, offer of sale, or solicitation of any security. debt, bank deposit or financial interest or instrument;

  **2.**   Any representations made at any time in relation to the price or value of any security, debt, bank deposit or financial interest or instrument; or

  **3.**   Any depreciation or decline in price or value of any security, debt, bank deposit or financial interest or instrument.

**S.**   **Bodily Injury** or **Property Damage** for which any **Insured** may be held liable by reason of:

  **1.**   Causing or contributing to the intoxication of any person;

  **2.**   The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

  **3.**   Any statute. ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

However, if insurance for such **Bodily Injury** or **Property Damage** is provided by a policy listed in the Schedule of Underlying Insurance:

  **1.**   This exclusion shall not apply; and

  **2.**   The insurance provided by our policy will not be broader than the insurance coverage provided by the policy listed in the Schedule of Underlying Insurance.

**T.**   **Bodily Injury or Property Damage:**

  **a.**   These forms and the insured is also an **Insured** under a nuclear energy liability policy issued by the Nuclear Energy Liability-Property Insurance Assoc., Mutual Atomic Energy Liability Underwriters or the Nuclear Insurance Association of Canada, or would be insured under any such policy but for its termination upon exhaustion of its limit of liability; or

**NOTICE:** APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, THESE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

57697 (6/93)        2 - 13000              (13)

1.   b.   resulting from the hazardous properties of nuclear material and with respect to which (1) any person or any organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, (2) the **Insured** is, or had this policy not been available would be, entitled to indemnity from the United States of America or any agency thereof, under any agreement entered into by the United States of America or any agency thereof, with any person or organization.

2.   **Bodily Injury** or **Property Damage** resulting from the hazardous properties of nuclear material, if:

    a.   the nuclear material (1) is at any nuclear facility owned by the **Insured** or operated by the **Insured** or on the **Insured's** behalf, or (2) has been discharged or dispensed therefrom;

    b.   the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by the **Insured** or on the **Insured's** behalf; or

    c.   the **Bodily Injury** or **Property Damage** arises out of the furnishing by the **Insured** of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion c. applies only to **Property Damage** to such nuclear facility and any property thereat.

3.   As used in this exclusion:

    a.   "hazardous properties" includes radioactive, toxic or explosive properties;

    b.   "nuclear material" means source material, special nuclear material or by-product material;

    c.   "source material", "special nuclear material" and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or any law amendatory thereof;

    d.   "spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor;

    e.   "waste" means any waste material (1) containing by-product material and (2) resulting from the operation by any person or organization of a nuclear facility included within the definition of nuclear facility below;

    f.   "nuclear facility" means:

        1)   any nuclear reactor;

        2)   any equipment or device designed or used for (i) separating the isotopes of uranium or plutonium, (ii) processing or utilizing spent fuel, or (iii) handling, processing or packaging wastes;

        3)   any equipment or device used for the processing, fabricating, or alloying of special nuclear material if at any time the total amount of such material in the **Insured's** custody at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235; or

        4)   any structure, basin, excavation, premises or place prepared or used for storage or disposal of waste, and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations;

    g.   "nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

**NOTICE:** THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.
57697 (6/93)          2 - 13000                    ( )

h) **Property Damage** includes all forms of radioactive contamination of property.

## VI.   Conditions

### A.   Appeals

If the **Insured** or the **Insured's** underlying insurers do not appeal a judgment in excess of the Retained Limit, we have the right to make such an appeal. If we elect to appeal, our liability on such an award or judgment shall not exceed our Limits of Insurance as stated in Item 3 of the Declarations plus the cost and expense of such appeal.

### B.   Audit

We may audit and examine your books and records as they relate to this policy at any time during the period of this policy and for up to three years after the expiration or termination of this policy.

### C.   Bankruptcy or Insolvency

Your bankruptcy, insolvency or inability to pay or the bankruptcy, insolvency or inability to pay of any of your underlying insurers will not relieve us from the payment of any claim covered by this policy.

But under no circumstances will such bankruptcy, insolvency or inability to pay require us to drop down and replace the Retained Limit or assume any obligation within the Retained Limit area.

### D.   Cancellation

1. You may cancel this policy. You must mail or deliver advance written notice to us stating when the cancellation is to take effect.

2. We may cancel this policy. If we cancel because of non-payment of premium, we must mail or deliver to you not less than ten (10) days advance written notice stating when the cancellation is to take effect. If we cancel for any other reason, we must mail or deliver to you not less than ninety (90) days advance written notice stating when the cancellation is to take effect. Mailing that notice to you at your mailing address shown in Item 1 of the Declarations will be sufficient to prove notice.

3. The policy period will end on the day and hour stated in the cancellation notice.

4. If we cancel, final premium will be calculated pro rata based on the time this policy was in force. Final premium will not be less than the pro rata share of the Minimum Premium as shown in Item 4 of the Declarations.

5. If you cancel, final premium will be more than pro rata; it will be based on the time this policy was in force and increased by our short rate cancellation table and procedure. Final premium will not be less than the short rate share of the Minimum Premium as shown in Item 4 of the Declarations.

6. Premium adjustment may be made at the time of cancellation or as soon as practicable thereafter but the cancellation will be effective even if we have not made or offered any refund due you. Our check or our representative's check, mailed or delivered, shall be sufficient tender of any refund due you.

7. The first **Named Insured** in Item 1 of the Declarations shall act on behalf of all other **Insureds** with respect to the giving and receiving of notice of cancellation and the receipt of any refund that may become payable under this policy.

8. Any of these provisions that conflict with a law that controls the cancellation of the insurance in this policy is changed by this statement to comply with that law.

**NOTICE:** APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

57697 (6/93)        2 - 13000                    (12)

**E.   Changes**

Notice to any agent or knowledge possessed by any agent or any other person will not effect a waiver or a change in any part of this policy.  This policy can only be changed by a written endorsement that becomes a part of this policy and that is signed by one of our authorized representatives.

**F.   Duties In The Event Of An Occurrence, Claim Or Suit**

1.   You must see to it that we are notified as soon as practicable of an **Occurrence** which may result in a claim under this policy.  To the extent possible, notice should include:

   a.   how, when and where the **Occurrence** took place;

   b.   the names and addresses of any injured persons and witnesses; and

   c.   the nature and location of any injury or damage arising out of the **Occurrence**.

2.   If a claim is made or **suit** is brought against any **Insured** that is reasonably likely to involve this policy you must notify us in writing as soon as practicable.

3.   You and any other involved **Insured** must:

   a.   immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or **suit**;

   b.   authorize us to obtain records and other information;

   c.   cooperate with us in the investigation, settlement or defense of the claim or **suit**; and

   d.   assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the **Insured** because of injury or damage to which this insurance may also apply.

4.   No **Insureds** will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

**G.   Inspection**

We have the right, but are not obligated, to inspect your premises and operations at any time.  Our inspections are not safety inspections. They relate only to the insurability of your premises and operations and the premiums to be charged. We may give you reports on the conditions we find. We may also recommend changes. While they may help reduce losses, we do not undertake to perform the duty of any person or organization to provide for the health or safety of your employees or the public. We do not warrant that your premises or operations are safe or healthful or that they comply with laws, regulations, codes or standards.

**H.   Legal Actions Against Us**

There will be no right of action against us under this insurance unless:

1.   You have complied with all the terms of this policy; and

2.   The amount you owe has been determined with our consent or by actual trial and final judgment.

This insurance does not give anyone the right to add us as a defendant in an action against you to determine your liability.

NOTICE: Maintenance of Underwriting Rules and THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS of the laws of this state. THE INSURANCE DEPARTMENT, HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

During the period of this policy you agree to keep the policies listed in the Schedule of Underlying Insurance in full force and effect;

57697 (6/93)      2 - 13000      (13)

2. That any renewals or replacements of the policies listed in the Schedule of Underlying Insurance will not be more restrictive in coverage;

3. That the limits of insurance of the policies listed in the Schedule of Underlying Insurance shall not change except for any reduction or exhaustion of aggregate limits by payment of claims for **Occurrences** covered by this policy; and

4. That the terms, conditions and endorsements of the policies listed in the Schedule of Underlying Insurance will not materially change during the period of this policy.

If you fail to comply with these requirements, we will only be liable to the same extent that we would had you fully complied with these requirements.

J. Other Insurance

If other valid and collectible insurance applies to a loss that is also covered by this policy, this policy will apply excess of the other insurance. However, this provision will not apply if the other insurance is specifically written to be excess of this policy.

K. Premium

The first **Named Insured** designated in Item 1 of the Declarations shall be responsible for payment of all premiums when due.

The premium for this policy shall be computed on the basis set forth in Item 4 of the Declarations. At the beginning of the policy period, you must pay us the Advance Premium shown in Item 4 of the Declarations.

When this policy expires or if it is cancelled, we will compute the earned premium for the time this policy was in force. If this policy is subject to audit adjustment, the actual exposure basis will be used to compute the earned premium. If the earned premium is greater than the Advance Premium, you will promptly pay us the difference. If the earned premium is less than the Advance Premium, we will return the difference to you. But in any event we shall retain the Minimum Premium as shown in Item 4 of the Declarations for each twelve months of our policy period.

L. Prior Insurance

If a loss covered by this policy is also covered in whole or in part under any other excess policy issued to the **Insured** prior to the effective date of this policy, our Limits of Insurance as stated in Item 3 of the Declarations will be reduced by any amounts due the **Insured** under such prior insurance.

M. Separation of **Insureds**

Except with respect to our Limits of Insurance and any rights or duties specifically assigned to the first **Named Insured** designated in Item 1 of the Declarations, this insurance applies:

1. As if each **Named Insured** were the only **Named Insured**; and

2. Separately to each **Insured** against whom claim is made or **Suit** brought.

N. Subrogation

If any **Insured** has rights to recover all or part of any payment we have made under this policy, those rights are transferred to us. The **Insured** must do nothing after loss to impair these rights and must help us enforce them.

Any recoveries shall be applied as follows:

1. Any interests, including the **Insured**, that have paid an amount in excess of our payment under this policy will be reimbursed first;

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

**2.** We then will be reimbursed up to the amount we have paid; and

**3.** Lastly, any interests, including the **Insured,** over which our insurance is excess, are entitled to claim the residue.

Expenses incurred in the exercise of rights of recovery shall be apportioned between the interests, including the **Insured,** in the ratio of their respective recoveries as finally settled.

**O.** Transfer Of Your Rights And Duties

Your rights and duties under this policy may not be transferred without our written consent.

If you die or are legally declared bankrupt, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. However, notice of cancellation sent to the first **Named Insured** designated in Item **1** of the Declarations and mailed to the address shown in this policy will be sufficient notice to effect cancellation of this policy.

**P.** When Loss Is Payable

Coverage under this policy will not apply unless and until the **Insured** or the **Insured's** underlying insurer is obligated to pay the Retained Limit.

When the amount of loss has finally been determined, we will promptly pay on behalf of the **Insured** amount of loss falling within the terms of this policy.

You shall promptly reimburse us for any amount within the Self Insured Retention paid by us on behalf of an **Insured.**

**In Witness Whereof,** we have caused this policy to be executed and attested, but this policy shall not be valid unless countersigned by one of our duly authorized representatives, where required by law.

*Elizabeth M. Tuck*

SECRETARY

*Jh. L. Evyle*

PRESIDENT

**NOTICE:** THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.
57697 (6/93)       2 - 13000       (8)

# EXHIBIT B

EFILED Document – District Court
CO Adams County District Court 17th JD
2011cv299
Filing Date: Mar 1 2011 4:41PM MST
Transaction ID: 36187172

DISTRICT COURT, COUNTY OF ADAMS,
STATE OF COLORADO

Court Address:  Adams County District Court
                1100 Judicial Center Drive
                Brighton, Colorado 80601

**Plaintiffs:**

Lexington Insurance Company, United States Fire
Insurance Company, Commonwealth Insurance
Company, United Insurance Company, United Fire
& Casualty, Tartan Products Company, and Western
Innovations, Inc.,

v.

**Defendants:**

Cornerstone Security, a Colorado Corporation d/b/a
Sonitrol of Denver; and Sonitrol Management,
Corporation, a Delaware Corporation; EB, an
individual; CRG, an individual.

---

Attorneys for Lexington, United States Fire
Insurance Company, and Commonwealth Insurance:

| | |
|---|---|
| Name: | Thomas M. Dunford #31765 |
| Address: | Cozen O'Connor |
| | 707 17th Street, Suite 3100 |
| | Denver, Colorado 80202 |
| Phone No.: | 720-479-3900 |
| FAX No.: | 720-479-3890 |
| Email: | tdunford@cozen.com |

Attorneys for United Insurance, United Fire
Insurance, and Tartan Products Company:

| | |
|---|---|
| Name | Todd A. Myers #14799 |
| Address: | Sage & Vargo, PC |
| | 6464 W 14th Avenue |
| | Lakewood, Colorado 80214-1913 |
| Phone No.: | 303-238-8832 |
| FAX No.: | 303-233-2210 |
| Email: | tmyers@sagevargo.com |

Attorneys for Western Innovations, Inc.:

| | |
|---|---|
| Name | Gregory Fasing #7631 |
| Address: | Fasing Law Firm, PC |
| | 300 South Jackson Street, Suite 100 |
| | Denver, CO  80209 |
| Phone No.: | 303-692-8833 |
| FAX No.: | 303-692-8557 |
| Email: | whitehats@aol.com |

**?  COURT USE ONLY  ?**

Case Number:

Division:

---

### COMPLAINT AND JURY DEMAND

---

Plaintiffs Lexington Insurance Company, United States Fire Insurance Company, Commonwealth Insurance Company, United Insurance Company, United Fire & Casualty, Tartan Products Company, and Western Innovations, Inc., by and through their attorneys, Cozen O'Connor, Sage & Vargo, and Fasing Law Firm, complain as follows:

## GENERAL ALLEGATIONS

1.      Plaintiff Lexington Insurance Company is a Delaware corporation authorized to do business and transact insurance in the state of Colorado.  At all relevant times, Lexington provided insurance to Core-Mark International, including Core-Mark's property and business operation located at 3650 Fraser in Aurora, Adams County, Colorado.

2.      Plaintiff United States Fire Insurance Company is a New Jersey corporation authorized to do business and transact insurance in the state of Colorado.  At all relevant times, United States provided insurance to Core-Mark International, including Core-Mark's property and business operation located at 3650 Fraser in Aurora, Adams County, Colorado.

3.      Plaintiff Commonwealth Insurance Company is a Canadian corporation authorized to do business and transact insurance in the state of Colorado.  At all relevant times, Commonwealth provided insurance to Core-Mark International, including Core-Mark's property and business operation located at 3650 Fraser in Aurora, Adams County, Colorado.

4.      Plaintiff United Insurance Company is a Nebraska corporation authorized to do business and transact insurance in the state of Colorado.  At all relevant times, United provided insurance to Western Innovations, including Western Innovations' property and business operation located at 3650 Fraser in Aurora, Adams County, Colorado.

5.      Plaintiff United Fire & Casualty is an Iowa corporation authorized to do business and transact insurance in the state of Colorado.  At all relevant times, United Fire & Casualty provided insurance to Tartan Products Company, a Colorado corporation, including Tartan Products' business product located at 3650 Fraser in Aurora, Adams County, Colorado.

6.      Plaintiff Tartan Products Company is a Colorado corporation with its principal place of business in Englewood, Arapahoe County, Colorado.  At all relevant times, Tartan Products was doing business in Adams County, Colorado.

7.      Plaintiff Western Innovations, Inc. is a Colorado corporation with its principal place of business in Aurora, Adams County, Colorado.  At all relevant times, Western Innovations was doing business in Adams County, Colorado.

8.      Defendant Cornerstone Security, Inc. d/b/a Sonitrol of Denver is, on information and belief, a Colorado corporation with its principal place of business in Greenwood Village, Colorado.  At all relevant times, Sonitrol of Denver installed, maintained, and monitored burglar alarm systems in Aurora, Adams County, Colorado.

9.      Defendant Sonitrol Management Corporation is, on information and belief, a Delaware corporation with its principal place of business in Westlake, Texas.  At all relevant times, Sonitrol Management provided monitoring services for burglar alarms installed in Aurora, Adams County, Colorado.

10.     "EB" are the initials of an individual who, on information and belief, was at all relevant times residing in Texas and was employed as an operator by Defendant Sonitrol Management.  It is anticipated that EB's full name will be obtained during discovery and thereafter substituted in the caption.

11.     "CRG" are the initials of an individual who, on information and belief, was at all relevant times residing in Texas and was employed as an operator by Defendant Sonitrol Management.  It is anticipated that CRG's full name will be obtained during discovery and thereafter substituted in the caption.

12.     On or about December 18, 1995, Core-Mark contracted with Sonitrol of Denver for the installation of a burglar alarm signaling service in the warehouse at 3650 Fraser Street in Aurora, Colorado in which Core-Mark was a tenant.  The contract between Core-Mark and Sonitrol of Denver included Sonitrol of Denver's agreement to provide offsite monitoring of the burglar alarm equipment installed in the Core-Mark premises.

13.     The agreement between Core-Mark and Sonitrol of Denver was assigned to Sonitrol Management.  Sonitrol Management thereafter assumed Sonitrol of Denver's duties and provided offsite monitoring of the burglar alarm system installed at the Core-Mark premises in Aurora, Colorado.  The burglar alarm equipment and system monitoring were intended to protect persons and property in and around the warehouse space rented by Core-Mark.

14.     In the morning of December 21, 2002, at least three individuals forced their way into the Core-Mark premises at 3650 Fraser Street in Aurora, Colorado.  The burglars kicked in or otherwise broke through an overhead door on the west side of the Core-Mark warehouse.  After gaining entrance, the burglars roamed through the warehouse and committed a burglary by removing goods and materials owned by Core-Mark that were stored in the warehouse.

15.     A microphone which was part of the burglar alarm system was mounted on a wall approximately fifteen feet away from the exterior door the burglars kicked in to gain access to the warehouse.  The microphone failed to detect the noise of the initial break-in.  The microphone then failed to detect the burglars' activities inside the warehouse for nearly two hours.  The microphone, believed to be designated "detector one," never produced an audio activation because its sensitivity was set at its lowest level by defendants, effectively disabling the microphone and rendering it useless as a safety device for protecting persons and property at the Core-Mark warehouse.

16.     At approximately 6:50 a.m., an audio microphone designated "detector two" tripped, resulting in an audio activation of the Core-Mark burglar alarm system being monitored by Sonitrol Management.

17.     At 6:50 a.m., the Core-Mark burglar alarm system was being monitored offsite by a Sonitrol Management operator whose initials are "EB."  Upon receipt of an audio signal from

3

the burglar alarm system in the Core-Mark warehouse, Sonitrol Management's operator EB was required to use reasonable efforts to identify the sound and when warranted transmit notice of the signal to the public police department.

18.     After the monitoring system showed detector two tripped resulting in an audio activation, Sonitrol Management's operator EB simply reset the burglar alarm system panel without attempting to identify the sound and without notifying the Aurora Police Department.

19.     On information and belief, there was a shift change at Sonitrol Management following the first audio activation of the Core-Mark burglar alarm system at 6:50 a.m. A second Sonitrol Management operator whose initials are "CRG" replaced EB and took over monitoring duties for the burglar alarm system in the Core-Mark warehouse.

20.     At approximately 7:29 a.m., the audio microphone designated detector two tripped again, resulting in an audio activation of the Core-Mark burglar alarm system being monitored by Sonitrol Management.

21.     Upon receipt of an audio signal from the burglar alarm system in the Core-Mark warehouse, Sonitrol Management's operator CRG was required to use reasonable efforts to identify the sound and when warranted transmit notice of the signal to the public police department.

22.     After the monitoring system showed detector two had tripped a second time resulting in another audio activation, the new Sonitrol Management operator CRG simply reset the panel without attempting to identify the sound and without notifying the Aurora Police Department.

23.     At approximately 7:56 a.m., the audio microphone designated detector two tripped a third time, resulting in an audio activation of the Core-Mark burglar alarm system being monitored by Sonitrol Management.

24.     Upon receipt of an audio signal from the burglar alarm system in the Core-Mark warehouse, Sonitrol Management's operator CRG was required to use reasonable efforts to identify the sound and when warranted transmit notice of the signal to the public police department.

25.     After the monitoring system showed detector two had tripped a third time resulting in yet another audio activation, the Sonitrol Management operator CRG simply reset the panel without attempting to identify the sound and without notifying the Aurora Police Department.

26.     At approximately 8:36 a.m., the audio microphone designated detector two tripped for a fourth time, resulting in still another audio activation of the Core-Mark burglar alarm system being monitored by Sonitrol Management.

27.     Upon receipt of an audio signal from the burglar alarm system in the Core-Mark warehouse, Sonitrol Management's operator CRG was required to use reasonable efforts to

identify the sound and when warranted transmit notice of the signal to the public police department.

28.     After the monitoring system showed detector two tripped a fourth time, resulting in a fourth audio activation in less than two hours, Sonitrol Management's operator CRG simply reset the panel without attempting to identify the sound and without notifying the Aurora Police Department.

29.     At approximately 8:42 a.m., the burglars, seeking to destroy evidence of their crime, intentionally ignited fires inside the Core-Mark warehouse. Because Sonitrol Management's operators EB and CRG failed to properly respond to the multiple audio activations triggered by the sound detectors inside the warehouse and never called the Aurora Police Department, the burglars were unmolested during the commission of their burglary and were not arrested before their arson at the Core-Mark warehouse

30.     At approximately 8:44 a.m. on December 21, 2002, audio microphones designated "detector three" and "detector four" tripped simultaneously, producing a fifth audio activation on the Sonitrol Management equipment monitoring the Core-Mark warehouse burglar alarm system.

31.     Upon receipt of an audio signal from the burglar alarm system at the Core-Mark warehouse, Sonitrol Management's operator was required to use reasonable efforts to identify the sound and when warranted transmit notice of the signal to the public police department.

32.     At approximately 8:46 a.m., after multiple audio activations, Core-Mark operator CRG made his/her first attempt to identify the sound that had tripped the microphones in the Core-Mark warehouse. Sonitrol Management's operator replayed a recording several times, but never notified the Aurora Police Department.

33.     Sonitrol Management's operator finally called the fire department after an activation of the fire suppression system in the Core-Mark warehouse, the Aurora Fire Department was already at the scene fighting the fire at the Core-Mark warehouse, having been alerted to the fire by passersby and eyewitnesses.

34.     Two Sonitrol Management operators EB and CRG had at least four opportunities to properly respond to audio activations produced by tripped microphones inside the Core-Mark warehouse, but failed to do so at each opportunity. Sonitrol Management's operators EB and CRG also failed to notify the Aurora Police Department.

35.     If Sonitrol Management's operators EB and CRG had used reasonable efforts to identify the multiple sounds which tripped the burglar alarm system microphones installed in the Core-Mark warehouse, the tripped microphones causing multiple audio activations of the monitoring system, indicating an unauthorized entry of the burglars into Core-Mark's premises, and had transmitted notice of that unauthorized entry to the Aurora Police Department, the burglars would have been captured or enticed to leave the premises before they started fires inside the Core-Mark facility.

36.     The fires set by the burglars/arsonists destroyed the contents of the Core-Mark warehouse and disrupted Core-Mark's ongoing business operations.

37.     Following the fire, Core-Mark presented a claim to its insurers, Lexington, United States Fire, and Commonwealth seeking benefits under the respective policies. Core-Mark's insurers have to date paid more than ten million dollars ($10,000,000.00) to or on behalf of Core-Mark for damages caused by the December 21, 2002 fire. Additional payments may be forthcoming. Core-Mark's insurers are subrogated against Defendants to the extent of their payments made to or on behalf of Core-Mark.

38.     The fires spread from the Core-Mark tenancy into the portion of the warehouse occupied by Western Innovations. The fire destroyed or damaged Western Innovations' property and disrupted its business operations.

39.     Following the fire, Western Innovations presented a claim seeking benefits under its United Insurance Company policy. United Insurance Company paid three hundred seventy-five thousand ($375,000.00) to or on behalf of Western Innovations for damages caused by the fire. United Insurance Company is subrogated against Defendants to the extent of payments made to or on behalf of Western Innovations.

40.     Western Innovations sustained a loss to its property and business operations of approximately $1,000,000.00 in excess of its United Insurance Company insurance policy that Western Innovations seeks to recover.

41.     Tartan Products Company had product in the Western Innovations premises at the warehouse at the time of the fire which was destroyed by the fire. United Fire and Casualty Company paid $19,520 under its policy of insurance for which it is subrogated against Defendants. Tartan Products Company incurred additional uninsured losses in the approximate amount of thirty thousand ($30,000) that it seeks to recover.

42.     Defendants are responsible for the acts and/or omissions of their employees within the scope of their employment under the doctrine of respondeat superior.

## FIRST CLAIM FOR RELIEF
## NEGLIGENCE—SONITROL OF DENVER AND SONITROL MANAGEMENT

43.     Plaintiffs adopt and incorporate by reference their General Allegations.

44.     The Sonitrol Defendants owed a duty to plaintiffs to properly and reasonably design, install, maintain, and monitor the burglar alarm system in the Core-Mark warehouse.

45.     Sonitrol Management had a duty to hire competent employees and to properly train, instruct, and supervise those employees in the operation and monitoring of the Core-Mark burglar alarm system.

46.     Because of the nature of their undertaking at the Core-Mark warehouse, the Sonitrol Defendants owed a duty to the public to insure that the warehouse burglar alarm system was properly and reasonably designed, installed, maintained, and monitored. It was foreseeable

to the Sonitrol Defendants that a breach of their duty to plaintiffs could result in a fire that would damage Core-Mark, Western Innovations, and Tartan Products. It was foreseeable to the Sonitrol Defendants that a fire in the Core-Mark warehouse would endanger Colorado citizens, including public servants such as policemen and firefighters.

47.     The Sonitrol Defendants breached the duty they owed to plaintiffs and the public by failing to properly design, install, maintain, and monitor the burglar alarm system in the Core-Mark warehouse. The Sonitrol Defendants breached the duty owed to plaintiffs and the public by failing to properly hire, train, instruct, and supervise competent operators to monitor the Core-Mark warehouse burglar alarm system.

The Sonitrol Defendants' breach of the duty owed to plaintiffs and the Colorado public was a substantial factor and cause of the December 21, 2002 fire that resulted in Plaintiffs' damages and losses.

<div align="center">

**SECOND CLAIM FOR RELIEF**
**GROSS NEGLIGENCE – SONITROL OF DENVER AND**
**SONITROL MANAGEMENT**

</div>

48.     Plaintiffs adopt and incorporate by reference their General Allegations and all previous Claims for Relief.

49.     The Sonitrol Defendants had a duty to plaintiffs and the Colorado public to exercise reasonable care in the design, installation, maintenance, and monitoring of the burglar alarm system in the Core-Mark warehouse. The Sonitrol Defendants had a duty to plaintiffs and the Colorado public to hire competent employees and insure that those employees received proper training and supervision in the design, installation, maintenance and monitoring of the Core-Mark warehouse burglar alarm system.

50.     The Sonitrol Defendants breached their duty owed to plaintiffs and the Colorado public by failing to properly design, install, maintain and monitor the Core-Mark burglar alarm system.

51.     The Sonitrol Defendants' breach of their duty demonstrated a reckless, willful and wanton disregard for the safety of persons and property at the Core-Mark warehouse.

52.     The Sonitrol Defendants showed reckless, willful and wanton disregard for the safety of persons and property at the Core-Mark warehouse in several ways, including, but not limited to, the following:

        (a)     The Sonitrol Defendants failed to ensure that microphones inside the warehouse were properly adjusted to detect intruders entering the building. The microphone approximately fifteen feet away from where the burglars kicked in a door to obtain access to the warehouse interior should have detected the noise of the break-in and the burglars' subsequent unlawful activities inside the warehouse. The microphone never produced an audio activation because its sensitivity was set at its lowest level by defendants,

<div align="center">7</div>

effectively disabling the microphone and rendering it useless as a safety device for protecting persons and property at the Core-Mark warehouse.

(b)     Other microphones in the Core-Mark warehouse detected the burglars inside the warehouse resulting in numerous and repeated tripped detectors and audio activations at the offsite monitoring station.  Contrary to their duty, accepted industry practice, the burglar alarm system monitoring contract, and common sense, the Sonitrol Defendants' operators ignored, disregarded, and/or failed to use any reasonable efforts to identify the sounds producing the audio signals indicating the burglars' unauthorized entry and unlawful activities inside the Core-Mark warehouse.

(c)     The Sonitrol defendants' operators failed to transmit notice of the numerous audio activations inside the Core-Mark warehouse to the Aurora Police Department.  The Sonitrol Defendants' operators failed to notify the Aurora Fire Department until after the Aurora Fire Department was already at the fire scene fighting the blaze.

53.     The Sonitrol Defendants' reckless, willful and wanton disregard for the consequences of their dangerous conduct and for the safety of people and property at the Core-Mark warehouse was a substantial factor and cause of Plaintiffs' damages.

## THIRD CLAIM FOR RELIEF
## NEGLIGENCE—SONITROL MANAGEMENT OPERATORS EB AND CRG

54.     Plaintiffs adopt and incorporate by reference their General Allegations.

55.     Defendants ER and CRG owed a duty to plaintiffs to properly monitor the burglar alarm system in the Core-Mark warehouse, including a duty to use their training, industry knowledge, and common sense to properly respond to audio activations produced by the Core-Mark burglar alarm system.

56.     Because of the nature of their employer's undertaking at the Core-Mark warehouse, Defendants ER and CRG owed a duty to the public to use their training, industry knowledge, and common sense to ensure that the warehouse burglar alarm system was properly and reasonably monitored.  It was foreseeable to Defendants ER and CRG that a breach of their duty to plaintiffs could result in a fire that would damage Core-Mark, Western Innovations, and Tartan Products.  It was foreseeable to Defendants ER and CRG that a fire in the Core-Mark warehouse would endanger Colorado citizens, including public servants such as policemen and firefighters.

57.     Defendants ER and CRG breached the duty they owed to plaintiffs and the public by failing to properly monitor the burglar alarm system in the Core-Mark warehouse. Defendants ER and CRG breached the duty owed to plaintiffs and the public by failing to

properly respond to audio activations produced by the Core-Mark warehouse burglar alarm system.

58.    Defendants ER's and CRG's breach of the duty owed to plaintiffs and the Colorado public was a substantial factor and cause of the December 21, 2002 fire which resulted in Plaintiffs' damages and losses.

<div align="center">

**FOURTH CLAIM FOR RELIEF**
**GROSS NEGLIGENCE – SONITROL MANAGEMENT**
**OPERATORS EB AND CRG**

</div>

59.    Plaintiffs adopt and incorporate by reference their General Allegations and all previous Claims for Relief.

60.    Defendants EB and CRG had a duty to plaintiffs and the Colorado public to exercise reasonable care in the monitoring of the burglar alarm system in the Core-Mark warehouse. Defendants had a duty to plaintiffs and the Colorado public to use their training, industry knowledge, and common sense to properly respond to audio activations produced by the Core-Mark warehouse burglar alarm system.

61.    Defendants EB and CRG breached their duty owed to plaintiffs and the Colorado public by failing to properly monitor the burglar alarm system installed in the Core-Mark warehouse and by failing to properly respond to audio activations produced by the Core-Mark burglar alarm system.

62.    Defendants EB's and CRG's breach of their duty demonstrated a reckless, willful and wanton disregard for the safety of persons and property at the Core-Mark warehouse in several ways, including, but not limited to, the following:

    (a)    Microphones in the Core-Mark warehouse detected the burglars inside the warehouse resulting in numerous and repeated tripped detectors and audio activations at the offsite monitoring station. Contrary to accepted industry practice, the burglar alarm system monitoring contract, their training, and common sense, Defendants EB and CRG ignored, disregarded, and/or failed to use any reasonable efforts to identify the sounds producing the audio signals indicating the burglars' unauthorized entry and unlawful activities inside the Core-Mark warehouse.

    (b)    EB and CRG failed to transmit notice of the numerous audio activations inside the Core-Mark warehouse to the Aurora Police Department. CRG failed to notify the Aurora Fire Department until after the Aurora Fire Department was already at the fire scene fighting the blaze.

63.    Defendants EB's and CRG's reckless, willful and wanton disregard for the consequences of their dangerous conduct and for the safety of people and property at the Core-Mark warehouse was a substantial factor and cause of Plaintiffs' damages.

<div align="center">9</div>

## FIFTH CLAIM FOR RELIEF
## BREACH OF CONTRACT – SONITROL OF DENVER AND SONITROL
## MANAGEMENT

64.     Plaintiffs adopt and incorporate by reference their General Allegations and all previous Claims for Relief.

65.     Core-Mark contracted with Defendant Sonitrol of Denver for the design, installation, maintenance, and monitoring of the burglar alarm system in the Core-Mark warehouse.  A portion or all of Sonitrol of Denver's obligations under the contract were assigned or assumed by Sonitrol Management.  Sonitrol of Denver, as assignor, remained liable for its contractual obligations.

66.     The contract between defendants and Core-Mark included an implied covenant of good faith and fair dealing that upholds Core-Mark's reasonable expectations of defendants' performance under the contract.

67.     Defendant Sonitrol of Denver induced Core-Mark to enter into the burglar alarm installation and monitoring contract with representations that defendants would use appropriate discretion to fulfill their obligations under the contract and that defendants would provide security for the Core-Mark warehouse by installing proper equipment, that the equipment would function properly, and that the burglar alarm system would be monitored by competent, conscientious, and well trained operators.

68.     Core-Mark reasonably and justifiably relied on defendants' inducements when it entered into the alarm system installation and monitoring agreement with Sonitrol of Denver, ultimately to Core-Mark's and plaintiffs' detriment.

69.     Plaintiffs Western Innovations and Tartan Products Company were foreseeable beneficiaries of the contract between Core-Mark and Defendants.

70.     The Sonitrol Defendants had a duty to fulfill their obligations under the contract, including the implied covenant of good faith and fair dealing, in a safe and reasonable manner, consistent with accepted industry standards and common sense.

71.     The alarm system monitoring contract provides that "upon receipt of an audio signal indicating an unauthorized entry into CLIENTS' premises, DEALERS' operator will use reasonable efforts to identify the sound, and when warranted transmit notice of said signal to the public police department."

72.     The Sonitrol Defendants showed reckless, willful and wanton disregard for their obligations under the contract, for the consequences of their dangerous conduct, and for the safety of persons and property at the Core-Mark warehouse in several ways, including, but not limited to, the following:

       (a)     The Sonitrol Defendants failed to ensure that microphones inside the warehouse were properly adjusted to detect intruders entering the building.  The microphone approximately fifteen feet away

10

from where the burglars kicked in a door to obtain access to the warehouse interior should have detected the noise of the break-in and the burglars' subsequent unlawful activities inside the warehouse. The microphone never produced an audio activation because its sensitivity was set at its lowest level by defendants, effectively disabling the microphone and rendering it useless as a safety device for protecting persons and property at the Core-Mark warehouse.

(b)     Other microphones in the Core-Mark warehouse detected the burglars inside the warehouse resulting in numerous and repeated tripped detectors and audio activations at the offsite monitoring station. Contrary to accepted industry practice, the burglar alarm system monitoring contract, and common sense, Sonitrol Management's operators ignored, disregarded, and/or failed to use any reasonable efforts to identify the sounds producing the audio signals indicating the burglars' unauthorized entry and unlawful activities inside the Core-Mark warehouse.

(c)     Sonitrol Management's operators failed to transmit notice of the numerous audio activations inside the Core-Mark warehouse to the Aurora Police Department. Sonitrol Management's operators failed to notify the Aurora Fire Department until after the Aurora Fire Department was already at the fire scene fighting the blaze.

73.     Because Defendants failed to comply with and perform their obligations under the contract, including the implied covenant of good faith and fair dealing, the contract has failed of its essential purpose. The contract is void or voidable by plaintiffs. Defendants are not entitled to selectively enforce contractual provisions because they failed to comply with their contractual obligations. The contract is also contrary to Colorado public policy.

74.     Defendants' breach of the alarm system monitoring contract was a substantial factor and cause of plaintiffs' damage.

<div align="center">

### SIXTH CLAIM FOR RELIEF
### MISREPRESENTATION – SONITROL OF DENVER AND SONITROL MANAGEMENT

</div>

75.     Plaintiffs adopt and incorporate by reference their General Allegations and all previous Claims for Relief.

76.     The Sonitrol Defendants represented to Core-Mark that they would use reasonable care and comply with accepted industry standards in designing, installing, maintaining, and monitoring the burglar alarm system at the Core-Mark warehouse. The Sonitrol Defendants represented to Core-Mark that they would hire competent, capable

<div align="center">

11

</div>

and conscientious operators to monitor the burglar alarm system and would adequately train and supervise those operators.

77.    Core-Mark reasonably and justifiably relied on the Sonitrol Defendants' representations regarding the quality of the burglar alarm system equipment, installation, maintenance, operation of the equipment, and offsite monitoring of the system when entering into the burglar alarm system monitoring agreement, ultimately to Core-Mark's and plaintiffs' detriment.

78.    The Sonitrol Defendants misrepresented the nature and quality of equipment and services they would provide under the alarm system installation and monitoring contract. These misrepresentations included, but were not limited to the following:

(a)    That microphones inside the warehouse would be properly adjusted to detect intruders entering the building. The microphone approximately fifteen feet away from where the burglars kicked in a door to obtain access to the warehouse interior should have detected the noise of the break-in and the burglars' activities inside the warehouse. The microphone never produced an audio activation because its sensitivity was set at its lowest level by defendants, effectively disabling the microphone and rendering it useless as a safety device for protecting persons and property at the Core-Mark warehouse.

(b)    That the operators monitoring the burglar alarm system were properly hired and were competent, capable, conscientious, well-trained and supervised, and that the operators would use reasonable efforts to identify any sound that resulted in an audio activation. Microphones in the Core-Mark warehouse detected the burglars inside the warehouse resulting in numerous and repeated tripped detectors and audio activations at the offsite monitoring station. Contrary to accepted industry practice, their training, terms of the burglar alarm system monitoring contract, common sense, and Defendants' representations, Sonitrol Management's operators ignored, disregarded, and/or failed to use any reasonable efforts to identify the sounds producing the multiple audio signals indicating the burglars' unauthorized entry and unlawful activities inside the Core-Mark warehouse.

(c)    That the operators monitoring the burglar alarm system would transmit notice of audio activations to the public police department. In fact, Sonitrol Management's operators failed to transmit notice of the audio activations to the Aurora Police Department. Sonitrol Management's operators failed to notify the Aurora Fire Department until after the Aurora Fire Department was already at the fire scene fighting the blaze.

12

79.     The Sonitrol Defendants' misrepresentations were a substantial factor and cause of Plaintiffs' damages.

## SEVENTH CLAIM FOR RELIEF
## BREACH OF IMPLIED WARRANTY (MERCHANTABILITY) –SONITROL OF DENVER AND SONITROL MANAGEMENT

80.     Plaintiffs adopt and incorporate by reference their General Allegations and all previous Claims for Relief.

81.     The Sonitrol Defendants were merchants of the burglar alarm system they designed, installed, maintained, and monitored at the Core-Mark warehouse.

82.     Core-Mark relied upon the burglar alarm system equipment and monitoring services in a manner and for a purpose which was foreseeable to Defendants and for which the equipment and monitoring service was intended.

83.     The Sonitrol Defendants knew or reasonably should have known that Plaintiffs would be damaged by Defendants' failure to provide the Core-Mark warehouse with equipment and monitoring of merchantable quality.

84.     Plaintiffs notified Defendants within a reasonable period of time after they discovered Defendants' breach of warranty.

85.     The Sonitrol Defendants' breach of warranty was a substantial factor and cause of Plaintiffs' damages.

## EIGHTH CLAIM FOR RELIEF
## BREACH OF IMPLIED WARRANTY OF FITNESS
## FOR A PARTICULAR PURPOSE – SONITROL OF DENVER AND SONITROL MANAGEMENT

86.     Plaintiffs adopt and incorporate by reference their General Allegations and all previous Claims for Relief.

87.     The Sonitrol Defendants designed, installed, maintained, and monitored the burglar alarm system in the Core-Mark warehouse.

88.     The Sonitrol Defendants impliedly warranted that the burglar alarm system was suitable and fit for its particular purpose.

89.     The Sonitrol Defendants knew or reasonably should have known that Plaintiffs would be damaged by defective burglar alarm equipment and monitoring.

90.     The burglar alarm equipment and monitoring were not suitable or fit for their particular purpose because of defects in its design, installation, maintenance and monitoring.

13

91.     Within a reasonable time after Plaintiffs discovered the breach of warranty, they notified Defendants of that breach.

92.     The Sonitrol Defendants' breach of implied warranty of fitness for a particular purpose was a substantial factor and cause of Plaintiffs' damages.

## PRAYER FOR RELIEF

Plaintiffs pray for judgment against Defendants as follows:

1.      For compensatory damages in amounts to be proven at trial;

2.      For Plaintiffs' costs and expenses incurred herein;

3.      For pre-judgment interest as allowed by law;

4.      For attorneys' fees and expert witness fees as allowed by law; and

5.      For such other and further relief as the Court deems just and equitable.

### PLAINTIFFS DEMAND TRIAL BY JURY AND TENDER
### THE REQUIRED JURY FEE HEREWITH.

Dated this 17th day of December 2003.

Respectfully submitted,

COZEN O'CONNOR

*Original signature on file at offices of Cozen O'Connor pursuant to C.R..C.P. 121 § 1-26*

By: _____

Thomas M. Dunford, #31765
Attorneys for Plaintiffs Lexington, United States Fire, and Commonwealth

SAGE & VARGO, PC

*Original signature on file at offices of Cozen O'Connor pursuant to C.R..C.P. 121 § 1-26*

By: _____

Todd A. Myers, #14799
Attorneys for United Insurance Company, United Fire and Casualty, and Tartan Products Company

14

FASING LAW FIRM, PC

*Original signature on file at offices of*
*Cozen O'Connor pursuant to*
*C.R..C.P. 121 § 1-26*

By: _____

Gregory J. Fasing, #7631
Attorneys for Western Innovations, Inc.

Plaintiffs' Addresses:

Lexington Insurance Company
2201 East Camelback Road, Suite 410B
Phoenix, AZ  85016

United States Fire
PO Box 5090
Denver, CO  80155

Commonwealth Insurance Company
PO Box 34069
Seattle, WA  98124

Plaintiff's Attorneys:

Attorneys for Lexington, United States Fire Insurance Company, and Commonwealth Insurance:
-Thomas M. Dunford #31765
Cozen O'Connor
707 17th Street, Suite 3100
Denver, Colorado 80202

Attorneys for United Insurance, United Fire Insurance, and Tartan Products Company:
Todd A. Myers #14799
Sage & Vargo, PC
6464 W 14th Avenue
Lakewood, Colorado 80214-1913

Attorneys for Western Innovations, Inc.:
Gregory Fasing #7631
Fasing Law Firm, PC
300 South Jackson Street, Suite 100
Denver, CO  80209

::ODMA\PCDOCS\DENVER01\110541\1

15

# EXHIBIT C

EFILED Document – District Court
CO Adams County District Court 17th JD
2011cv299
Filing Date: Mar  1 2011  4:41PM MST
Transaction ID: 36187172

| | |
|---|---|
| DISTRICT COURT, COUNTY OF ADAMS, STATE OF COLORADO <br><br> Adams County District Court <br> 1100 Judicial Center Drive <br> Brighton, Colorado 80601 | |
| **Plaintiffs:** <br> CORE-MARK MIDCONTINENT, INC.; and <br> CORE-MARK INTERNATIONAL, INC. | ▲  **COURT USE ONLY**  ▲ |
| **Defendants:** <br> SONITROL MANAGEMENT CORPORATION; <br> CORNERSTONE SECURITY, INC. d/b/a SONITROL OF <br> DENVER; and SONITROL CORPORATION | Case Number: <br><br> Div.          Ctrm.: |
| **Attorneys for Plaintiffs:** <br> K. C. Groves, #20832 <br> Kelley A. Bergelt, #35168 <br> IRELAND STAPLETON PRYOR & PASCOE, P.C. <br> 1675 Broadway, Suite 2600 <br> Denver, Colorado 80202 <br> Telephone:  (303) 623-2700 <br> Fax No.:     (303) 623-2062 <br> E-mail:      kcgroves@irelandstapleton.com <br>                   kbergelt@irelandstapleton.com | |
| **COMPLAINT AND JURY DEMAND** ||

Plaintiffs Core-Mark MidContinent, Inc. and Core-Mark International, Inc. (collectively, "Core-Mark"), through their undersigned counsel, Ireland, Stapleton, Pryor & Pascoe, P.C., state their Complaint against Defendants as follows:

## NATURE OF THE CASE

1.     This action is closely related to a civil action brought by Core-Mark's insurance companies, currently pending in Division C of Adams County District Court and styled as *Lexington Ins. Co., et al. v. Cornerstone Security, et al.*, Case No. 03-CV-3836.

2.     The claims against Defendants arise from a December 21, 2002 fire set by burglars (the "Fire") that destroyed a warehouse leased by Core-Mark MidContinent, located at 3650 Fraser Street, Aurora, Colorado 80011 (the "Warehouse"). The Warehouse was equipped with a Sonitrol burglar alarm system that was sold to Core-Mark, installed and maintained by Defendant Cornerstone Security, Inc. d/b/a Sonitrol of Denver ("Sonitrol of Denver").

Defendant Sonitrol Management Corporation ("Sonitrol Management") assumed responsibility for providing offsite monitoring of this burglar alarm system. During relevant times, Defendant Sonitrol Corporation ("Sonitrol Corporation") held itself out to the public as providing "comprehensive and ongoing training" to its franchisees, such as Sonitrol of Denver, and to the individuals who operate Sonitrol security systems, such as the employees of Sonitrol Management responsible for monitoring the burglar alarm system purchased by Core-Mark.

3.      As a result of Defendants' wrongful conduct, alleged below, the burglars were able to unlawfully break into, burglarize and ultimately destroy the Warehouse by setting the Fire. In this action, Core-Mark sues all three Defendants for negligence, gross negligence, and false representation, and Core-Mark sues Sonitrol of Denver and Sonitrol Management for breach of contract, breach of implied warranty of merchantability, and breach of implied warranty of fitness for a particular purpose.

## PARTIES, JURISDICTION AND VENUE

4.      Core-Mark is an Arkansas corporation with its principle place of business at 395 Oyster Point Boulevard, Suite 415, South San Francisco, California 94080. It is the wholly-owned subsidiary of CMI. At all relevant times, Core-Mark stored fresh, frozen and dry-packaged goods at the Warehouse in Aurora, Adams County, Colorado.

5.      CMI is a Delaware corporation with its principle place of business at 395 Oyster Point Boulevard, Suite 415, South San Francisco, California 94080. CMI is one of the leading convenience industry distributors, authorized to do and doing business in the State of Colorado.

6.      Sonitrol Management is a Delaware corporation with its principle place of business at 8 Campus Circle, Suite 150, West Lake, Texas 76262. At all relevant times, Sonitrol Management provided monitoring services for Sonitrol security systems installed in Aurora, Adams County, Colorado.

7.      Sonitrol of Denver is a Colorado corporation with its principle place of business at 8775 East Orchard Road, Greenwood Village, Colorado 80111. At all relevant times, Sonitrol of Denver installed, maintained, and monitored Sonitrol security systems in Aurora, Adams County, Colorado.

8.      Sonitrol Corporation is a Delaware corporation with its principle place of business at 211 North Union Street, Suite 350, Alexandria, Virginia 22314. At all relevant times, Sonitrol Corporation was doing business in the State of Colorado.

9.      Upon the facts alleged herein, this Court has subject matter jurisdiction over all claims for relief asserted herein, it has personal jurisdiction over each Defendant, and venue is proper in this judicial district pursuant to C.R.C.P. 98.

## GENERAL ALLEGATIONS

10.     During relevant times, Sonitrol Corporation's website, www.sonitrol.com, included the following statements:

> Sonitrol Corporation based in Alexandria, Virginia supports its franchisees with comprehensive and ongoing training. This standardized training ensures that every operator, sales representative, and technician receives the necessary tools and guidance required for success. In turn, this provides Sonitrol customers access to a team of professionals who can deliver high quality security services and maintain the integrity of each installed Sonitrol security system.

The Sonitrol website contained other similar statements about the quality of Sonitrol Corporation's security systems and the people who operate and monitor them.

11.     On or about December 18, 1995, Core-Mark contracted with Sonitrol of Denver for the installation of a burglar alarm signaling service in the Warehouse. The contract between Core-Mark and Sonitrol of Denver included Sonitrol of Denver's agreement to provide offsite monitoring of the burglar alarm equipment installed in the Warehouse.

12.     The agreement between Core-Mark and Sonitrol of Denver was assigned to Sonitrol Management. Sonitrol Management thereafter assumed Sonitrol of Denver's duties to provide offsite monitoring of the burglar alarm system installed in the Warehouse. The burglar alarm equipment and system monitoring were intended to protect persons and property in and around the Warehouse.

13.     During the morning of December 21, 2002, at least three individuals forced their way into Core-Mark's premises in the Warehouse. The burglars kicked in or otherwise broke through an overhead door on the west side of the Warehouse. After gaining entrance, the burglars roamed through the Warehouse and committed a burglary by removing goods and materials owned by Core-Mark and stored in the Warehouse.

14.     A microphone that was part of the Sonitrol burglar alarm system was mounted on a wall approximately fifteen feet away from the exterior door that the burglars kicked in to gain access to the Warehouse. The microphone failed to detect the noise of the initial break-in. The microphone then failed to detect the burglars' activities inside the Warehouse for nearly two hours. The microphone, believed to be designated as "Detector One," never produced an audio activation because its sensitivity was set at its lowest level by one of the Defendants, effectively disabling the microphone and rendering it useless as a safety device for protecting persons and property at the Warehouse.

15.     At approximately 6:50 a.m. on December 21, 2002, an audio microphone in the Warehouse designated as "Detector Two" tripped, resulting in an audio activation of the burglar alarm system being monitored by Sonitrol Management.

16.     At that time, the burglar alarm system was being monitored offsite by Ed Bell ("Bell"), a Sonitrol Management operator. Upon receipt of an audio signal from the burglar alarm system in the Warehouse, Bell was required to use reasonable efforts to identify the sound, and when warranted transmit notice of the signal to the public police department.

17.     After the monitoring system showed Detector Two tripped, resulting in an audio activation, Bell simply reset the burglar alarm system panel without attempting to identify the sound and without notifying the Aurora Police Department.

18.     Upon information and belief, there was a shift change at Sonitrol Management following the first audio activation of the burglar alarm system at 6:50 a.m. A second Sonitrol Management operator, Cindy George ("George"), replaced Bell and took over monitoring duties for the burglar alarm system in the Warehouse.

19.     At approximately 7:29 a.m. on December 21, 2002, Detector Two tripped again, resulting in an audio activation of the burglar alarm system being monitored by Sonitrol Management.

20.     Upon receipt of this second audio signal from the burglar alarm system in the Warehouse, Sonitrol Management's operator, George, was required to use reasonable efforts to identify the sound, and when warranted transmit notice of the signal to the public police department.

21.     After the monitoring system showed Detector Two had tripped a second time resulting in another audio activation, George simply reset the panel without attempting to identify the sound and without notifying the Aurora Police Department.

22.     At approximately 7:56 a.m. on December 21, 2002, Detector Two tripped a third time, resulting in an audio activation of the burglar alarm system being monitored by Sonitrol Management.

23.     Upon receipt of this third audio signal, Sonitrol Management's operator, George, was required to use reasonable efforts to identify the sound, and when warranted transmit notice of the signal to the public police department.

24.     After the monitoring system showed Detector Two had tripped a third time, resulting in yet another audio activation, George simply reset the panel without attempting to identify the sound and without notifying the Aurora Police Department.

25.     At approximately 8:36 a.m. on December 21, 2002, Detector Two tripped for a fourth time, resulting in still another audio activation of the burglar alarm system being monitored by Sonitrol Management.

26.     Upon receipt of this fourth audio signal from the burglar alarm system in the Warehouse, Sonitrol Management's operator, George, was required to use reasonable efforts to identify the sound, and when warranted transmit notice of the signal to the public police department.

27.     After the monitoring system showed Detector Two tripped a fourth time, resulting in a fourth audio activation in less than two hours, George simply reset the panel without attempting to identify the sound and without notifying the Aurora Police Department.

28.     At approximately 8:42 a.m. on December 21, 2002, the burglars, seeking to destroy evidence of their crime, intentionally ignited fires inside the Warehouse. Because Sonitrol Management's operators failed to properly respond to the multiple audio activations triggered by the sound detectors inside the Warehouse and never called the Aurora Police Department, the burglars were unmolested during the commission of their burglary and were not arrested before their arson at the Warehouse.

29.     At approximately 8:44 a.m. on December 21, 2002, audio microphones designated as "Detector Three" and "Detector Four" tripped simultaneously, producing a fifth audio activation on the Sonitrol equipment monitoring the Warehouse burglar alarm system.

30.     Upon receipt of this fifth audio signal from the burglar alarm system at the Warehouse, Sonitrol Management's operator, George, was required to use reasonable efforts to identify the sound, and when warranted transmit notice of the signal to the public police department.

31.     At approximately 8:46 a.m. on December 21, 2002, after the multiple audio activations of the burglar alarm system described above, George made her first attempt to identify the sound that had tripped the microphones in the Warehouse. George replayed a recording several times, but never notified the Aurora Police Department.

32.     George finally called the fire department after an activation of the fire suppression system in the Warehouse. However, the Aurora Fire Department was already at the scene fighting the Fire at the Warehouse, having been alerted to the Fire by passersby and eyewitnesses.

33.     Two Sonitrol Management operators had at least five opportunities to properly respond to audio activations produced by tripped microphones inside the Warehouse, but failed to do so at each opportunity. Sonitrol Management's operators never notified the Aurora Police Department.

34.     If Sonitrol Management's operators had used reasonable efforts to identify the many sounds that tripped the burglar alarm system microphones installed in the Warehouse, indicating an unauthorized entry of the burglars into Core-Mark's premises, and if they had transmitted notice of that unauthorized entry to the Aurora Police Department, the burglars

would have been captured or motivated to leave the premises before they started fires inside the Warehouse.

35.     The fires set by the burglars/arsonists destroyed the contents of the Core-Mark Warehouse and disrupted the ongoing business operations of Core-Mark.

36.     Defendants are responsible for the acts and/or omissions of their employees within the scope of their employment under the doctrine of respondeat superior.

## FIRST CLAIM FOR RELIEF
### (Negligence)

37.     Core-Mark repeats and realleges the allegations in all preceding paragraphs of this Complaint, as if set forth fully herein.

38.     Defendants owed a duty to Core-Mark to properly and reasonably design, install, maintain, and/or monitor the burglar alarm system in the Warehouse.

39.     Sonitrol Management had a duty to hire competent employees and to properly train, instruct, and supervise those employees in the operation and monitoring of the burglar alarm system.

40.     Upon information, including statements made in Sonitrol Corporation's website, Core-Mark believes and alleges that Sonitrol Corporation provided comprehensive and ongoing training to the employees of Sonitrol of Denver and Sonitrol Management. Sonitrol Corporation had a duty to properly train those employees in the operation and monitoring of the burglar alarm system.

41.     Because of the nature of their undertaking at the Warehouse, Defendants owed a duty to the public to insure that the Warehouse burglar alarm system was properly and reasonably designed, installed, maintained, and monitored.

42.     It was foreseeable to Defendants that a breach of their duty to Core-Mark could result in a fire that would damage Core-Mark. It also was foreseeable to Defendants that a fire in the Warehouse would endanger Colorado citizens, including employees of Core-Mark, persons working for or patronizing neighboring businesses, and public servants such as police officers and firefighters.

43.     Defendants breached the duty they owed to Core-Mark and the public by failing to properly design, install, maintain, and/or monitor the burglar alarm system in the Warehouse.

44.     Defendants breached the duty owed to Core-Mark and the public by failing to properly hire, train, instruct, and supervise competent operators to monitor the Warehouse burglar alarm system.

45.     Defendants' breach of the duties owed to Core-Mark and the public was a substantial factor and cause of the Fire that resulted in Core-Mark's damages and losses, the amount of which will be proved at trial.

46.     The acts of Defendants constitute misconduct purposely or heedlessly and recklessly committed without regard to the consequences or to the rights and interests of Core-Mark, thereby entitling Core-Mark to an award of exemplary and punitive damages against Defendants.

## SECOND CLAIM FOR RELIEF
### (Gross Negligence)

47.     Core-Mark repeats and realleges the allegations in all preceding paragraphs of this Complaint, as if set forth fully herein.

48.     Defendants owed a duty to Core-Mark and the public to exercise reasonable care in the design, installation, maintenance, and/or monitoring of the burglar alarm system in the Warehouse. Defendants owed a duty to Core-Mark and the public to hire competent employees and to ensure that those employees received proper training and supervision in the design, installation, maintenance and/or monitoring of the Warehouse burglar alarm system.

49.     Defendants breached their duties owed to Core-Mark and the public by failing to properly design, install, maintain and/or monitor the burglar alarm system. Defendants also breached their duties owed to Core-Mark and the public by failing to hire competent employees and failing to ensure that those employees received proper training and supervision in the design, installation, maintenance and/or monitoring of the Warehouse burglar alarm system.

50.     Defendants' breaches of their duties demonstrated a reckless, willful and wanton disregard for the safety of persons and property at the Warehouse.

51.     Defendants showed reckless, willful and wanton disregard for the safety of persons and property at the Warehouse in several ways, including, but not limited to, the following:

>           (a)     Defendants failed to ensure that microphones inside the
>                   Warehouse were properly adjusted to detect intruders
>                   entering the building. The microphone approximately
>                   fifteen feet away from where the burglars kicked in a door
>                   to gain access to the Warehouse interior should have
>                   detected the noise of the break-in and the burglars'
>                   subsequent unlawful activities inside the Warehouse. The
>                   microphone never produced an audio activation because its
>                   sensitivity was set at its lowest level by one of the
>                   Defendants, effectively disabling the microphone and

rendering it useless as a safety device for protecting persons and property at the Warehouse.

(b) Other microphones in the Warehouse detected the burglars inside the Warehouse resulting in numerous and repeated tripped detectors and audio activations at the offsite monitoring station. Contrary to their duty, accepted industry practice, the burglar alarm system monitoring contract, and common sense, Sonitrol Management's operators ignored, disregarded, and/or failed to use any reasonable efforts to identify the sounds producing the audio signals indicating the burglars' unauthorized entry and unlawful activities inside the Warehouse.

(c) Sonitrol Management's operators failed to transmit notice of the numerous audio activations inside the Warehouse to the Aurora Police Department. Sonitrol Management's operators failed to notify the Aurora Fire Department until after the Aurora Fire Department was already at the Fire scene fighting the blaze.

52.    Defendants' reckless, willful and wanton disregard for the consequences of their dangerous conduct and for the safety of people and property at the Warehouse was a substantial factor and cause of Core-Mark's damages, the amount of which will be proved at trial.

53.    The acts of Defendants constitute misconduct purposely or heedlessly and recklessly committed without regard to the consequences or to the rights and interests of Core-Mark, thereby entitling Core-Mark to an award of exemplary and punitive damages against Defendants.

### THIRD CLAIM FOR RELIEF
### (False Representation)

54.    Core-Mark repeats and realleges the allegations in all preceding paragraphs of this Complaint, as if set forth fully herein.

55.    Defendants made false representations of past or present facts to Core-Mark, which facts were material to Core-Mark's decision to enter into the contract with Sonitrol of Denver and Sonitrol Management.

56.    Defendants misrepresented the nature and quality of equipment and services they would provide under the alarm system installation and monitoring contract. These misrepresentations included, but were not limited to, the following:

(a) That microphones inside the Warehouse would be properly adjusted to detect intruders entering the building. The microphone approximately fifteen feet away from where

the burglars kicked in a door to gain access to the
Warehouse interior should have detected the noise of the
break-in and the burglars' activities inside the Warehouse.
The microphone never produced an audio activation
because its sensitivity was set at its lowest level by one of
the Defendants, effectively disabling the microphone and
rendering it useless as a safety device for protecting
persons and property at the Warehouse.

(b)     That the operators monitoring the burglar alarm system were
properly hired and were competent, capable, conscientious, well-
trained and supervised, and that the operators would use reasonable
efforts to identify any sound that resulted in an audio activation.
Microphones in the Warehouse detected the burglars inside the
Warehouse resulting in numerous and repeated tripped detectors
and audio activations at the offsite monitoring station. Contrary to
accepted industry practice, their training, the terms of the burglar
alarm system monitoring contract, common sense, and Defendants'
representations, Sonitrol Management's operators ignored,
disregarded, and/or failed to use any reasonable efforts to identify
the sounds producing the multiple audio signals indicating the
burglars' unauthorized entry and unlawful activities inside the
Warehouse.

(c)     That the operators monitoring the burglar alarm system
would transmit notice of audio activations to the public
police department. In fact, Sonitrol Management's
operators failed to transmit notice of the audio activations
to the Aurora Police Department. Sonitrol Management's
operators failed to notify the Aurora Fire Department until
after the Aurora Fire Department was already at the fire
scene fighting the blaze.

57.    · Defendants made such misrepresentations intending that Core-Mark would rely
upon them in deciding to enter into the burglar alarm system monitoring agreement.

58.    Core-Mark reasonably and justifiably relied on Defendants' false representations
regarding the quality of the equipment, installation, maintenance, operation, and offsite
monitoring of the burglar alarm system when entering into the burglar alarm system monitoring
agreement.

59.    As a proximate result of its reliance, Core-Mark has suffered damage and loss in
an amount to be proved at trial.

60.     The acts of Defendants constitute misconduct purposely or heedlessly and recklessly committed without regard to the consequences or to the rights and interests of Core-Mark, thereby entitling Core-Mark to an award of exemplary and punitive damages against Defendants.

## FOURTH CLAIM FOR RELIEF
### (Breach of Contract)

61.     Core-Mark repeats and realleges the allegations in all preceding paragraphs of this Complaint, as if set forth fully herein.

62.     Core-Mark contracted with Sonitrol of Denver for the installation, maintenance, and monitoring of the burglar alarm system in the Warehouse. A portion or all of Sonitrol of Denver's obligations under the contract were assigned to or assumed by Sonitrol Management. Sonitrol of Denver, as assignor, remained liable for its contractual obligations.

63.     The contract between Core-Mark, Sonitrol of Denver, and Sonitrol Management included an implied covenant of good faith and fair dealing that upholds Core-Mark's reasonable expectations as to these Defendants' performance under the contract.

64.     Defendants induced Core-Mark to enter into the burglar alarm installation and monitoring contract with representations that Defendants would use appropriate discretion to fulfill their obligations under the contract and that Defendants would provide security for the Warehouse by installing proper equipment, that the equipment would function properly, and that the burglar alarm system would be monitored by competent, conscientious, and well-trained operators.

65.     Core-Mark reasonably and justifiably relied on Defendants' inducements when it entered into the alarm system installation and monitoring agreement with Sonitrol of Denver, ultimately to Core-Mark's detriment.

66.     Defendants had a duty to fulfill their obligations under the contract, including the implied covenant of good faith and fair dealing, in a safe and reasonable manner, consistent with accepted industry standards and common sense.

67.     The alarm system monitoring contract provides that "upon receipt of an audio signal indicating an unauthorized entry into 'CLIENTS' premises, 'DEALERS' operator will use reasonable efforts to identify the sound, and when warranted transmit notice of said signal to the public police department."

68.     Sonitrol of Denver and Sonitrol Management breached their contract with Core-Mark, and showed reckless, willful and wanton disregard for the safety of persons and property at the Core-Mark Warehouse, in several ways, including, but not limited to, the following:

(a)   Defendants failed to ensure that microphones inside the Warehouse were properly adjusted to detect intruders entering the building. The microphone approximately fifteen feet away from where the burglars kicked in a door to gain access to the Warehouse interior should have detected the noise of the break-in and the burglars' subsequent unlawful activities inside the Warehouse. The microphone never produced an audio activation because its sensitivity was set at its lowest level by one of the Defendants, effectively disabling the microphone and rendering it useless as a safety device for protecting persons and property at the Warehouse.

(b)   Other microphones in the Warehouse detected the burglars inside the Warehouse resulting in numerous and repeated tripped detectors and audio activations at the offsite monitoring station. Contrary to accepted industry practice, the burglar alarm system monitoring contract, and common sense, Sonitrol Management's operators ignored, disregarded, and/or failed to use any reasonable efforts to identify the sounds producing the audio signals indicating the burglars' unauthorized entry and unlawful activities inside the Warehouse.

(c)   Sonitrol Management's operators failed to transmit notice of the numerous audio activations inside the Warehouse to the Aurora Police Department. Sonitrol Management's operators failed to notify the Aurora Fire Department until after the Aurora Fire Department was already at the Fire scene fighting the blaze.

69.   Because Sonitrol of Denver and Sonitrol Management failed to perform their obligations under the contract, including the implied covenant of good faith and fair dealing, the contract has failed of its essential purpose. The contract is void or voidable by Core-Mark. Defendants are not entitled to selectively enforce contractual provisions because they failed to comply with their contractual obligations. The contract is also contrary to Colorado public policy.

70.   As a result of Defendants' breach of contract, Core-Mark has suffered damages, the amount of which will be proved at trial.

## FIFTH CLAIM FOR RELIEF
### (Breach of Implied Warranty of Merchantability)

71.     Core-Mark repeats and realleges the allegations in all preceding paragraphs of this Complaint, as if set forth fully herein.

72.     Defendants were merchants of the burglar alarm system they designed, installed, maintained, and monitored at the Warehouse.

73.     Core-Mark relied upon the burglar alarm system equipment and monitoring services in a manner and for a purpose which was foreseeable to Defendants and for which the equipment and monitoring service was intended.

74.     Defendants knew or reasonably should have known that Core-Mark would be damaged by Defendants' failure to provide the Warehouse with equipment and monitoring of merchantable quality.

75.     Core-Mark notified Defendants within a reasonable period of time after they discovered Defendants' breach of warranty.

76.     Defendants' breach of warranty was a substantial factor and cause of Core-Mark's damages.

## SIXTH CLAIM FOR RELIEF
### (Breach of Implied Warranty of Fitness)

77.     Core-Mark repeats and realleges the allegations in all preceding paragraphs of this Complaint, as if set forth fully herein.

78.     Defendants designed, installed, maintained, and/or monitored the burglar alarm system in the Warehouse.

79.     Defendants impliedly warranted that the burglar alarm system was suitable and fit for its particular purpose.

80.     Defendants knew or reasonably should have known that Core-Mark would be damaged by defective burglar alarm equipment and monitoring.

81.     The burglar alarm equipment and monitoring were not suitable or fit for their particular purpose because of defects in its design, installation, maintenance and/or monitoring.

82.     Within a reasonable time after Core-Mark discovered the breach of warranty, they notified Defendants of that breach.

83.     Defendants' breach of implied warranty of fitness for a particular purpose was a substantial factor and cause of Core-Mark's damages.

## DEMAND FOR JUDGMENT

WHEREFORE, Core-Mark respectfully pray that the Court enter judgment and other orders in their favor and against Defendants on each of the foregoing claims for relief as follows:

(a)     Upon all Claims for Relief, awarding Core-Mark such actual, compensatory, consequential and incidental damages as are shown to have been proximately and directly caused by the acts of Defendants complained of herein;

(b)     Upon the First, Second and Third Claims for Relief, awarding Core-Mark exemplary and punitive damages against each of the Defendants pursuant to C.R.S. § 13-21-102, in an amount sufficient to punish Defendants and to deter similar conduct in the future;

(c)     Awarding Core-Mark the costs of this action, including expert witness fees and reasonable attorney fees, in accordance with applicable law, together with prejudgment, moratory and post-judgment interest in accordance with applicable law; and

(d)     Awarding Core-Mark such other and further relief as is necessary to remedy the harms inflicted by Defendants.

**PLAINTIFFS DEMAND A TRIAL BY JURY OF ALL ISSUES SO TRIABLE.**

DATED:  June 15, 2004

IRELAND, STAPLETON, PRYOR & PASCOE, P.C.

K. C. Groves, #20832
Kelley A. Bergelt, #35168

ATTORNEYS FOR PLAINTIFFS
CORE-MARK MIDCONTINENT, INC. and
CORE-MARK INTERNATIONAL, INC.

Address of Plaintiffs:
395 Oyster Point Blvd., Suite 415
South San Francisco, CA  94080

\KCGRO\LIT-PLD\6PF001LDOC 10231.0201 #312876 v3

13

# EXHIBIT D

EFILED Document – District Court
CO Adams County District Court 17th JD
2011cv299
Filing Date: Mar 1 2011 4:41PM MST
Transaction ID: 36187172

| DISTRICT COURT, ADAMS COUNTY, COLORADO<br><br>1000 Judicial Center Dr<br>Brighton CO 80601-8800 | FILED IN ADAMS COUNTY COMBINED COURT<br><br>**JAN 2 4 2005** |
|---|---|
| **Plaintiffs:**<br>WESTERN INNOVATIONS, INC.,<br>UNION INSURANCE COMPANY,<br>UNITED FIRE & CASUALTY,<br>TARTAN PRODUCTS COMPANY,<br>RANDY OVERLEY d/b/a C.P. & D COM-<br>PANIES<br><br>**Defendants:**<br>SONITROL CORPORATION,<br>CORE-MARK INTERNATIONAL, INC.,<br>FLEMING COMPANIES, INC., and<br>CINTAS COMPANY d/b/a/ ROCKY MOUN-<br>TAIN FIRE AND SAFETY, INC. | Case No. **04 CV 3625**<br><br>Division C |

2989  SMP

Gregory J. Fasing, No. 7631
Fasing Law Firm P.C.
300 South Jackson Street 100
**All mail:** P. O. Box 2 0 0 3 4 0
Denver, CO  80220-0340
303 692 8833
303 692 8557 telefax
Attorneys for Plaintiff Western Innovations,
Inc.

Todd A. Myers, No. 14799
Sage & Vargo, P.C.
6464 W 14th Avenue
Lakewood, CO 80214-1913
303-238-8832
303-233-2210
tmyers@sagevargo.com

Attorneys for  Union Insurance Company,
United Fire & Casualty, Tartan Products
Company, and Randy Overley d/b/a C.P.
& D Companies

FILED IN ADAMS COUNTY
COMBINED COURT

JAN 2 4 2005

## AMENDED COMPLAINT FOR DAMAGES

Plaintiffs Western Innovations, Inc., by Fasing Law Firm P.C., and Union Insurance
Company, United Fire & Casualty, Tartan Products Company, and Randy Overley d/b/a
C.P. & D Companies, by Sage & Vargo, P.C., files their amended complaint against
defendants Sonitrol Corporation, Core-Mark International, Inc., Fleming Companies, Inc.,
and Cintas Company d/b/a/ Rocky Mountain Fire and Safety, Inc. as follows:

### INTRODUCTION

Plaintiffs Western Innovations,  Union Insurance Company (previously mistakenly
designated as "United Insurance Company"), United Fire & Casualty, Tartan Products
Company are also plaintiffs in the companion case of *Lexington Insurance Company, et
al. v. Cornerstone Security, a Colorado Corporation d/b/a Sonitrol of Denver, et al.*, Case
No. 03 CV 3836, Adams County District Court, filed December 17, 2003, and currently
pending a motion to consolidate with other companion cases arising out of the same fire.
All plaintiffs move that this complaint be consolidated with those other cases and the parties
aligned as necessary to reflect respective claims.

PAGE 2 OF 15

2990

## GENERAL ALLEGATIONS

1.  Plaintiff Western Innovations, Inc. is a Colorado corporation with its principal place of business in Aurora, Adams County, Colorado.  At all relevant times, Western Innovations was doing business in Adams County, Colorado. Before December 21, 2002, Western Innovations was in actual possession of goods (including goods owned by Tartan products and Randy Overley, d/b/a C.P. & D Companies) stored in a portion of an industrial building at 3650 Fraser Street in Aurora, Colorado.

2.  Plaintiff Union Insurance Company is a Nebraska corporation authorized to do business and transact insurance in the state of Colorado.  At all relevant times, Union provided insurance to Western Innovations, including Western Innovations' property and business operation located at 3650 Fraser in Aurora, Adams County, Colorado.

3.  Plaintiff United Fire & Casualty is an Iowa corporation authorized to do business and transact insurance in the state of Colorado.  At all relevant times, United Fire & Casualty provided insurance to Tartan Products Company, a Colorado corporation, including Tartan Products' business product located at 3650 Fraser in Aurora, Adams County, Colorado.

4.  Plaintiff Tartan Products Company is a Colorado corporation with its principal place of business in Englewood, Arapahoe County, Colorado.  At all relevant times, Tartan Products was doing business in Adams County, Colorado.

5.  Plaintiff Randy Overley, d/b/a C.P. & D Companies, is a resident of the State of Colorado with its principal place of business in Sedalia, Douglas County, Colorado.

6.  Before December 21, 2002 plaintiffs possessed goods stored in a portion of an industrial building at 3650 Fraser Street in Aurora, Colorado. Defendant Core-Mark was a tenant/lessee in the building.

7.  Pursuant to lease, Core-Mark occupied and controlled approximately 91,264 square feet of the subject property on December 21, 2002.

8.  Pursuant to lease, Core-Mark could legally store only hazardous substances specified in the lease.

9.  The lease required Core-Mark to obey all applicable laws, orders, rules,

2991

regulations or other requirements regarding storage of any hazardous substances.

10. Before December 21, 2002, Core-Mark and Sonitrol of Denver contracted for Sonitrol of Denver to install and monitor a burglar alarm system.

11. Upon information and belief, Sonitrol of Denver, Sonitrol Management Corporation and/or Sonitrol Corporation designed, sold, installed and/or monitored the burglar alarm system within Core-Mark's facility at the subject property.

12. Accordingly, upon information and belief, Sonitrol of Denver, Sonitrol Management Corporation and/or Sonitrol Corporation undertook and agreed to properly design, install, maintain and monitor the burglar alarm system within the subject property.

13. Upon information and belief, Cintas Company d/b/a/ Rocky Mountain Fire and Safety, Inc. orally contracted to install and maintain a sprinkler/fire suppression system at 3650 Fraser. Cintas Company d/b/a/ Rocky Mountain Fire and Safety maintained that system.

14. Accordingly, upon information and belief, Cintas Company d/b/a/ Rocky Mountain Fire and Safety, Inc. undertook and agreed to properly maintain a sprinkler/fire suppression system within the building at 3650 Fraser.

15. In the early morning hours of December 21, 2002, three burglars unlawfully entered the warehouse at 3650 Fraser and stole property from the Core-Mark controlled portion of the subject property.

16. Upon information and belief, after these persons removed these items, they returned to the portion of the warehouse occupied by defendant Core-Mark and, using flammable liquid(s) stored inside the building, ignited several fires within the warehouse.

17. Core-Mark's failure to store these hazardous substances properly and in the quantity and manner specified within the lease resulted in the excessive and exponential spread of the fire on December 21, 2002.

18. A microphone which was part of the burglar alarm system was mounted on a wall approximately fifteen feet away from the exterior door the burglars kicked in to gain access to the warehouse. The microphone failed to detect the noise of the initial break-in. The microphone then failed to detect the burglars' activities inside the warehouse for nearly two hours. The microphone, believed

2992

to be designated "detector one," never produced an audio activation because its sensitivity was set at its lowest level by defendants, effectively disabling the microphone and rendering it useless as a safety device for protecting persons and property at the Core-Mark warehouse.

19.     At approximately 6:50 a.m., an audio microphone designated "detector two" tripped, resulting in an audio activation of the Core-Mark burglar alarm system being monitored by Sonitrol Management.

20.     At 6:50 a.m., the Core-Mark burglar alarm system was being monitored offsite by a Sonitrol Management operator whose initials are "EB." Upon receipt of an audio signal from the burglar alarm system in the Core-Mark warehouse, Sonitrol Management's operator EB was required to use reasonable efforts to identify the sound and when warranted transmit notice of the signal to the police department.

21.     After the monitoring system showed detector two tripped, resulting in an audio activation, Sonitrol Management's operator EB simply reset the burglar alarm system panel without attempting to identify the sound and without notifying the Aurora Police Department.

22.     On information and belief, there was a shift change at Sonitrol Management following the first audio activation of the Core-Mark burglar alarm system at 6:50 a.m. A second Sonitrol Management operator whose initials are "CRG" replaced EB and took over monitoring duties for the burglar alarm system in the Core-Mark warehouse.

23.     At approximately 7:29 a.m., the audio microphone designated detector two tripped again, resulting in an audio activation of the Core-Mark burglar alarm system being monitored by Sonitrol Management.

24.     Upon receipt of an audio signal from the burglar alarm system in the Core-Mark warehouse, Sonitrol Management's operator CRG was required to use reasonable efforts to identify the sound and when warranted transmit notice of the signal to the public police department.

25.     After the monitoring system showed detector two had tripped a second time resulting in another audio activation, the new Sonitrol Management operator CRG simply reset the panel without attempting to identify the sound and without notifying the Aurora Police Department.

26.     At approximately 7:56 a.m., the audio microphone designated detector two tripped a third time, resulting in an audio activation of the Core-Mark burglar

alarm system being monitored by Sonitrol Management.

27.   Upon receipt of an audio signal from the burglar alarm system in the Core-Mark warehouse, Sonitrol Management's operator CRG was required to use reasonable efforts to identify the sound and when warranted transmit notice of the signal to the public police department.

28.   After the monitoring system showed detector two had tripped a third time resulting in yet another audio activation, the Sonitrol Management operator CRG simply reset the panel without attempting to identify the sound and without notifying the Aurora Police Department.

29.   At approximately 8:36 a.m., the audio microphone designated detector two tripped for a fourth time, resulting in still another audio activation of the Core-Mark burglar alarm system being monitored by Sonitrol Management.

30.   Upon receipt of an audio signal from the burglar alarm system in the Core-Mark warehouse, Sonitrol Management's operator CRG was required to use reasonable efforts to identify the sound and when warranted transmit notice of the signal to the public police department.

31.   After the monitoring system showed detector two tripped a fourth time, resulting in a fourth audio activation in less than two hours, Sonitrol Management's operator CRG simply reset the panel without attempting to identify the sound and without notifying the Aurora Police Department.

32.   At approximately 8:42 a.m., the burglars, seeking to destroy evidence of their crime, intentionally ignited fires inside the Core-Mark warehouse. Because Sonitrol Management's operators EB and CRG failed to properly respond to the multiple audio activations triggered by the sound detectors inside the warehouse and never called the Aurora Police Department, the burglars were not stopped during the commission of their burglary and were not arrested before their arson at the Core-Mark warehouse.

33.   At approximately 8:44 a.m. on December 21, 2002, audio microphones designated "detector three" and "detector four" tripped simultaneously, producing a fifth audio activation on the Sonitrol Management equipment monitoring the Core-Mark warehouse burglar alarm system.

34.   Upon receipt of an audio signal from the burglar alarm system at the Core-Mark warehouse, Sonitrol Management's operator was required to use reasonable efforts to identify the sound and, when warranted, transmit notice of the signal to the public police department.

2994

35.   At approximately 8:46 a.m., after multiple audio activations, Core-Mark operator CRG made his/her first attempt to identify the sound that had tripped the microphones in the Core-Mark warehouse. Sonitrol Management's operator replayed a recording several times, but never notified the Aurora Police Department.

36.   When Sonitrol Management's operator finally called the fire department after an activation of the fire suppression system in the Core-Mark warehouse, the Aurora Fire Department was already at the scene fighting the fire at the Core-Mark warehouse, after being alerted to the fire by a passer by and eyewitnesses.

37.   Two Sonitrol Management operators EB and CRG had at least four opportunities to properly respond to audio activations produced by tripped microphones inside the Core-Mark warehouse, but failed to do so at each opportunity. Sonitrol Management's operators EB and CRG also failed to notify the Aurora Police Department.

38.   Upon information and belief, none of the fire alarms located on the outside of the building were sounding, and several of the fire alarms and sprinkler heads located inside the building were not activated.

39.   At approximately 09:02, the Sonitrol of Denver, Sonitrol Management Corporation and/or Sonitrol Corporation central monitoring station responsible for monitoring the warehouse at 3650 Fraser reported a fire alarm.

40.   If Sonitrol Management's operators EB and CRG had used reasonable efforts to identify the multiple sounds which tripped the burglar alarm system microphones installed in the Core-Mark warehouse, the tripped microphones causing multiple audio activations of the monitoring system, indicating an unauthorized entry of the burglars into Core-Mark's premises, and had transmitted notice of that unauthorized entry to the Aurora Police Department, the burglars would have been captured or enticed to leave the premises before they started fires inside the Core-Mark facility.

41.   The fires spread from the Core-Mark tenancy into the portion of the warehouse occupied by Western Innovations. The fire destroyed or damaged Western Innovations' property and disrupted its business operations.

42.   Following the fire, Western Innovations presented a claim seeking benefits under its Union Insurance Company policy. Union Insurance Company paid three hundred seventy-five thousand ($375,000.00) to or on behalf of Western

PAGE 7 OF 15

2995

Innovations for damages caused by the fire. Union Insurance Company is subrogated against defendants to the extent of payments made to or on behalf of Western Innovations.

43.  Western Innovations sustained a loss to its property and business operations of approximately $1,000,000.00 in excess of its Union Insurance Company insurance policy that Western Innovations seeks to recover.

44.  Tartan Products Company had product in the Western Innovations premises at the warehouse at the time of the fire which was destroyed by the fire. United Fire and Casualty Company paid $19,520 under its policy of insurance for which it is subrogated against Defendants. Tartan Products Company incurred additional uninsured losses in the approximate amount of thirty thousand ($30,000) that it seeks to recover.

45.  Plaintiff Randy Overley, d/b/a C.P. & D Companies incurred additional uninsured losses in the approximate amount of fifty thousand dollars ($50,000) and seeks to recover for his property stored in Western Innovations' premises.

46.  Defendants are responsible for the acts and/or omissions of their employees within the scope of their employment under the doctrine of respondeat superior.

47.  The fires set by the burglars/arsonists destroyed the contents of the warehouse caused catastrophic damages to plaintiffs' property stored there, and disrupted plaintiffs' business operations.

48.  The property damage was a direct and proximate result of the defendants' combined negligence as more fully explained herein.

49.  As a direct and proximate result of defendants' negligence, plaintiffs suffered damages in an amount to be determined at trial.

## FIRST CLAIM: SONITROL CORPORATION'S NEGLIGENCE

50.  At all relevant times, Sonitrol Corporation was the manufacturer, distributor, advertiser, monitoring entity, parent corporation, and/or retailer of the audio alarm system that was installed at 3650 Fraser Street and monitored at the central monitoring station that failed to notify the proper authorities about the repeated audio alarm detection activations which caused plaintiffs' damages.

51.  As the manufacturer, distributor, monitoring agent and/or retailer of the alarm

2996

system, Sonitrol Corporation, through its agents, either actual or ostensible, servants, employees and/or representatives, had a duty to comply with applicable requirements of law, statutes, regulations and standards in the design, manufacture, inspection, monitoring and testing of its product to insure that it was safe for its entire use.

52.   Upon information and belief, Sonitrol Corporation breached its duties to plaintiffs through acts and/or omissions constituting negligence including, but not limited to, the following:

a.   Failing to properly design the Sonitrol audio alarm system in a manner that it would not fail;

b.   Failing to properly manufacture the Sonitrol audio alarm system in a manner that it would not fail;

c.   Failing to properly monitor and/or maintain the audio alarm system;

d.   Failing to properly test and inspect the Sonitrol audio detection system to insure that it functioned properly;

e.   Failing to hire, train, supervise and control competent, qualified, careful and prudent employees to perform their responsibilities in a safe and workmanlike manner and/or adequately train such employees in the safe and proper design, manufacture, testing, monitoring and/or inspection of the product;

f.   Failing to hire, train, supervise and control competent, qualified, careful and prudent employees to perform their responsibilities while monitoring the facility at 3650 Fraser Street in a reasonable and prudent manner so as to protect Plaintiffs property;

g.   Failing to report to the proper authorities at least five audio detection activations or tripped detectors that occurred between approximately 06:50 and 08:44 on December 21, 2002;

h.   Failing to otherwise take reasonable precautions to protect against potential damage to the property; and

i.   Any other acts and/or omissions constituting negligence, willful and wanton conduct and/or negligence per se.

53.   The above acts and/or omissions of Sonitrol Corporation caused the property

PAGE 9 OF 15

2998

damage on December 21, 2002.

54. As a direct and proximate result of Sonitrol Corporation's negligence, plaintiffs sustained damages.

## SECOND CLAIM: CORE-MARK'S NEGLIGENCE

55. Defendant Core-Mark leased a portion of the warehouse located at 3650 Fraser Street in Aurora, Colorado. Core-Mark used the facility to store goods for general wholesale distribution to retail outlets.

56. Defendant Core-Mark owed a duty to plaintiffs to exercise reasonable care in the storage of these goods and in its use of the property.

57. Core-Mark and its respective agents and employees breached their duties by the following acts or omissions, without limitation:

a. Failing to secure or properly store hazardous substances or materials;

b. Storing excessive and unsafe quantities of hazardous substances or materials, or improperly storing such substances or materials;

c. Failing to notify other tenants or the lessor or its agents of the existence of unscheduled hazardous substances, the quantity of hazardous substances, and the manner in which the substances were stored;

d. Failing to hire, train, supervise and control competent, qualified, careful and prudent employees to perform their responsibilities in a safe and workmanlike manner and/or adequately train such employees in the safe and proper operation of the subject facility;

e. Failing to monitor, inspect, supervise or control the storage of hazardous substances or materials;

f. Failing to store hazardous substances in a fire safe/rated room or in an area away from other combustible material;

g. Storing hazardous substances in violation of federal, state, municipal, county or other governmental regulations or guidelines;

h. Failing to otherwise take reasonable precautions to protect against potential damage to the plaintiffs' property;

2999

i.    Failing to properly secure the leased premises to prevent unlawful entry; and

j.    Any other acts and/or omissions constituting negligence, willful and wanton conduct and/or negligence per se.

58.   As a direct and proximate result of Core-Mark's negligence, plaintiffs sustained damages.

### THIRD CLAIM:  FLEMING'S NEGLIGENCE

59.   Defendant Fleming leased a portion of the warehouse located at 3650 Fraser Street in Aurora, Colorado. Fleming used the facility to store goods for general wholesale distribution to retail outlets.

60.   Defendant Fleming owed a duty to plaintiffs to exercise reasonable care in the storage of these goods and in its use of the property.

61.   Fleming and its respective agents and employees breached their respective duties by one or more of the following acts or omissions:

a.    Failing to secure or properly store hazardous substances or materials;

b.    Failing to properly monitor and/or maintain the alarm system and/or the spring their fire suppression system;

c.    Failing to properly test and inspect the fire alarm system and fire suppression system to insure that it functioned properly;

d.    Storing excessive and unsafe quantities of hazardous substances or materials;

e.    Failing to notify plaintiffs or lessor or its agents of the existence of unscheduled hazardous substances, the quantity of hazardous substances and the manner in which the substances were stored;

f.    Failing to hire, train, supervise and control competent, qualified, careful and prudent employees to perform their responsibilities in a safe and workmanlike manner and/or adequately train such employees in the safe and proper operation of the subject facility;

g.    Failing to monitor, inspect, supervise or control the storage of

3000

hazardous substances or materials;

h.   Failing to store hazardous substances in a fire safe/rated room or away from other combustible material;

i.   Storing hazardous substances in violation of federal, state, municipal, county or other governmental regulations or guidelines;

j.   Failing to otherwise take reasonable precautions to protect against potential damage to the plaintiffs property; and

k.   Any other acts and/or omissions constituting negligence, willful and wanton conduct and/or negligence per se.

62.   As a direct and proximate result of Fleming's negligence, plaintiffs sustained damages.

## FOURTH CLAIM: CINTAS COMPANY D/B/A/ ROCKY MOUNTAIN FIRE AND SAFETY'S NEGLIGENCE

63.   At all relevant times, upon information and belief, Cintas Company d/b/a/ Rocky Mountain installed, monitored and maintained the sprinkler/fire suppression system at 3650 Fraser Street that failed to operate appropriately at the time of the fire, thereby causing damage to plaintiffs.

64.   Cintas Company d/b/a/ Rocky Mountain, through its agents, had a duty to the plaintiffs concerning as the installation, monitoring and maintenance of the sprinkler/fire suppression system to comply with applicable requirements of law, statutes, regulations and standards to inspect, monitor and test the sprinkler/fire suppression system to insure that it was safe and would operate appropriately.

65.   Cintas Company d/b/a/ Rocky Mountain breached its duties to plaintiffs through acts and/or omissions constituting negligence including the following, without limitation:

a.   Failing to properly install, monitor and/or maintain the sprinkler/fire suppression system;

b.   Failing to properly test and inspect the sprinkler/fire suppression system to insure that it functioned properly, including but not limited to allegedly

PAGE 12 OF 15

workmanlike manner and/or adequately train such employees in the safe and proper installation, testing, monitoring and/or inspection of the sprinkler/fire suppression system;

    d.    Failing to hire, train, supervise and control competent, qualified, careful and prudent employees to perform their responsibilities while working at the facility at 3650 Fraser Street, in a reasonable and prudent manner so as to protect plaintiffs' property;

    e.    Failing to otherwise take reasonable precautions to protect against potential damage to the property; and

    f.    Any other acts and/or omissions constituting negligence, willful and wanton conduct and/or negligence per se.

66.    As a direct and proximate result of Cintas Company d/b/a/ Rocky Mountain's negligence, plaintiffs sustained damages.

    WHEREFORE, plaintiffs pray for fair and reasonable compensatory damages against the defendants, jointly and severally, and for pre-judgment interest from the earliest date that the tortious conduct began, in the maximum amount allowed by law, and for all other legal and equitable remedies and penalties provided by law, together with their costs, expert witness fees and for such other relief as the court deems appropriate.

    PLAINTIFFS REQUEST THAT ALL ISSUES RAISED IN THE PLEADINGS BE TRIED BEFORE A JURY OF SIX PERSONS.

Respectfully submitted,

SAGE & VARGO, P.C.

FASING LAW FIRM P.C.

## CERTIFICATE OF MAILING

    I certify that a copy of the foregoing document was placed in the United States mail, postage prepaid, or telefaxed, or hand-delivered, as indicated below the address, on Friday, January 21, 2005   11:17:40 hours, to the following:

PAGE 13 OF 15

3002

## CERTIFICATE OF MAILING

I certify that a copy of the foregoing document was placed in the United States mail, postage prepaid, or telefaxed, or hand-delivered, as indicated below the address, on Friday, January 21, 2005   11:17:40 hours, to the following:

THOMAS DUNFORD ESQ
707 17th ST STE 3100
DENVER CO 80202-3400
USPS

TIMOTHY BEYER ESQ
410 17TH ST STE 2200
DENVER CO 80202-4468
USPS

SCOTT ALBERTSON ESQ
HOLLEY ALBERSON & POLK PC
1667 COLE BLVD STE 19-100
GOLDEN CO 80401-3302
USPS

R SCOTT CAULKINS ESQ
2200 WILSON BLVD STE 800
ARLINGTON VA 22201-3361
USPS

KENNETH C GROVES ESQ
IRELAND STAPLETON PRYOR & PASCOE PC
1675 BROADWAY STE 2600
DENVER CO 80202-4626
USPS

ROBERT MCGEE JR ESQ
1660 DOWNING ST
DENVER CO 80218-1529
USPS

ROBERT M LEMAY ESQ
1600 ELM ST STE 3700
DALLAS TX 75201-4702
USPS

STEWART J ROURKE ESQ
ANDERSON & JAHDE P C
2100 W LITTLETON BLVD STE 300
LITTLETON CO 80120-5708

3004

# EXHIBIT E

EFILED Document – District Court
CO Adams County District Court 17th JD
2011cv299
Filing Date: Mar  1 2011  4:41PM MST
Transaction ID: 36187172

**Chartis**
175 Water Street, 21ˢᵗ Floor
New York, New York 10038
212.458.2493 Telephone
866.823-7816 Facsimile
Jeffrey.Mickletz@chartisinsurance.com

RECEIVED

FEB 22 2011

TYCO RISK MGMT.



**CHARTIS**

February 17, 2011

**Via E-mail and regular mail**
Sean Patton
Tyco International
9 Roszel Road
Princeton, NJ 08540-07960

Re: Insured:    **Tyco International**
   Claimant:  **Core-Mark, et al.**
   Policy #:   **BE 2195412**
   Our File:   **169-202056**

Dear Mr. Patton:

Chartis Claims, Inc. (formerly known as AIG Domestic Claims, Inc.), a division of Chartis Inc.,
is the claims administrator for National Union Fire Insurance Company of Pittsburgh, Pa.
("National Union"), which issued policy number BE 2195412 to Tyco International Ltd.
("Tyco"). The purpose of this letter is to advise you of National Union's position as to coverage
for Sonitrol Management Company ("Sonitrol") with respect to the subsequent jury verdicts and
awards in the underlying lawsuits. We are not in possession of a final judgment following the
verdicts but assume a judgment was entered and is consistent with those verdicts unless advised
to the contrary. Until then, we refer to the jury verdicts and awards.

We previously acknowledged having received notice of lawsuits pending in the District Court of
Adams County, Colorado. These were referenced in our January 3, 2007 letter to you, which
served as National Union's initial reservation of rights letter, and are identified as consolidated
lawsuits titled Core-Mark Midcontinent, Inc., et al. v. Sonitrol Corporation, District Court,
Adams County, State of Colorado, Civil action No. 03-CV-3836, consolidated for trial with 04-
CV-1978 and 04-CV-3725 ("the underlying lawsuits"). Thereafter, we learned of the results of
motions practice and an appeal that remanded the lawsuits to the District Court to conduct a trial
on the remaining issues of willful and wanton breach of contract and willful and wanton breach
of the duties of good faith and fair dealing. We issued a July 29, 2010, pre-trial reservation of
rights letter which addressed the pending trial issues as we understood them and we refer you to
the full contents of that letter as well.

[00014169.1]

Sean Patton
Tyco International
February 17, 2011
Page 2

We would like you to know that we appreciate and value you as a customer; however, we must
inform you that there is no coverage under the National Union policy captioned above for the
jury verdicts and awards, as more fully discussed below.  After you have reviewed the letter, if
there is additional information you would like us to consider please forward me same.   Also, if
you have any questions about the letter, please contact me.

In considering the coverage issues, we have reviewed the insurance policy referenced above and
the  information referenced below.  No other policies were considered.  If you assert a right to
coverage under another policy issued by any member company of Chartis, Inc., please submit
notice pursuant to the notice provisions contained in that policy.

## THE JURY VERDICTS AND AWARDS IN THE UNDERLYING LAWSUITS

Since the pre-trial reservation of rights letter we understand the underlying lawsuits went to trial
before a jury in the District Court of Adams County, Colorado.  We have obtained and reviewed
the trial transcripts and summarize some of the information revealed therein for the purposes of
this letter. Please refer to the transcripts for complete detail.

The trial transcripts evidence this matter went to trial and a jury verdict on the claims that
Sonitrol willfully and wantonly breached its contract and the duties of good faith and fair
dealing.  The transcripts show the introduction of evidence on the issues of intentional acts by
Sonitrol from the system installation to the monitoring of the event at issue, surrounding
circumstances and knowledge of same by Sonitrol over that time, the duties and obligations of
Sonitrol under and pursuant to the contract, and Sonitrol's knowledge and expectation regarding
the loss and damages at issue. Sonitrol introduced evidence and offered arguments on the issues,
specifically denying that it breached its contract and duties of good faith and fair dealing, that
any breach that may be found was not "willful and wanton", and that the claimed damages
resulting from the theft and arson were not probable or reasonably foreseeable to result from a
breach by Sonitrol.

We are in receipt of the typed jury instructions submitted to the Court, and the trial transcript
wherein the Judge instructed the jury.  They are consistent but please refer to the complete jury
instruction document for its details.  The Judge, among other things, instructed the jury that in
order to hold in favor of the plaintiffs they had to find that Sonitrol breached its contract and its
duties of good faith and fair dealing, and that any breach was "by willful and wanton conduct".
The Judge further instructed that "[w]illful and wanton means an act or omission purposefully
committed by a person, who must have realized that the conduct was dangerous and which
conduct was done heedlessly and recklessly, either without regard to the consequences or
without regard to the rights and safety to others, particularly, the Plaintiffs." The Judge also
instructed the jury to award only damages that were proven and which "were the natural and
probable consequence of the Defendant's breach of contract, and the Defendant's [sic] reasonably
could have foreseen, at the time that the parties entered into the contract, that the damages would
probably occur if it breached the contract."

{00014169.1 }

Sean Patton
Tyco International
February 17, 2011
Page 3

We are in receipt of two Special Verdict Forms. These forms differ in their subjects with Form 1 pertaining to the breach of contract claim and Form 2 pertaining to the breach of the duties of good faith and fair dealing claim. The jury completed Part A of Special Verdict Forms 1 and 2, finding against Sonitrol and in favor of the plaintiffs. The jury found that Sonitrol breached its contract with, and duties of good faith and fair dealing towards, Core-Mark Midcontinent, Inc./Core-Mark International, Inc. "by willful and wanton conduct". The jury awarded plaintiffs damages in the same combined amount of $18,314,509 on each form.

## POLICY INFORMATION

National Union issued Commercial Umbrella Policy No. BE 2195412 to Tyco for the effective period October 1, 2002 through October 1, 2003 (the "National Union Policy"). **Attached to this letter as Exhibit 1 are the relevant policy provisions for convenient review.** Kindly refer to the National Union Policy for the complete terms and conditions.

## COVERAGE ANALYSIS

As an initial matter, the National Union Policy is a commercial umbrella liability policy that applies in excess of the Retained Limit, as defined by the National Union Policy and set forth in Exhibit 1. We currently have no information that the Retained Limit has been exhausted. Therefore, the National Union Policy would not respond to the verdicts in the underlying lawsuits at this time. If you have information evidencing that the Retained Limit has been exhausted, please provide us immediately with such information.

Notwithstanding the foregoing, we take this opportunity to advise you that the National Union policy does not provide coverage for the verdicts and awards in the underlying lawsuits.

We first repeat that the National Union Policy potentially provides coverage only to an **Insured**. As defined in the Policy, the term **Insured** includes, in relevant part, any company that is a subsidiary of, or owned and controlled by, Tyco, as of the effective date of the Policy. It is our understanding that Sonitrol was a wholly owned subsidiary of Tyco at that time. To the extent that Sonitrol was a wholly owned subsidiary of Tyco as required in the National Union policy, it would qualify as an **Insured** under the Policy. We requested advice from you to see if our understanding of the facts is incorrect but have not received any response. If Sonitrol was not an **Insured** as required in the policy there would be no coverage.

Assuming that Sonitrol qualifies as an **Insured** under the National Union Policy, for coverage to potentially apply, the jury verdict in underlying lawsuits must have awarded damages because of **Bodily Injury, Property Damage, Personal Injury** or **Advertising Injury** taking place during the Policy Period and caused by an **Occurrence**, as those terms are defined in the National Union Policy. Based upon our review, the verdicts in the underlying lawsuits do not impose liability for damages because of **Bodily Injury, Personal Injury** or **Advertising Injury** caused by an **Occurrence**, as those terms are defined under the National Union Policy. Therefore,

Sean Patton
Tyco International
February 17, 2011
Page 4


neither **Bodily Injury**, **Personal Injury** nor **Advertising Injury** coverage are implicated under the National Union Policy with respect to the underlying lawsuits.

With respect to **Property Damage**, the term **Occurrence** means an accident, including continuous or repeated exposure to conditions, which results in **Property Damage** neither expected nor intended from the standpoint of the **Insured**. The verdicts in the underlying lawsuits found Sonitrol willfully and wantonly breached its contract and duties of good faith and fair dealing through intentional conduct, knowing that its conduct was dangerous and disregarding the rights and safety of the plaintiff, that the damage to the plaintiff's property was the natural and probable result of its breaches, and that at the time of contracting these damages were reasonably foreseeable to Sonitrol. The verdicts in the underlying lawsuits did not award damages for **Property Damage** caused by an **Occurrence**, as that term is defined in the National Union Policy, and more specifically those verdicts awarded damages for **Property Damage** that was expected or intended from the standpoint of Sonitrol. National Union has no coverage obligation under the National Union Policy with respect to these verdicts and denies coverage accordingly.

In addition to the foregoing, even if covered injury or damages were alleged, an exclusion in the National Union Policy also applies to preclude coverage for the verdicts in the underlying lawsuits. In particular, we direct your attention to Exclusion O of the National Union Policy, which precludes coverage for **Property Damage** that is expected or intended from the standpoint of the **Insured**. Again, the jury found that Sonitrol expected the **Property Damage** and the damages awarded to the plaintiffs. Accordingly, National Union reserves rights to assert that Exclusion O precludes coverage.

The National Union Policy defines **Property Damage** to mean (1) physical injury to tangible property, including all resulting loss of use of that property, and all such loss of use shall be deemed to occur at the time of the physical injury that caused it, or (2) loss of use of tangible property that is not physically injured. All such loss shall be deemed to occur at the time of the **Occurrence** that caused it. The jury awarded gross sums as damages to each plaintiff, which may include damages that do not qualify as damages because of **Property Damage**. If or to the extent that the jury awarded damages that were not damages because of **Property Damage**, as that term is defined in the National Union Policy, National Union has no coverage obligation and reserves the right to deny coverage for any such amounts.

Finally, we repeat that even if National Union had an obligation with respect to the verdicts in the underlying lawsuits it would be affected by the availability of other insurance. Condition J of the National Union Policy provides that if other valid and collectable insurance applies to a loss that is also covered by the National Union Policy, the National Union Policy will apply excess of the other insurance. National Union continues to reserve its rights on that basis.

National Union's coverage position is based on the information presently available to us. This letter is not, and should not be construed as, a waiver of any terms, conditions, exclusions, or other provisions of the National Union Policy, or any other policies of insurance issued by

Sean Patton
Tyco International
February 17, 2011
Page 5


Chartis Inc., or any of its affiliates. National Union expressly reserves all of its rights under the National Union Policy, including the right to assert additional defenses to any claims for coverage.

Should you have any additional information that you feel would either cause us to review our position or would assist us in our investigation or determination, we ask that you advise us as soon as possible.

*If our final coverage determination is unacceptable to you, Chartis provides an internal appeals process which is available for review of the decision to which you object. Upon receipt of your appeal, a panel of at least three employees of Chartis who have had no involvement with the handling of your claim will review the disputed claim decision. Within 10 business days after receipt of your appeal, the internal appeals panel will make its decision. The decision of the internal appeals panel will then be communicated to you within three additional business days. If you find it necessary to seek an internal appeal, please notify Chartis' Internal Appeals Administrator in writing by mail, electronic mail, facsimile, delivery service, or via phone by contacting:*

<div align="center">

**New Jersey Appeals Administrator**
**American International Companies**
**180 Maiden Lane, 29th floor**
**New York, NY 10270**
**Phone – (212) 458-9180**
**Fax – (866) 810-3842**
**njappealsadmin@aig.com**

</div>

In closing, allow me to reiterate that we value you as a customer and encourage you to contact us should you have any questions or concerns regarding the contents of this letter. Thank you for your cooperation in this matter.

Sincerely,

Jeffrey C. Mickletz
Complex Director

cc:     Stan Sexton, Esq.
        Shook, Hardy & Bacon
        **Via e-mail: jsexton@shb.com**


{00014169.1 }

Sean Patton
Tyco International
February 17, 2011
Page 6


Brian Levy
Marsh
1166 Avenue of the Americas
New York, NY 10036
**Via e-mail: bryan.levy@marsh.com**

Richard Huckstadt
Marsh
**Via e-mail: Richard.huckstadt@marsh.com**

{00014169.1 }

## EXHIBIT 1 – RELEVANT POLICY PROVISIONS

**Insuring Agreements**

**I.      Coverage**

We will pay on behalf of the **Insured** those sums in excess of the Retained Limit that the **Insured** becomes legally obligated to pay by reason of liability imposed by law or assumed by the **Insured** under an **Insured Contract** because of **Bodily Injury, Property Damage, Personal Injury** or **Advertising Injury** that takes place during the Policy Period and is caused by an **Occurrence** happening anywhere in the world.   The amount we will pay for damages is limited as described in Insuring Agreement III, Limits of Insurance.

If we are prevented by law or statute from paying on behalf of the **Insured**, then we will, where permitted by law or statute, indemnify the **Insured** for those sums in excess of the Retained Limit.

**II.     Defense[1]**

**A.**      We shall have the right and duty to defend any claim or suit seeking damages covered by the terms and conditions of this policy when the applicable Limits shown in the Schedule of Related Limits have been exhausted by payment of claims to which this policy applies.

\*          \*          \*

**III.    Limits of Insurance**

\*          \*          \*

**E.[2]**     Retained Limit

We will be liable only for that portion of damages in excess of the Limits stated in the Schedule of Retained Limits attached to this policy and then up to the amount not exceeding the Each Occurrence Limits as stated in the Declarations.   The Retained Limits shown in the attached

---

[1] As modified by Endorsement No. 6, entitled "Retained Limit Amendment Endorsement."

[2] As modified by Endorsement No. 6, entitled "Retained Limit Amendment Endorsement."

{00614169.1 }

Schedule shall apply whether or not the Insured maintains applicable underlying insurance.

Coverage is limited to apply only in excess of the Retained Limits shown in the attached Schedule and only for those coverages for which a Retained Limit is shown, these Retained limits shall not include "Defense Expenses."

The National Union Policy contains the following Definitions:

IV.   **Definitions**

A.   **Advertising Injury** means injury arising solely out of your advertising activities as a result of one or more of the following offenses:

1.   Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

2.   Oral or written publication of material that violates a person's right of privacy;

3.   Misappropriation of advertising ideas or style of doing business; or

4.   Infringement of copyright, title or slogan.

\*       \*       \*

C.   **Bodily Injury** means bodily injury, sickness, disability or disease. **Bodily Injury** shall also mean mental injury, mental anguish, humiliation, shock or death if directly resulting from bodily injury, sickness, disability or disease.

\*       \*       \*

E.   **Insured** means each of the follow, to the extent set forth:

1.   The **Named Insured**, meaning:

a.   any person or organization listed in Item 1 of the Declarations, and any company that is your subsidiary as of the effective date of this policy and any company you own or control as of the effective date of this policy; and

# EXHIBIT F

EFILED Document – District Court
CO Adams County District Court 17th JD
2011cv299
Filing Date: Mar  1 2011  4:41PM MST
Transaction ID: 36187172



Tyco International (US) Inc.
9 Roszel Road
Princeton, NJ 08540

*Tele: 609-720-4200*
*Fax: 609-720-4208*

*Dennis P. Lynch*
*Vice President*
*Chief Litigation Counsel*

February 18, 2011

**VIA ELECTRONIC MAIL**
**(Jeffrey.Mickletz@chartisinsurance.com)**
**and U.S. MAIL**
Mr. Jeffrey C. Mickletz
Complex Director
Chartis
175 Water Street, 21st Floor
New York, NY 10038

Re: <u>Core-Mark Midcontinent, Inc. v. Sonitrol Management Corp, et al.</u>

Dear Mr. Mickletz:

We write in response to your letter to Sean Patton, dated February 17, 2011, denying coverage for the referenced lawsuits under commercial umbrella policy no. BE 2195412 issued by National Union Fire Insurance Co. of Pittsburgh, Pa. ("National Union") to Tyco for the period October 1, 2002 to October 1, 2003. We understand your letter to be written on behalf of Chartis Claims, Inc. ("Chartis"), the claims administrator for National Union. We have evaluated Chartis' stated grounds for its coverage denial and reservation of rights, as well as the policy language and the relevant law. Our conclusion is that Chartis' position is mistaken and that coverage is available under the policy.

As an initial matter, there is no question that Sonitrol was a subsidiary of Tyco as of the policy's effective date and on December 21, 2002, the date of the loss at issue, and that it qualifies as an "Insured" under the policy. Nor is there any doubt that the underlying lawsuits sought "Property Damage" as that term is defined in the policy; indeed, the warehouse leased by the underlying plaintiffs and its contents were completely destroyed in a fire set by one of the burglars. Moreover, the judgment on the verdict entered against Sonitrol totals approximately $33 million, including interest, which will exhaust the "Retained Limit" and implicate the National Union policy.

The principal basis for Chartis' position is that because the jury found "willful and wanton" conduct by Sonitrol in breach of contract and the duties of good faith and fair dealing, there is no coverage under the policy.  As grounds for this position, Chartis cites the "Occurrence" definition.  It states that the term "Occurrence" means, with respect to "Property Damage," "an accident, including continuous or repeated exposure to conditions, which results in ... Property Damage neither expected nor intended from the standpoint of the Insured."  Chartis adds that Exclusion O precludes coverage for "Property Damage expected or intended from the standpoint of the Insured," and asserts this exclusion as grounds for a reservation of rights.  According to Chartis, the verdicts in the underlying lawsuits did not award damages for "Property Damage" caused by an "Occurrence," as defined in the National Union policy, because those verdicts awarded damages for "Property Damage" that was expected or intended from the standpoint of Sonitrol.

Chartis' position is incorrect.  The jury did not award damages based on any finding that property damage was expected or intended from the standpoint of Sonitrol.  Chartis mistakenly conflates the concept of "willful and wanton" conduct with the express policy language, which requires that damage be "expected or intended from the standpoint of the Insured" in order to bar coverage.  Willful and wanton conduct involves the act that caused the damage while the policy's expected or intended language centers on the policyholder's subjective knowledge about the resulting damage.  Under this subjective standard, coverage may be denied only if the policyholder expected or intended the specific resulting damage.  Thus, before concluding that the policyholder intended to cause a specific resulting injury, it must be shown that the policyholder actually knew that its actions would result in the damage in question.

There has been no such finding in this case.  A determination that Sonitrol breached its contract with Core-Mark or duties of good faith and fair dealing by willful and wanton conduct is not a finding that Sonitrol actually knew (i.e., expected or intended from the standpoint of the Insured) that its actions would result in the damages claimed by the plaintiffs.  This is amply supported by case authority.

A majority of jurisdictions examining the expected/intended issue, including those relevant to this analysis, have adopted the subjective standard.  These courts focus on whether the policyholder actually intended the specific resultant damage, not on whether the policyholder intended the act that caused the damage.  *See City of Johnstown v. Bankers Standard Ins. Co.*, 877 F.2d 1146 (2d Cir. 1989) (applying New York law).  There, the Second Circuit held that "recovery will be barred only if the insured intended the damages or if it can be said that the damages were, in a broader sense, 'intended' by the insured because the insured knew that the damages would flow directly and immediately from its intentional act." *Id.* at 1147.  Similarly, New York state's highest court, the Court of Appeals, in interpreting the meaning of "occurrence" under a definition substantially identical to the standard CGL clause, has stated: "For an occurrence to be covered under the . . . policies [at issue], the injury must be unexpected and unintentional.  We have read such policy terms narrowly, barring recovery only when

the insured intended the damages. Resulting damage can be unintended even though the act leading to the damage was intentional." *Cont'l Cas. Co. v. Rapid-Am. Corp.*, 609 N.E.2d 506, 510 (N.Y. 1993). The Court of Appeals cited *City of Johnstown* in support. *Id.*

The law in Colorado and New Jersey is substantially the same. In *Hecla Mining Co. v. New Hampshire Insurance Co.*, 811 P.2d 1083 (Colo. 1991), the Colorado Supreme Court, following *City of Johnstown,* held that "the phrase 'neither expected nor intended' should be read only to exclude those damages that the insured knew would flow directly and immediately from its intentional act." *Id.* at 1088. Similarly, the New Jersey Supreme Court has held that "the accidental nature of an occurrence is determined by analyzing whether the alleged wrongdoer intended or expected to cause an injury. If not, then the resulting injury is 'accidental,' even if the act that caused the injury was intentional." *Voorhees v. Preferred Mut. Ins. Co.*, 607 A.2d 1255, 1264 (N.J. 1992).

Chartis' position appears to be that because Sonitrol's conduct was willful or wanton, it must have expected or intended the plaintiffs' damages. That view is completely at odds with the policy language and case law referenced above. To the extent Chartis maintains that coverage should be denied because the damage was a reasonably foreseeable consequence of Sonitrol's willful or wanton conduct, such an argument also has been rejected. Courts have noted that foreseeability is based on tort and criminal law concepts that are inappropriate to apply in the insurance coverage context. *See City of Johnstown*, 877 F.2d at 1150. To apply a foreseeability test would conflict with the terms of general liability insurance policies prohibiting coverage for damage that is "intended" or "expected," not "foreseeable."

We request that Chartis consider the information in this letter, reevaluate its position and acknowledge the availability of coverage in this matter.

Sincerely,

Dennis P. Lynch
Vice President and
Chief Litigation Counsel

cc:    Sean Patton

114716v1 NewYork 014539